# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 17, 2021 Session

## JESSIE DOTSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-07688          James C. Beasley, Jr., Special Judge**

———————————————————————

## No. W2019-01059-CCA-R3-PD

———————————————————————

The Petitioner, Jessie Dotson, appeals the post-conviction court's denial of his post-conviction petition, in which he challenged his six convictions for first degree premeditated murder and three convictions for attempted first degree murder and his resulting sentences of death for each of the first degree murder convictions plus 120 years. On appeal, the Petitioner contends that (1) he received ineffective assistance of counsel at trial and on appeal; (2) the Administrative Office of the Courts ("AOC") and the Chief Justice of the Tennessee Supreme Court improperly vacated the post-conviction court's orders granting the Petitioner's request for funding of experts; (3) the convictions and death sentences were the result of juror misconduct; (4) the State and the trial court committed various errors; (5) the Petitioner's convictions and death sentences and Tennessee's execution method are unconstitutional; and (6) cumulative error warrants relief. Upon reviewing the record, the parties' briefs and oral arguments, and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Justyna Scalpone, Post-Conviction Defender; and Andrew L. Harris (at hearing and on appeal), Kelly Gleason (at hearing), and Christopher M. Minton (on appeal), Assistant Post-Conviction Defenders, for the appellant, Jessie Dotson.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Courtney N. Orr, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephen Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

In March of 2008, the Petitioner shot and killed his brother, Mr. Cecil Dotson, Sr.; his brother's fiancé, Ms. Marissa Williams; his brother's friend, Mr. Hollis Seals; and Mr. Seals's girlfriend, Ms. Shindri Roberson, while at his brother's home. The Petitioner then attacked his brother's five children with kitchen knives and wooden boards. Mr. Cecil Dotson's four-year-old son, Cemario, and two-year-old son, Cecil II, died as the result of injuries sustained from the attack. His nine-year-old son, C.J., five-year-old son, Cedrick, and two-month-old daughter, Ceniyah, survived the attack.[1]

A jury convicted the Petitioner of six counts of premeditated first degree murder and three counts of attempted first-degree murder. The jury sentenced the Petitioner to death for each of the first degree murder convictions. Following a separate sentencing hearing, the trial court sentenced the Petitioner as a Range II, multiple offender to forty years for each conviction of attempted first degree murder to be served consecutively to each other and to the death sentences. The Tennessee Supreme Court affirmed the Petitioner's convictions and sentences on direct appeal. *See State v. Dotson*, 450 S.W.3d 1, 11-12 (Tenn. 2014).

The Petitioner timely filed a pro se petition for post-conviction relief. The Office of the Post-Conviction Defender ("OPCD") was appointed to represent the Petitioner and filed an amended petition. Following an evidentiary hearing, the post-conviction court issued a lengthy written order denying relief. This appeal ensued.

### Trial Proceedings

We summarize the evidence presented at trial as it relates to the issues raised in the post-conviction proceedings.

---

[1] Consistent with the Tennessee Supreme Court's opinion on direct appeal, we use given names and abbreviated forms of given names when referring to the child victims. *See State v. Dotson*, 450 S.W.3d 1, 12 n.2 (Tenn. 2014). The Court noted that the use of the child victims' given names did not compromise their privacy because the record reflected that the surviving children's surnames were changed following the commission of the crimes. *Id.*

## A. Guilt Phase

### 1. *Discovery of the Victims*

Following the Petitioner's release from prison in August 2007, he began living with his sister, Ms. Nicole Dotson, at her apartment in Memphis, while working with his father, Mr. Jessie Dotson Sr., as a painter. *Id.* at 12. The Petitioner's family referred to him as "Junior." *Id.* Ms. Nicole Dotson testified that the Petitioner held a "grudge" against his family for failing to visit him more often while he was in jail and that the Petitioner expressed his feelings to her on a daily basis. *Id.* at 29. She stated that she was too frightened of the Petitioner to ask him to move out of her apartment. *Id.* The Petitioner's father testified that the Petitioner and Mr. Cecil Dotson had a normal relationship but that it bothered the Petitioner whenever Mr. Cecil Dotson told others that the Petitioner had recently been released from jail. *Id.* at 30.

On Saturday, March 1, 2008, the Petitioner, his father, and his half-brother, Mr. William Waddell, went to Mr. Cecil Dotson's Memphis home, which he shared with Ms. Williams and his children. *Id.* at 12. The Petitioner's father recalled seeing a "powder blue" revolver, which was the type of firearm that did not eject shell casings, on the counter at the home. *Id.* at 30. Mr. Cecil Dotson moved the gun, commenting that the children might mistake it for a toy, and told the Petitioner that he had moved the gun. *Id.* Mr. Waddell stated that the Petitioner had a black and silver gun that evening, instead of the blue revolver that he ordinarily carried. *Id.* at 31. The Petitioner's father left during the early evening, and Mr. Waddell left at 10:30 or 11:00 p.m. *Id.* at 12.

At 10:00 or 10:30 p.m., the Petitioner and Mr. Cecil Dotson went to the home of Ms. Sheila Jones, the Petitioner's girlfriend, but left upon learning that Ms. Jones was not there. *Id.* at 26. Ms. Keaira Jones, Ms. Sheila Jones's daughter, testified that both the Petitioner and Mr. Cecil Dotson appeared intoxicated. *Id.* Between 10:30 and 11:30 p.m., the Petitioner, Mr. Cecil Dotson, and Mr. Seals went to the apartment of Mr. Willie Boyd Hill, Jr. *Id.* at 27. Mr. Hill, Mr. Seals, and Mr. Cecil Dotson were members of the Gangster Disciples, while the Petitioner was a member of the Crips gang. *Id.* Mr. Seals had recently been released from jail and came to retrieve a pistol he had left with Mr. Hill. *Id.* Mr. Seals retrieved a P-232 Sig Sauer, .380-caliber handgun, which could hold up to eight rounds, consisting of seven-rounds in the magazine and a single round in the chamber. *Id.* Mr. Seals took the loaded gun and left with the Petitioner and Mr. Cecil Dotson. *Id.*

At around midnight on March 2, 2008, Mr. Cecil Dotson, the Petitioner, and Mr. Seals went to the home of Ms. Stacey Young, a friend of Mr. Cecil Dotson. *Id.* at 29. Mr. Cecil Dotson told her that he would return after dropping off Mr. Seals and the

Petitioner, but Mr. Cecil Dotson never returned. *Id.* At approximately 12:30 a.m., Mr. Cecil Dotson, the Petitioner, and Mr. Seals went to the apartment of Ms. Erika Smith, Cecil II's mother, and Mr. Cecil Dotson spoke to her in the parking lot. *Id.* After the men left, Ms. Smith called Mr. Cecil Dotson multiple times. *Id.* During the last call at approximately 2:00 a.m., Ms. Smith overheard Mr. Cecil Dotson and the Petitioner arguing and using profanity. *Id.*

Between 3:00 a.m. and 4:30 a.m., the Petitioner returned to the home of Ms. Sheila Jones and Ms. Keaira Jones. *Id.* at 26. Ms. Keaira Jones allowed the Petitioner to enter the apartment, and she returned to her bedroom. *Id.* Approximately five minutes later, the Petitioner knocked on her bedroom door and asked to talk to her. *Id.* She was putting her son to sleep and told the Petitioner that she would speak to him shortly. *Id.* She heard water running in the bathroom and fell asleep without speaking to the Petitioner. *Id.* Ms. Sheila Jones returned home at approximately 5:00 a.m. and found the Petitioner lying in her bed. *Id.* at 27. They went to sleep and got up at 10:30 or 11:00 a.m., and she drove the Petitioner to Ms. Nicole Dotson's apartment. *Id.* After the Petitioner and Ms. Sheila Jones left, Ms. Keaira Jones noticed bleach spots on the brown rug in the bathroom. *Id.* at 26. A bottle of Clorox bleach was in the hallway and was not stored in its usual place. *Id.*

The Petitioner's father arrived at Ms. Nicole Dotson's apartment the next morning to pick the Petitioner up for work, but the Petitioner was not there. *Id.* at 12. His father instructed Ms. Nicole Dotson to tell the Petitioner to contact him if he wanted to keep his job. *Id.* Later that evening, the Petitioner called his father and explained that he had not called earlier because his girlfriend had hidden his cell phone during an argument. *Id.* He did not explain why he missed work. *Id.* The Petitioner and Mr. Waddell went to dinner that evening, and the Petitioner asked Mr. Waddell if he wanted to pick up Mr. Cecil Dotson. *Id.* at 12-13. Because Mr. Waddell had been unable to reach Mr. Cecil Dotson via telephone numerous times throughout the day, they did not go by Mr. Cecil Dotson's home. *Id.* at 13.

Ms. Smith had not spoken to Mr. Cecil Dotson since the early morning hours of March 2nd, and no one had come to the door of his home when she knocked that afternoon. *Id.* Although the door was partially open and the radio was playing, Ms. Smith did not see anyone or hear the children. *Id.* On the morning of March 3rd, Ms. Smith learned that Mr. Cecil Dotson had not shown up for work and that family members had not heard from him. *Id.* She was unable to reach him by telephone and called the police. *Id.*

Officer Randall Davis, the first officer to arrive, could "'smell the dead bodies'" as he walked into the front door. *Id.* A firefighter, who arrived later, confirmed that when

he approached the house, he "'could smell the blood in the air'" and described it as "'[a] thick, spoiled smell like it had been there a while.'"  *Id.*  Officer Davis noted that the storm door was closed and that the interior door was partially open, and he saw a person's foot lying on the floor inside.  *Id.*  Upon entering the house, he discovered the four adult victims, all of whom appeared to have sustained multiple gunshot wounds and were deceased.  *Id.*  A paramedic later confirmed that the adult victims were deceased and noted that the blood on the victims appeared to have dried.  *Id.* at 14.

Officer Davis and other officers continued to search the house.  *Id.* at 13.  There was blood throughout the house, but none of it appeared to be fresh.  *Id.*  Officer Davis discovered C.J. in the bathtub of the hallway bathroom with a knife embedded in his head.  *Id.*  Initially, Officer Davis believed C.J. was deceased but then noticed C.J.'s eyes twitch.  *Id.*  A firefighter who attended to C.J. and transported him to an ambulance saw cuts on C.J.'s face and a "sawzall blade" sticking out of the top of his head.  *Id.* at 14.  The bathroom was "'a mess,'" with "'blood everywhere.'"  *Id.*  An emergency medical technician ("EMT") testified that upon entering the bathroom, C.J. "'turned his head and the next thing we saw was one of the most horrible things I've seen, it was a knife stuck embedded in his skull and it was just stuck there.  And it absolutely is the worst thing I've ever seen in my life.'"  *Id.*  The EMT noted puncture wounds on C.J.'s abdomen and superficial cuts to his neck.  *Id.*

Officer Davis discovered Cemario, who was deceased, in a bedroom on the left side of the hallway ("bedroom two").  *Id.* at 13.  He discovered Cecil II and Cedrick, both of whom he believed were deceased, in another bedroom ("bedroom one").  *Id.*  Emergency medical personnel determined that Cedrick was still alive and transported him in an ambulance.  *Id.* at 14.  Another officer discovered Ceniyah, who was still alive, and removed her from the home.  *Id.* at 13.

### 2. Crime Scene Evidence

Sergeant Anthony Mullins of the Memphis Police Department's Homicide Bureau, who was accepted by the trial court as an expert in general crime scene investigation and bloodstain pattern analysis, testified regarding his observations of the crime scene and the collection of evidence by the crime scene processing team.  *Id.* at 15.  He described the crime scene as horrific and said it was the worst he had ever worked.  *Id.*  The adult victims sustained multiple gunshot wounds, and all of the adult victims except Mr. Seals sustained at least one gunshot wound to the leg.  *Id.*  A nine-millimeter firearm and a .380 caliber firearm were used in the shooting, but neither firearm was located at the scene.  *Id.*  Officers recovered spent bullets throughout the living room and two nine-millimeter and three .380 caliber spent cartridge casings on the living room floor.  *Id.*  A sealed Ziploc bag containing eleven nine-millimeter and five .380 caliber spent cartridge casings

was located underneath a jacket on the love seat, and Sergeant Mullins concluded that the perpetrator or perpetrators collected the shell casings after the shootings in order to remove them from the scene. *Id.*

Special Agent Cervinia Braswell, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), analyzed the eight .380 caliber cartridge casings and the thirteen nine-millimeter cartridge casings. *Id.* at 37. She concluded that all of the .380 caliber casings were fired from the same gun and that all of the nine-millimeter casings were fired from the same nine-millimeter firearm. *Id.* She noted that a .380 caliber firearm typically holds eight rounds, with seven rounds in the magazine and one round in the gun, and that a nine-millimeter firearm typically told thirteen rounds, with twelve rounds in the magazine and one round in the gun. *Id.* She testified that a single person could have fired all thirteen rounds from the nine-millimeter firearm and all eight rounds from the .380 caliber firearm within a short period of time. *Id.*

Mr. Cecil Dotson sustained several gunshot wounds, including multiple wounds to the front of his body and to his lower legs and one wound to his neck and to the bottom of his foot. *Id.* at 15. A different gun was used to shoot his legs than the gun used to shoot his neck. *Id.* Sergeant Mullins believed several of the wounds were inflicted close in time to or after Mr. Cecil Dotson's death. *Id.* Officers collected fibers from Mr. Cecil Dotson's chin and mouth that were consistent with a pillow having been placed over his face when he was shot, and officers collected a pillow in the living room through which a bullet had passed. *Id.* Mr. Cecil Dotson was in a kneeling position in front of the sofa with his torso on a sofa cushion and a bag of marijuana in his left hand. *Id.* Sergeant Mullins believed Mr. Cecil Dotson's body had been staged after the shooting. *Id.* at 16. He explained that Mr. Cecil Dotson would not have sustained the gunshot wounds to the front of his body while in the position in which he was discovered, and he likely would have been facing the shooter when the first shot was fired. *Id.* Sergeant Mullins further explained that the bag of marijuana was too large for Mr. Cecil Dotson to close his fingers around and that he would have dropped it had he been holding it during the shooting. *Id.*

Ms. Roberson was "in a seated position on the floor, with her back to the sofa, her legs extended, and her head to the side, between the sofa and the loveseat. Her shirt was pulled up, exposing her breasts, and her pants were pulled down, exposing her lower body from her waist to her knees." *Id.* Sergeant Mullins noted little blood on the floor beneath her body and stated that thick coagulated blood on a nearby sofa cushion was consistent with the type of blood loss from a gunshot wound similar to a wound sustained to Ms. Roberson's leg. *Id.* Sergeant Mullins believed Ms. Roberson had been pulled from the sofa to the floor near the time of or after her death. *Id.* Her pants were "saturated with blood, and bullet holes in her pants corresponded to the location of the

gunshot wounds to her legs, indicating that her pants were covering her legs when she was shot and were pulled down afterwards." *Id.* A clear plastic bag containing what appeared to be crack cocaine was found on the outer portion of her vagina, and Sergeant Mullins noted that the bag appeared to have been placed on her body. *Id.*

Ms. Williams was slumped over onto Ms. Roberson on the floor with her legs across Ms. Roberson's legs. *Id.* Sergeant Mullins noted that the carpet was stained with blood on the side opposite the direction in which Ms. Williams was leaning. *Id.* at 17. He stated that based upon the position of Ms. Williams's legs across Ms. Roberson's legs, Ms. Williams's body was staged after Ms. Roberson was positioned on the floor. *Id.*

Mr. Seals was located across the front door and near a door connecting the kitchen and the living room, and his pants were pulled below his knees. *Id.* Sergeant Mullins noted a pool of blood on the carpet near Mr. Seals's body with a "void" area where the carpet was not bloodstained. *Id.* He stated that the "void" indicated that unstained area was covered when the blood pool was formed and that the carpet was stained with blood on the opposite side of Mr. Seals's body. *Id.* "Based on the bloodstains, the distance between them, and the location of Mr. Seals's legs one atop [of] the other, Sergeant Mullins believed that Mr. Seals's body may have originally been lying in the area of the 'void' and may have been rolled from that area when his pants were pulled down and his wallet removed." *Id.*

Officers located a loaded twelve-gauge sawed-off shotgun on a stack of clothing in the living room, a little more than an arm's length away from Mr. Cecil Dotson, and officers found additional live rounds of shotgun ammunition under the sofa. *Id.* at 16. Blood was found on the end of the shotgun barrel, and Ceniyah was a minor contributor to the DNA from the blood. *Id.* Sergeant Mullins testified that the gun was positioned on the clothing after the shooting because no blood spatter was on the clothing beneath the gun and the victim to whom the blood belonged was found in another area of the home. *Id.*

Sergeant Mullins testified that the sharp force and blunt force injuries sustained by the children "were inflicted with kitchen knives and wooden boards the perpetrator found in the home." *Id.* at 17. Officers located five knife blades throughout the home, one of which was lodged into C.J.'s head. *Id.* The word, "Faberware," a brand of kitchen knives, was on one of the blades. *Id.* Officers located an intact knife handle and what appeared to be broken pieces of another knife handle, and "Sergeant Mullins believed the perpetrator removed the knife handles from the blades after the assaults." *Id*. A silverware tray was overturned on the kitchen floor. *Id.* Officers also located bloodstained and broken pieces of wood throughout the house. *Id.* Sergeant Mullins

stated that "the perpetrator's use of guns, knives, and boards already present in the home demonstrated the perpetrator's familiarity with the home." *Id.*

Sergeant Mullins offered extensive testimony regarding the large amount of blood spatter throughout the home. *Id.* at 17-19. He stated that "the large amount of blood spatter found in the bathroom and bedrooms one and two was consistent with a prolonged 'one-on-one struggle' rather than a more rapid execution of the children." *Id.* at 17. He identified numerous areas of cast-off spatter throughout the bathroom, indicating multiple blows with either a wooden board or a knife. *Id.* at 18. He noted dripped blood caused by an actively bleeding victim on the toilet tank and down the toilet bowl. *Id.* He also identified a bloody partial palm print on the tile wall as a transfer stain, and the print was later matched to Cemario. *Id.* at 17-18. Sergeant Mullins believed more than one victim was assaulted in the bathroom based on the dripped blood and Cemario's bloody palm print. *Id.* at 18. Officers recovered three green beads similar to the beads found in Cecil II's hair, which Sergeant Mullins testified could have fallen out during an attack of Cecil II in the bathroom. *Id.*

Cemario was discovered in bedroom one face down on the floor in a pool of blood. *Id.* Officers discovered two wooden boards and broken pieces of braided hair on the floor, which Sergeant Mullins said would have broken off as a result of a forceful blow to Cemario's head. *Id.* at 18-19. Based on the broken braids and the pool of blood beneath Cemario's head, Sergeant Mullins believed Cemario suffered a fatal blow while lying on the floor of bedroom one. *Id.* at 19. Sergeant Mullins believed Cemario also was assaulted in the bathroom, explaining "'[t]he level of violence delivered to [Cemario] couldn't have happened in [bedroom one] without some additional blood evidence. So there has to be some movement after the fact.'" *Id.*

Cecil II and Cedrick were found in bedroom two. *Id.* Sergeant Mullins testified regarding the blood spatter in bedroom two, which he stated indicated that multiple blows were delivered in the room. *Id.* More green hair beads like those in Cecil II's hair were on the floor beneath the bed. *Id.* Officers discovered a knife blade bent into an "S" shape with blood on it inside a pillowcase, and Sergeant Mullins believed the blade was bent when the handle was removed. *Id.* Officers found a second knife blade between the mattress and the wall and a bloodstained wooden board inside the room. *Id.* Sergeant Mullins testified that a perpetrator could have prevented the children from escaping by standing in the doorway of the living room because the children would have been required to travel through the living room to reach an exterior door. *Id.*

Sergeant Mullins believed the perpetrator spent a considerable amount of time staging the crime scene following the murders. *Id.* He stated that the perpetrator was familiar with the home and comfortable enough to remain in the home to alter the scene.

*Id.* at 20. He noted that "knowledge of gangs and drug activity would have been useful in staging the crime scene." *Id.* Based on his experience, he did not believe gang members would have gone to the scene unarmed, used weapons found in the home to commit the offenses, and then remained inside the home following the murders. *Id.* He was "unaware of any gang-related homicides in which women were murdered and children were assaulted and killed with knives and boards." *Id.*

Blood samples taken from the scene were sent to the TBI for analysis. *Id.* at 36. Each of the samples matched one of the victims, but none of the samples matched the Petitioner. *Id.* The Petitioner's DNA was not on any of the other items from the crime scene that were collected and analyzed. *Id.* at 37.

### 3. The Petitioner's Initial Statements and the Investigation into Whether the Offenses Were Gang-Related

Ms. Nicole Dotson, along with the Petitioner and their cousin, Ms. Tammy Randolph, went to the scene on the evening of March 3rd. *Id.* at 30. Ms. Nicole Dotson testified that the Petitioner told her not to speak to the media and that they likely would blame him for the murders due to his criminal history. *Id.* When Mr. Hill and "Trell," another acquaintance, arrived at the scene, the Petitioner became angry and told his sister that he believed the two men committed the murders. *Id.*

On the following day, Sergeant James Terry Max and Sergeant Joe Stark interviewed the Petitioner, who was at that time only considered a possible witness. *Id.* at 20. The Petitioner stated that he was at Mr. Cecil Dotson's home with his family on the evening of March 1st. *Id.* The Petitioner informed the officers of the various places where he, Mr. Cecil Dotson, and Mr. Seals visited after leaving the home. *Id.* at 21. The Petitioner stated that Mr. Cecil Dotson and Mr. Seals dropped him off at his girlfriend's apartment at approximately 2:15 or 2:30 a.m., after which he did not see them again. *Id.*

The officers asked the Petitioner whether Mr. Cecil Dotson had any enemies, and the Petitioner told them about an argument between Mr. Cecil Dotson and Mr. Hill about two weeks prior to the interview. *Id.* The Petitioner stated that the argument began after Mr. Hill's girlfriend called the police from her apartment which she shared with Mr. Hill after seeing Mr. Cecil Dotson slap Ms. Smith. *Id.* When officers arrived, Mr. Cecil Dotson told them that there were drugs inside the apartment. *Id.* The Petitioner stated that Mr. Cecil Dotson and Mr. Hill were members of the Gangster Disciples and that gang members were prohibited from calling the police on other gang members. *Id.* The Petitioner stated that Mr. Hill wrote up Mr. Cecil Dotson for a violation of the rule through "Doc Holiday" and that Mr. Cecil Dotson failed to attend the meeting held by the gang to determine his guilt. *Id.* The Petitioner also stated that following the murders,

Mr. Hill called "Doc Holiday" and asked him what had occurred and who had committed the murders. *Id.* at 22.

The police had not been investigating gang members as possible suspects prior to the Petitioner's statement. *Id.* Sergeant Max subsequently spoke to Mr. Cedric Atkins, who had earlier reported hearing that Mr. Cecil Dotson had stolen $300,000 from a drug dealer. *Id.* Sergeant Max also interviewed a confidential informant, who stated that he heard Mr. Cecil Dotson had stolen $50,000 from "Doc Holiday," a member of the Gangster Disciples. *Id.*

Both Mr. Hill and Ms. Smith confirmed at trial the incident during which Mr. Hill's girlfriend called the police on Mr. Cecil Dotson, who then reported to the officers that marijuana was inside the apartment where Mr. Hill also lived. *Id.* at 27-29. Mr. Hill informed "Cato," who then informed "Doc Holiday," the "coordinator" of the Gangster Disciples over the Orange Mound area in Memphis. *Id.* at 28. Mr. Hill discussed the matter with "Doc" and "Dread," the chief of security over the area, who told Mr. Hill to issue a "write-up" or disciplinary notice to Mr. Cecil Dotson. *Id.* Possible punishments for a write-up included anything from beatings to a "death violation." *Id.* Mr. Hill explained that, generally, a death violation only applied to the individual gang member and not to everyone associated with him. *Id.* He stated that gang members could have gotten Mr. Cecil Dotson alone if they had wanted to kill him and that they would not have waited until 2:00 a.m. to do so. *Id.* Mr. Hill had never heard of gang members involving innocent women and children in the punishments. *Id.* He said that if the gang members had entered a home to kill someone, they would have been armed and would have not run out of bullets. *Id.*

Mr. Hill testified that he never issued a write-up against Mr. Cecil Dotson. *Id.* He stated that "Dread" and "Doc" were close friends with Mr. Cecil Dotson and would not have harmed him. *Id.* Mr. Hill heard that when "Cato" and "Doc" approached Mr. Cecil Dotson about a gang violation, Mr. Cecil Dotson told them to "shove it" and refused to accept the discipline. *Id.* Mr. Hill also heard that "Doc" had slept with Ms. Williams, and Mr. Hill testified that Mr. Cecil Dotson and "Doc" had a disagreement over drywall work that Mr. Cecil Dotson had completed at "Doc's" apartment. *Id.* When Mr. Hill went to the crime scene, he called "Cato" and asked if he and "Doc Holiday" were involved in the murders, and "Cato" denied any involvement. *Id.* at 27.

Prior to his death, Mr. Cecil Dotson told his and the Petitioner's father that he was worried that members of the Gangster Disciples might harm him because he was trying to leave the gang. *Id.* at 30. Mr. Cecil Dotson asked his father to move in with him because he believed gang members would not harm him if his father was living with him. *Id.* His father lived with him for about one month. *Id.* Mr. Cecil Dotson's father moved out after

family members advised him that he likely would be killed if he interfered in Mr. Cecil Dotson's situation with other gang members. *Id.*

"Members of the Gangster Disciples reportedly became angry upon learning that the gang had been implicated in the murders of women and children." *Id.* at 22. The mother of the Petitioner, Mr. Cecil Dotson, and Ms. Nicole Dotson discovered that her door had been kicked in by gang members. *Id.* The Petitioner, his mother, Ms. Nicole Dotson, and her children moved in with a cousin. *Id.* Ms. Nicole Dotson contacted the police after she received calls on her cell phone that appeared to originate from her apartment. *Id.* Officers were assigned to protect the home where the Petitioner and his family were staying. *Id.* When the marked police car arrived, the Petitioner "became agitated and 'frantic.'" *Id.* The Petitioner expressed a belief that he was the target of the police investigation and that the police were attempting to "'pin'" the offenses on him, and he said that he did not intend to go to jail for an offense he did not commit. He declared that "[t]hey should 'just bury [him] with [his] brother.'" *Id.* The Petitioner pointed a gun at his head. *Id.*

The Petitioner's cousin told the two police officers who were outside the home that the Petitioner threatened to commit suicide if the officers entered the home. *Id.* Officer Laneeze Stepney spoke to the Petitioner on a cell phone, after which the Petitioner agreed to allow the officers to enter the home. *Id.* at 22-23. The Petitioner told the officer, "'[E]verybody think[s] I did it. I've been all on the news and the police saying I did it….'" *Id.* at 23. Upon entering the house, Officer Stepney retrieved the gun from the Petitioner and attempted to calm the Petitioner, "who was acting 'real nervous like he had a lot on his mind.'" *Id.* The officers placed the Petitioner and his family in protective custody and moved them to a safe house. *Id.*

*4. The Children's Testimony and the Petitioner's Confession*

Memphis Police Department Deputy Director Toney Armstrong, a lieutenant with the Homicide Bureau at the time of the murders, and Lieutenant Walter Davidson, the case coordinator, decided to quarantine the surviving children at the hospital and not release their identities because they had not yet identified the perpetrator and wanted to prevent additional attacks. *Id.* at 14. Family members were not allowed to contact the children from March 3rd through March 8th. *Id.*

C.J., Cedrick, and Ceniyah were transported to LeBonheur Children's Hospital where Dr. Michael Muhlbauer performed surgery on each of them. *Id.* at 23. Dr. Muhlbauer offered the following testimony regarding each of the children's injuries:

C.J. had trauma and swelling to his forehead, part of a steak knife sticking out of his head, and a six-to-seven-inch laceration in his scalp that extended down his forehead. C.J.'s skull was severely fractured, and large pieces of his skull had been driven inward with a blunt force object. C.J. also had either a "glancing" stab wound or two separate stab wounds on the back of his arm and chest, a superficial laceration across his neck, a laceration on his right hand, and a laceration on his left thumb. Dr. Muhlbauer said that without medical intervention C.J. would not have survived the injuries he sustained.

Dr. Muhlbauer testified that Cedrick exhibited significant facial trauma and was "essentially semicomatose" when he arrived at the hospital. Cedrick had sustained injuries that were, in Dr. Muhlbauer's opinion, consistent with having been beaten with boards, including multiple fractures to his face, mid-face, and the lower portion of his skull, a fractured nose which had been pushed inward, and a small skull fracture with bruising on the back of his brain. In addition, Cedrick sustained stab wounds to one eye, his forehead, and his neck. Dr. Muhlbauer testified that Cedrick would not have survived without medical intervention.

Dr. Muhlbauer testified that Ceniyah arrived at the hospital with significant head trauma, which included a large cut in her scalp that exposed her bone. The right side of Ceniyah's skull had been pushed or crushed in with a blunt object, resulting in an "open-depressed skull fracture." A CT scan revealed that the covering of Ceniyah's brain was "probably cut" and that her brain was mildly bruised. Dr. Muhlbauer testified that Ceniyah's injuries were consistent with being struck with boards. She also had stab wounds to her left lower extremity. Dr. Muhlbauer said that absent medical intervention, Ceniyah would not have survived these injuries.

*Id.* (footnote omitted).

On March 5, 2008, two days after C.J.'s surgery, Lieutenant Caroline Mason attempted to interview him. *Id.* at 23-24. However, C.J. was "'in and out' of consciousness, cursing, 'talking crazy,' and screaming out names, including 'Cassandra' and 'Roderick.'" *Id.* at 24. Although Ms. Williams had a sister named Cassandra, officers determined that she was not involved in the offenses. *Id.* On March 7th, Lieutenant Mason interviewed C.J. after a nurse called officers and reported that C.J. was awake and rational. *Id.* C.J. identified "Uncle Junior," the Petitioner, as the perpetrator. *Id.* After listening to the recording of the interview, Deputy Director Armstrong ordered

officers to transport the Petitioner to the Homicide Bureau and assigned Lieutenant Mason and Sergeant Max to interview him. *Id.*

The Petitioner, "who was under arrest at that time, was advised of his rights, signed a written waiver, and agreed to speak with the officers." *Id.* He essentially repeated his prior account of the events, varying in only one or two respects. *Id.* Lieutenant Mason testified that during the interview, the Petitioner told her and Sergeant Stark that "he didn't want to talk to us anymore, to get somebody else in there for him to talk to." Lieutenant Mason and Sergeant Max left the interview room, and Deputy Director Armstrong decided to attempt to interview the Petitioner. *Id.*

Deputy Director Armstrong

watched the [Petitioner's] body language as he talked to the [Petitioner] about how horrific the crimes were. He said the [Petitioner] seemed "really, really tight, like he was doing everything he could not to talk to me." According to Deputy Director Armstrong, the [Petitioner] gave one-or-two-word answers to questions and would not engage in open conversation. Deputy Director Armstrong said that "[m]ost of the time if I asked him a question, he would nod his head or shake his head. But you could tell he was doing everything he could not to engage me in an open conversation as to where we had open dialogue back and forth with each other."

Deputy Director Armstrong said that, when he entered the interview room, he knew that the [Petitioner] was very familiar with the criminal justice system and that the [Petitioner] had only recently been released from prison. When Deputy Director Armstrong asked the [Petitioner] whether he believed in God and in heaven and hell, the [Petitioner] said that he did. Deputy Director Armstrong stated that the [Petitioner] was "struggling to try to maintain his composure" and at times during the interview leaned forward as if he wanted to make a statement but would then lean back. Deputy Director Armstrong said that he could tell the [Petitioner] was hiding something.

At one point, Deputy Director Armstrong allowed the [Petitioner] to grab his hands, attempting to convey to the [Petitioner] that he knew something was weighing heavily on the [Petitioner's] mind. Although it appeared to Deputy Director Armstrong as if the [Petitioner] were about to speak to him, the [Petitioner] refused to engaged in conversation and asked to go to the restroom. Deputy Director Armstrong allowed him to go.

- 13 -

When the interview resumed, Deputy Director Armstrong asked the [Petitioner] what his family called him, and the [Petitioner] replied, "Junior." He asked the [Petitioner] if anyone else in his family was referred to as "Junior," and the [Petitioner] said, "[N]o." In response to questions, the [Petitioner] also told Deputy Director Armstrong that no one else in his family looked like him and no one in the family had ever confused him with someone else in the family. When the [Petitioner] was asked whether a member of his family would be referring to him if the person used the name "Junior," the [Petitioner] said yes.

Deputy Director Armstrong then played the tape recording of C.J. stating that he had been stabbed by his "Uncle Junior." According to Deputy Director Armstrong, the [Petitioner] became visibly upset and appeared as if he were about to cry. The [Petitioner] then told Deputy Director Armstrong that he and Cecil went somewhere to get a gun, began arguing, and continued to argue during the drive back to Cecil's house. The [Petitioner] said that when they returned to Cecil's home, the argument escalated. When Cecil reached for a shotgun, the [Petitioner] began shooting, using both his gun and Ms. Williams's gun. The [Petitioner] said that he then attempted to "get rid" of the children because they had seen him. The [Petitioner] stated that he "stuck them," using the knives from the kitchen drawer.

According to Deputy Director Armstrong, the [Petitioner] began to cry and appeared as if "he had gotten the weight of the world off his shoulders. But it was almost like I'm defeated." Deputy Director Armstrong testified that when he began to question the [Petitioner] in greater detail about what had occurred in the house, using his knowledge of the crime scene to frame the questions, the [Petitioner] asked for an attorney, and the interview ceased. The [Petitioner] also asked to speak with his mother….

*Id.* at 24-25.

Officers retrieved the Petitioner's mother from the safe house and transported her to the police station, where she spoke to the Petitioner. *Id.* at 25-26. She held the Petitioner's hands and asked him what was happening and whether the police were "'trying to put it on him.'" *Id.* at 26. The Petitioner initially did not respond but then told her that he "'did it.'" *Id.* His mother asked him "'why the babies,'" and the Petitioner responded that they had seen him. *Id.* The Petitioner stated that he and Mr. Cecil Dotson had argued all day and that Mr. Cecil Dotson had a gun. *Id.* Although Mr. Cecil Dotson

did not point the gun, he was "'swinging it.'" *Id.* The Petitioner said he began shooting once Mr. Cecil Dotson put the gun down and that the Petitioner later rode a bicycle away from the scene to his girlfriend's home. *Id.* The Petitioner's mother testified that she "'asked him [why] the kids and he said they saw me. And I said but the baby, the baby. He didn't say nothing, just shook his head. And I got up and told him I love him and I left.'" *Id.*

Officers subsequently located C.J.'s yellow bicycle in a shed behind Ms. Jones's home. *Id.* Neither the blood of any of the victims nor the Petitioner's DNA was found on the bicycle. *Id.* None of the victims' blood was on the Petitioner's clothing seized following his arrest. *Id.* at 37.

C.J. testified at trial that he was watching television in his sister's bedroom when he heard a gunshot. *Id.* at 31. C.J. said he

> walked out of his sister's room and into the hallway. C.J. recalled peeking into the living room and seeing "my Uncle Junior point a gun toward my daddy," who was not saying anything. C.J. testified that he saw "some smoke and sparks come out [of] the gun" and then looked down on the ground" and "saw [a] dude on the floor[ ]," who was wearing a black shirt and black pants.

> C.J. testified that when he heard another gunshot, he "peeked" through the door, walked into the hallway, and saw the [Petitioner] shooting at a woman who was on the arm of the couch. C.J. did not recognize the woman, but he recalled that she was telling the [Petitioner] that she loved him, but the [Petitioner] "just kept on shooting."

> C.J. said that he then returned to his sister's room and sat down on the bed. Hearing footsteps coming toward the door, he turned and saw the [Petitioner] holding a "handheld knife," which C.J. described as the type that opens and closes. C.J. said that when the [Petitioner] cut him on his neck, he told the [Petitioner] that he loved him, but the [Petitioner] replied, "[N]o, you don't." C.J. then lay down on the bed, and Cecil II began crying. C.J. heard the [Petitioner] then say to Cecil II, "[D]on't worry about it, you ain't going to get hurt."

> C.J. testified that he tried to retrieve the telephone from the hallway to call the police, but before he could do so, he saw the [Petitioner's] feet in the doorway and heard the [Petitioner] ask him what he was doing. When C.J. told the [Petitioner] that he was going to call the police, the [Petitioner]

- 15 -

said he would kill C.J.'s parents and Cecil's friends if C.J. did so. C.J. recalled asking the [Petitioner] if he could use the bathroom and noticing that the [Petitioner] had a "kitchen knife" in his hand. C.J. recalled the [Petitioner] allowing him to go to the bathroom, but stated that the [Petitioner] "ma[d]e [him] put [his] head in the tub." When he had done so, the [Petitioner] tried to stab C.J. in the chest, but C.J. put his hand up to block the blow, and the knife went into his head instead.

C.J. recalled seeing his mother, Ms. Williams, in the doorway of the bathroom saying that she did not want to die. The [Petitioner] asked her for Cecil's cellphone and car keys, and Ms. Williams replied that the keys likely were in Cecil's car. C.J. recalled the [Petitioner] then saying to Ms. Williams, "sorry because I ain't let your husband or your husband's friends get away with it and the kids." Then C.J. heard what he described as a "huge fall on the ground."

C.J. testified that he next saw the [Petitioner] walking in the hallway with a garbage bag and another kitchen knife, going into C.J.'s sister's bedroom. C.J. heard someone yelling and heard the [Petitioner] saying "shut up." C.J. then heard Cemario ask to use the bathroom and saw blood dripping from Cemario's head onto the rim of the toilet seat. He said that Cemario asked the [Petitioner] if he could return to his room and the [Petitioner] said that he could. Next, C.J. said, the [Petitioner] went into the kitchen, grabbed another knife, and entered the bedroom of C.J. and his brothers. C.J. said he saw Cemario lying on the bed and the [Petitioner] stab Cemario, who then fell on the floor. C.J. said he heard "rambling" in the hallway near the laundry room, as if the [Petitioner] were attempting to move something out of the way. C.J. then fell asleep in the bathtub and heard nothing more that night.

C.J. testified that when he awoke, he saw firemen in his bedroom looking at Cemario. One of the firemen came into the bathroom and got C.J. out of the bathtub. C.J. was transported to the hospital by ambulance. C.J. said that no one was with the [Petitioner] during the attacks and that the [Petitioner] acted alone. By the time of trial, more than two years had passed since C.J. identified the [Petitioner] as the lone perpetrator of the crimes. During that time, C.J. had not wavered in his identification of the perpetrator.

However, C.J. also testified at trial that he had told "Ms. Pat" in a previous interview that on the same night that the "bad thing" happened, a

- 16 -

woman named "Cassandra" knocked on the door and said that she needed to use the bathroom. She and some other people, including a man wearing a mask with "[a] little bit of blood" on it, entered the house. C.J. had never seen the man before, but he recalled Cecil referring to the man as "Roderick." C.J. did not recall who allowed "Roderick" to enter the house, although he acknowledged that he had previously told "Ms. Pat" that Cecil allowed "Roderick" to enter the house and that he was mad at Cecil for doing so. C.J. testified that "Roderick" said something to Cecil about the gang and also told Cecil, "[Y]ou got too big, boy." According to C.J., "Roderick" fired a gun at Cecil and said, "[N]ever stop playing with the gang boy, … you never know what would happen, boy."

On redirect examination, C.J. again identified the [Petitioner] as the person who stabbed him in the head, shot his parents and their friends, and hurt his brothers and baby sister.

On recross-examination, C.J. testified that he saw a fight in the living room between Cecil and the man in the mask and again maintained that the man was shooting at Cecil. He also agreed that he had met with "Ms. Caroline" and "Ms. Pat" at "Ms. Pat's" office, and had said, when they asked him how he knew some of the things he told them, that his "granny" had told him.

*Id.* at 31-32.

Cedrick, who was eight years old at the time of trial, testified that the Petitioner "stabbed him on the nose, forehead, and wrist and that no one else was with" the Petitioner. *Id.* at 32. According to Cedrick,

the attacks occurred at night but before he had eaten dinner. He did not recall hearing gunshots that night and also did not recall seeing the [Petitioner] shoot anyone. He said that no one had told him that the [Petitioner] shot anyone. Cedrick testified that the [Petitioner] got the knife he used to stab them from his car, but he could not remember the color of the [Petitioner's] car. Cedrick said that, although he had not seen the [Petitioner] stabbing his parents, he recalled that his parents and their friends were stabbed. Cedrick said that when his parents were killed, all of the children, other than one of his brothers and the baby, were locked in his sister's bedroom. Cedrick stated that his brother had told him that Ms. Williams was injured while she was in the living room changing the baby's diaper.

Cedrick testified that he heard Ms. Smith on the telephone calling the police, and he recalled that [Ms.] Nicole [Dotson], whom he referred to as "Auntie Foxy," was also present when they were attacked. Cedrick acknowledged previously telling "Ms. Pat" and C.J. that his father never should have opened the door. Cedrick explained that a fight began after his father opened the door, and he remembered many people fighting that night, and specifically recalled a man, whom he did not know, fighting with his father and his father's friends. Cedrick also remembered C.J. sneaking out of the house after the [Petitioner] had stabbed him and riding on his bicycle to his grandmother's home. Cedrick testified that he had sneaked up on his "Uncle Jessie," got on his own bike, and also rode away to his grandmother's home. Cedrick recalled that when he and C.J. left, everyone was still alive in the house and [they] were talking, singing, and having fun.

On redirect examination, Cedrick said that he had been in his sister's room when the [Petitioner] stabbed him, and he also recalled telling "Ms. Pat" that the [Petitioner] stabbed him. On recross-examination, Cedrick testified that he had talked to "Ms. Pat" after he had been living with his family for a period of time and after he had listened to others discussing the homicides and attacks.

*Id.* at 32-33.

Dr. Lisa Funte, a Shelby County medical examiner and expert in forensic pathology, performed the autopsies of Ms. Williams, Ms. Roberson, and Cecil II. *Id.* at 33-34. Dr. Miguel Laboy, another medical examiner in the Shelby County Medical Examiner's Office, performed the autopsies of Mr. Seals, Mr. Cecil Dotson, and Cemario. *Id.* at 33-35. Dr. Funte testified at trial regarding the autopsies of all six deceased victims. *Id.*

Mr. Seals died as the result of multiple gunshot wounds, including one to his mouth, one of his midline upper chest area, and one to the side of his chest near his right armpit. *Id.* at 33. Ms. Williams sustained five gunshot wounds: one to the left side of her head, one to the right side of her chest, one to her left leg, one to her right thigh, and one to the left side of her abdomen. *Id.* Ms. Roberson sustained four gunshot wounds: one to her right thigh, one to her left knee, one to her left calf, and one to her left thigh. *Id.* at 34. Dr. Funte testified that based upon the wound pattern on Ms. Roberson's legs on her jeans, she was wearing the jeans when she was shot, and her clothes were rearranged later. *Id.* Mr. Cecil Dotson sustained eight gunshot wounds: one to his head, one to his neck, one to his chest, one to his right thigh, two to his left thigh, one to his left

leg, and one to his left foot. *Id.* According to Dr. Funte, "fiber found in the area around the entry of the gunshot wound to Cecil's head was consistent with the shooter placing a fiber-filled pillow over Cecil's face and firing the gun through the pillow." *Id.*

Nine-millimeter and .380 caliber bullets and jackets were recovered from the bodies of the adult victims. *Id.* at 37. No gunshot residue was found on the clothing of Mr. Cecil Dotson, Ms. Roberson, or Ms. Williams. *Id.* at 38. Special Agent Braswell testified that the lack of gunshot residue "meant either that the shooter was far enough away from the victims when the gun was fired that it left no residue, or that an object, such as a pillow, had been placed between the gun and the victim." *Id.* Gunpowder particles were on the bullet holes in Mr. Seals's shirt. *Id.* Special Agent Braswell estimated that the gun was at least two feet and no more than four feet away from Mr. Seals when it was fired. *Id.*

Dr. Funte testified that "Cecil II died of multiple sharp force injuries, including multiple incised and stab wounds to his head, torso, and extremities." *Id.* at 34. Cecil II sustained seven stab wounds that penetrated and fractured his skull, as well as

> a puncture-style stab wound to the right side of his head, two puncture-style stab wounds to his left cheek, two incised wounds on the left side of his face near his eye, an incised wound to his right ear, beginning at the top of his ear and continuing along the inside of the ear, a group of incised wounds of varying lengths and an incised wound leading to a stab wound on his torso, multiple incised and stab wounds on his back, and a mixture of sharp force and blunt force injuries on the left side of his torso.

*Id.* at 34-35. Cecil II also sustained multiple blunt force injuries resulting in abrasions and contusions, including an abrasion on the right side of his head that almost formed the outline of a rectangle and was consistent with him being struck on the right side of his head with a board. *Id.* at 35. Dr. Funte stated that based on the nature of Cecil II's injuries, he attempted to fend off his attacker. *Id.* Cecil II possibly could have survived had he received medical treatment within an hour of receiving his injuries, although it was not "'necessarily probable.'" *Id.*

Cemario died of blunt force and sharp force injuries. *Id.* He sustained

> blunt force trauma to his head, with lacerations and bruises, multiple linear depressed fractures of the calvarium and the base of his skull, deep scalp and subarachnoid hemorrhage, and multiple contusions to his brain. Dr. Funte also noted areas of abrasions and lacerations on Cemario's head, as

well as an incised wound above his left ear that tore part of his scalp away from his skull.

*Id.* Cemario also sustained

incised wounds to his head, neck, and right hand. A stab wound to his chest went all the way through his body, injuring his left lung and hemidiaphragm, as well as his stomach, spleen, and liver. Cemario also sustained linear abrasions and bruises on his left arm, abrasions on his forehead, an abrasion and bruising on his right ear, a gaping incised wound to his neck, abrasions on his right arm, and an incised wound on his ring finger, which was consistent with Cemario having attempted to defend himself by holding up his hand or grabbing the knife.

*Id.*

### 5. *The Defense Proof*

The defense presented the testimony of Mr. Cedric Atkins, who said that approximately one and one-half weeks prior to the murders, Mr. Cecil Dotson told him that he owed about $300,000 to the "'mob.'" *Id.* at 38. Mr. Atkins testified that he relayed this conversation to a police officer after the murders and maintained that he never demanded money from the officer in exchange for the information. *Id.* Mr. Atkins did not recall asking the officer what was "'in it for [him].'" *Id.*

Sergeant Stark testified that following the murders, he interviewed Mr. Waddell, who stated that Mr. Hill had told him that the victims were tortured and that Mr. Cecil Dotson's fingers were severed. *Id.* Mr. Waddell also stated that Mr. Cecil Dotson and "Doc" had a "'falling out.'" *Id.*

Dr. Nancy Aldridge, a psychotherapist and expert in the forensic evaluation of children, testified regarding her concerns about the manner in which the interviews of C.J. and Cedrick were conducted. *Id.* at 39. She noted that C.J. was interviewed on four or five different occasions, including shortly after he was found, and that he gave different statements about what had occurred. *Id.* She also noted that the formal forensic interviews were not held until more than five months after the murders, which increased the potential that the children had been exposed to information about the crimes from other family members. *Id.* Dr. Aldridge testified that C.J.'s initial account in which he named "Cassandra" was "'possibly'" reliable because those who observed the interview said C.J. appeared to relive the trauma while giving the statement and the interviewers appropriately used open-ended questions. *Id.* Dr. Aldridge stated that a child's memory

- 20 -

becomes less clear with the passage of time and that a child who continues to be questioned after providing an answer may provide a different answer, thinking that the initial answer was unacceptable. *Id.*

Dr. Aldridge stated that C.J. and Cedrick appeared to be prepared for their testimony at trial in that they appeared to know what questions were going to be asked ahead of time and what their answers would be. *Id.* at 40. Dr. Aldridge testified that "although the reliability of C.J.'s testimony was an issue for the jury, she questioned its reliability because C.J. seemed to agree with whatever question was asked of him." *Id.* She noted the potential for contamination of their memories based upon the time period that had elapsed between the murders and the trial. *Id.* She acknowledged on cross-examination that she was unaware of whether C.J.'s identification of the Petitioner as the attacker was incorrect but noted that she had "'concerns.'" *Id.*

The Petitioner testified that the murders were committed by unknown assailants as he was hiding under the bed in the master bedroom. *Id.* He stated that earlier that night, Mr. Cecil Dotson had argued with a man in a parking lot while Mr. Seals was at Mr. Hill's apartment retrieving a gun. *Id.* The Petitioner stated the argument involved the incident during which Mr. Cecil Dotson reported to police that there was marijuana inside the apartment where Mr. Hill lived. *Id.*

The Petitioner testified that after making several stops, they returned to Mr. Cecil Dotson's home where the Petitioner and the four adult victims gathered in the living room. *Id.* at 40-41. Mr. Cecil Dotson asked Ms. Williams to put clean sheets on the bed in the master bedroom because he planned to allow Ms. Roberson and Mr. Seals, who had recently been released from jail, to use the master bedroom. *Id.* at 41. The Petitioner stated that he volunteered to change the sheets and that he heard two or three gunshots while in the master bedroom. *Id.* Although he had a blue .44 caliber handgun, he hid under the bed when he heard screaming. *Id.* He heard a few gunshots at first, followed by more gunshots seconds later. *Id.* The Petitioner stated that after several minutes, he left his hiding place and returned to the living room where he found the victims' bodies. *Id.* He said he believed everyone in the house, including the children, were deceased, and he rode away on a bicycle that was behind a door in the living room. *Id.* at 41-42. He stated that he rode the bicycle to Ms. Jones's home where he vomited in the bathroom. *Id.* at 42. He then used bleach to clean the vomit from the sink, dropping some of the bleach on the floor. *Id.*

The Petitioner explained that he did not report what he had witnessed to the police because, "'Y'all done heard testimony about the gangs. I'm in a gang. We don't call the police. It's just that simple. We don't call the police. It's not part of what we do. If I call the police, I'll be just like my brother.'" *Id.* He testified that he did not tell the truth

when initially questioned by the police because he "'[doesn't] talk to police.'" *Id.* The Petitioner testified that prior to his interview with Deputy Director Armstrong,

> he had been in the Homicide Bureau for hours and was handcuffed to a table. The [Petitioner] said that Deputy Director Armstrong played a tape recording of C.J. identifying him as the perpetrator but did not play earlier taped interviews of C.J. identifying other individuals. The [Petitioner] stated that after playing the recording, Deputy Director Armstrong began screaming about the [Petitioner's] family and said that he was tired of "playing games." According to the [Petitioner], Deputy Director Armstrong said he knew the [Petitioner] was "bullshitting" and that he was "sick of it." The [Petitioner] said that Deputy Director Armstrong began "pounding" on the table and demanding to have answers "now."

*Id.*

The Petitioner denied that he was telling the truth to Deputy Director Armstrong and his mother when he admitted to shooting the adult victims and attacking the children. *Id.* He explained that

> when he was interviewed on March 7th, he had not slept since the homicides were discovered on March 3rd and that he had cried and had been depressed about what had happened. The [Petitioner] stated that he asked to see his mother approximately three times during the interview, but Deputy Director Armstrong told him that he would not be allowed to see anyone until the [Petitioner] told him what he wanted to know. The [Petitioner] said that, earlier on March 7th, he had told other officers that he did not kill the victims. The [Petitioner] insisted that his statement to Deputy Director Armstrong admitting his guilt was not true, and he proclaimed his innocence of the crimes, stating that he did not kill Cecil or any of the other victims.

*Id.* at 42-43.

On cross-examination, the Petitioner admitted that he did not call 9-1-1 after discovering the victims and that he did not report the crimes to anyone the following day. *Id.* at 43. He also admitted that he had lied to family members about the last time that he had seen Mr. Cecil Dotson. *Id.* He did not attempt to use the cordless phone in the master bedroom to call for help. *Id.* He remained under the bed for approximately thirty minutes and denied hearing the children scream or hearing anyone hitting the children with boards. *Id.* He stated that when he entered the living room, Ms. Roberson was in

the position in which she was discovered by police. *Id.* The Petitioner said that he saw C.J. lying in the bathtub but that he did not "'pay attention'" to the knife in C.J.'s head and did not check to determine whether C.J. was alive. *Id.*

With regard to his confession to Deputy Director Armstrong, the Petitioner testified that

> he was in the interview room with Deputy Director Armstrong for four or five hours, and the [Petitioner] maintained that he had confessed only after Deputy Director Armstrong screamed at him and threatened him. The [Petitioner] explained:
>
>> He didn't pound on the table. It was he asked me when he played the tape and after he played the tape, he played the tape what, [twelve, thirteen] times. And after he played it [twelve] to [thirteen] times, after I still told him I didn't do it, that's when he said I'll kill your mother f***ing ass myself, you cold-hearted murdering killing mother f***er.
>
> According to the [Petitioner], Deputy Director Armstrong then said: "I got something for you. I'm going to throw your ass on that 4th floor and I'm going to let them kill your mother f***ing ass."

*Id.*

With respect to his meeting with his mother, the Petitioner testified that

> he had leaned across the table and told his mother, "[T]hey trying to put this on [me]." His mother asked for the names of those who were trying to do this so that she could get him help. The [Petitioner] said that he told her he did not know their names and that they were watching him. The [Petitioner] said that he and his mother then grabbed each other's hands, that he told his mother not to worry, and then admitted to committing the offenses. The [Petitioner] acknowledged that he told his mother that he and Cecil began arguing and that, after Cecil put down his gun, he had begun shooting. The [Petitioner] also recalled both his mother asking him how he got away from the house and his response that he rode away on a bicycle. The [Petitioner] agreed that he had told his mother that he killed the children because they saw him. However, the [Petitioner] insisted that he lied to his mother and that his trial testimony was truthful.

- 23 -

*Id.* at 43-44.

The jury convicted the Petitioner of six counts of premeditated first degree murder for the deaths of Mr. Cecil Dotson, Ms. Williams, Mr. Seals, Ms. Roberson, Cemario, and Cecil II. The jury also convicted the Petitioner of three counts of attempted premediated first degree murder for attacking C.J., Cedrick, and Ceniyah.

## *B. Penalty Phase*

During opening statements in the penalty phase, counsel for the Petitioner argued that based upon the Petitioner's age, he would never be released from prison even if the jury imposed a sentence of less than death. Counsel noted that there were structures in place to help defendants "be better and live lives in prison." Counsel also asked the jury to consider the Petitioner's background in determining an appropriate sentence.

The State relied upon the proof submitted during the guilt phase of the trial and introduced three additional photographs of Cemario and Cecil II as evidence of the heinous, atrocious, and cruel aggravating circumstance. The parties stipulated that the Petitioner previously had been convicted of second degree murder, which qualified as a felony involving the use of violence to the person.

The State presented victim impact evidence through the testimony of Ms. Williams's mother and Mr. Seals's aunt. Ms. Williams's mother testified that she had adopted her surviving grandchildren and was raising them and that, as a result, she had lost her job and was struggling financially. She and her family were in counseling as a result of the offenses. Mr. Seals's aunt testified that Mr. Seals had three children, whom he loved and was supporting at the time of his death. She stated that Mr. Seals's death deeply affected her because he was like a younger brother to her before his mother died and she acted as a mother figure to him following his mother's death.

The defense presented the testimony of Ms. Glori Shettles, a mitigation specialist, regarding the Petitioner's family history and background. She stated that prior to becoming a mitigation specialist, she worked as a parole officer and became familiar with the prison system in Tennessee. She offered testimony regarding the different classifications and tasks that could be assigned to a prisoner based upon the prison where he or she was assigned.

Ms. Shettles testified that she gathered all available records regarding the Petitioner, spent a great deal of time with the Petitioner, who was "open" about his background, and interviewed several family members, who were willing to provide information but were not willing to testify. According to Ms. Shettles, the Petitioner's

parents were married in 1972 when his mother was fifteen years old and his father was nineteen years old. Their first child, Ms. Nicole Dotson, was subsequently born. The Petitioner's father joined the Army and was stationed in Florida where the Petitioner was born. At some point, the Petitioner's mother and Ms. Nicole Dotson returned to Memphis, and Ms. Nicole Dotson became very ill, after which the Petitioner's father left his station and returned to Memphis. The Petitioner's father served about three years in the Army and received an honorable discharge. He was unable to find employment in Florida, so he moved his family back to Memphis.

Upon their return to Memphis, the Petitioner's mother began leaving the children at home, and his father became jealous of her. She returned from a church trip to New Orleans with a boyfriend and told the Petitioner's father that she no longer wanted to be married to him. They remained married for a period, during which time the children witnessed their parents arguing and the Petitioner's father being physically abusive to his mother. By this time, Mr. Cecil Dotson, who was three years younger than the Petitioner, was born. The Petitioner's mother saved up money and left with the children without telling the Petitioner's father. She did not contact the Petitioner's father until four or five months later. The Petitioner, who was about six years old, and the other children did not know what had happened to their father. The Petitioner and his siblings had little contact with their father during their childhood. When the Petitioner was nine years old, his mother began a relationship with the father of her next two children. The man treated the Petitioner, his siblings, and his mother well, but the relationship ended.

Ms. Shettles noted a great amount of instability in the family, stating that the family moved often and that the Petitioner attended ten different schools. The Petitioner was diagnosed with a learning disability in reading and math, and he was enrolled in resource classes as a result. He also had disciplinary problems at school and at home. According to school mental health records, the Petitioner received individual counseling and benefited from it. The records also indicated that his mother canceled appointments to meet with school mental health officials or would not be home when home visits were scheduled. The Petitioner repeated the fourth grade twice, not due to poor grades but due to excessive absences. The Petitioner and his siblings were teased at school because they did not have proper clothing, so the Petitioner would not go to school. He was socially promoted in other grades.

The Petitioner became involved in the juvenile court system when he was fifteen years old and was arrested several times. His mother reported being unable to control him, and job corps was recommended but was not followed through. His mother attended juvenile court proceedings involving the Petitioner on many occasions. On one occasion, Ms. Nicole Dotson, who was about two years older than the Petitioner, attended

a juvenile court proceeding involving both the Petitioner and Mr. Cecil Dotson because their mother was unable to attend.

The Petitioner's mother often was not at home, and Ms. Nicole Dotson cared for her brothers. The food was locked up in the home so that the Petitioner and his siblings did not have access to it. The family often went to the home of the Petitioner's maternal grandmother for Sunday dinner, and the Petitioner and Mr. Cecil Dotson took money from her purse. Ms. Shettles testified that although they did not tell people why they were taking the money, they were doing so in order to purchase food. They were punished severely for taking the money, and the Petitioner's grandmother told his mother that the Petitioner and Mr. Cecil Dotson were no longer welcome in her home.

The Petitioner withdrew from school at the age of sixteen while in the eighth grade. For a three-month period, the Petitioner lived with his cousin and her mother, and several relatives lived nearby. The Petitioner was happy while living there, but his mother asked him to return home to help care for her three young children. The Petitioner worked as a security guard for a very short period of time at the age of eighteen, and Ms. Shettles stated this was the only legitimate job that he ever held.

At the age of nineteen, the Petitioner pleaded guilty to second degree murder and received an eighteen-year sentence. Ms. Shettles detailed the restrictions and various punishments for violating rules in prison. She said that the Petitioner had many write-ups during the first few years, most of which were for non-violent acts, but that he also had one write-up for a violent act. The Petitioner was denied parole on two different occasions before he was granted parole after serving fourteen years in prison. Ms. Shettles detailed the various programs completed by the Petitioner while in prison.

While the Petitioner was in prison, his mother and her husband visited him on one occasion, and no other relatives ever visited him. He spoke to his father "a couple of times" on the telephone. Ms. Shettles noted that the Petitioner has family members who care for him, including a son, a personal friend, and a friend of his grandmother.

On cross-examination, Ms. Shettles acknowledged that when the Petitioner was younger, he often was in trouble at school and at home and that he had been suspended from school so often that the school system refused to allow him to continue his enrollment. She noted that several of the Petitioner's adjudications in juvenile court involved weapons and that his school and juvenile court records referenced problems with his brother. Ms. Shettles was aware that the Petitioner became a member of the Crips gang while in prison. She recalled that while in prison, the Petitioner and four other inmates were accused of cutting another inmate during a gang-related altercation.

On redirect examination, Ms. Shettles testified that the Petitioner also witnessed violence as a child, including physical fights between his parents. When he was seventeen years old, he saw his mother place her baby in scalding hot water. The Department of Children's Services investigated the incident and concluded the matter to be unfounded. The Petitioner maintained that the incident occurred.

During closing arguments, counsel for the Petitioner requested that the jury consider the Petitioner's background, as well as any residual doubt, and to impose a sentence of life without parole. At the conclusion of the closing arguments, the trial court instructed the jury regarding the following mitigating circumstances: (1) any lingering or residual doubt as to the Petitioner's guilt; (2) the Petitioner was raised in a dysfunctional family; (3) he suffered childhood neglect; (4) his parents separated when he was six years old, and his father was not a part of his life; (5) the Petitioner experienced numerous changes of residences and schools throughout early childhood; (6) he was retained twice in the fourth grade due to truancy and was absent from school many times; (7) he was diagnosed with a learning disability; (8) his mother was not compliant with scheduled meetings and failed to appear at juvenile court hearings on several occasions; (9) he witnessed what he believed to be intentional physical abuse of his younger brother by his mother; and (10) any other mitigating facts raised by the evidence.

At the conclusion of the penalty phase, the jury returned sentences of death for each of the first degree murder convictions. With regard to the murder of Mr. Cecil Dotson, the jury found the following three aggravating circumstances set forth in Tennessee Code Annotated section 39-13-204(i): (2) the Petitioner previously was convicted or one or more felonies involving the use of violence; (3) he knowingly created a great risk of death to two or more people, other than the victim murdered, during the act of murder; and (12) he committed mass murder. With regard to the murders of Ms. Williams, Mr. Seals, and Ms. Roberson, the jury found the same three aggravating circumstances applied to Mr. Cecil Dotson's murder, as well as the following two additional aggravating circumstances: (6) the murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the Petitioner or another; and (7) the murder was knowingly committed while the Petitioner had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit any first degree murder. *See* T.C.A. § 39-13-204(i)(6), (7). With regard to the murders of two of the minor children, the jury found the same five aggravating circumstances applied to the first degree murders of Ms. Williams, Mr. Seals, and Ms. Roberson, as well as the following two additional aggravating circumstances: (1) the victim was less than twelve years old and the Petitioner was eighteen years or older; and (5) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. *See* T.C.A. § 39-13-204(i)(1), (5).

During a separate sentencing hearing, the trial court sentenced the Petitioner to forty years as a Range II, multiple offender for each of his convictions for attempted first degree murder to be served consecutively to each other and to the death sentences. The Petitioner appealed to this court, raising twenty-one issues, and this court affirmed the Petitioner's convictions and sentences on direct appeal. *See State v. Jessie Dotson*, No. W2011-00815-CCA-R3-CD, 2013 WL 4728679, at *1 (Tenn. Crim. App. June 25, 2013), *affirmed by State v. Dotson*, 450 S.W.3d 1 (Tenn. 2014). On automatic review, the Tennessee Supreme Court also affirmed the convictions and sentences. *See Dotson*, 450 S.W.3d at 12.

## Post-Conviction Proceedings

On August 17, 2015, the Petitioner filed a timely pro se petition for post-conviction relief, alleging ineffective assistance of counsel and errors by both the trial court and the State. Shortly thereafter, the post-conviction court appointed counsel to represent the Petitioner. On May 31, 2017, the Petitioner filed an amended petition. The evidentiary hearing was continued on multiple occasions, and much of the pre-hearing litigation centered on the denial of funding for expert witnesses, the admissibility of testimony of jurors from the Petitioner's trial, and various discovery issues. The evidentiary hearing occurred October 1-4, 2018.

At the evidentiary hearing, co-counsel testified that he and lead counsel were appointed to represent the Petitioner at trial. Co-counsel had been practicing law since 1996 and had attended capital defense training sessions prior to the Petitioner's trial. He had represented defendants in six or seven capital cases prior to the Petitioner's trial. Co-counsel had approximately fifty cases when he was representing the Petitioner, some of which were non-capital homicides.

Co-counsel testified that the defense at trial was that "there [was] no way one person shot two guns, killed all these people and left no trace in there," that "the State's theory [did] not make sense," and that "there was [not] one shred of physical evidence to corroborate the State's theory." Co-counsel stated that he was in charge of preparing for the penalty phase and almost half of the guilt phase and that he spent approximately seven-five percent of his time preparing for the guilt phase.

Trial counsel retained Ms. Rachael Geiser as the guilt/innocence investigator and Ms. Glori Shettles as the mitigation investigator, and trial counsel had worked with both Ms. Geiser and Ms. Shettles in numerous prior cases. Trial counsel provided the investigators with direction, but the investigators also often came to trial counsel about issues. Trial counsel had multiple meetings with the investigators and communicated with them through telephone calls and email. Co-counsel stated that he also spoke to the

investigators when he saw them at the courthouse about once a week. Co-counsel did not interview any witnesses at their homes, explaining that the majority of the witnesses were uncooperative.

The trial court granted a limited change of venue and ordered that the jury be selected in Nashville and then transported back to Memphis for the trial. Co-counsel stated that he and lead counsel believed that if the jury convicted the Petitioner of the offenses, the jury would impose the death penalty. As a result, trial counsel chose some jurors, whom trial counsel believed would be favorable to the defense regarding issues of guilt or innocence, even though trial counsel did not believe those jurors would be favorable regarding death penalty issues.

Co-counsel testified that one of the jurors who was chosen for the jury ("Juror 1") stated in his jury questionnaire that he had "no problem with the death penalty as [he] believe[d] no person has a right to take any person's life under any circumstance." Co-counsel acknowledged that during voir dire, Juror 1 indicated that he could not consider a sentence of less than death for the killing of a child and that it would be difficult to mitigate the murder of a child. Co-counsel acknowledged that some judges would exclude a prospective juror for cause if the juror was unable to consider a sentence of less than death for the killing of a child and that a defense attorney should seek to exclude such a juror for cause unless the attorney wanted the juror "for some other reason." Co-counsel stated that while he generally did not want such a juror on the jury for a capital case, trial counsel chose jurors who were "far less appealing" regarding death penalty decisions because trial counsel wanted jurors who could comprehend the forensic evidence. Co-counsel said that the DNA and hair evidence was more complicated than in a "usual trial" and that, as a result, they chose jurors whom they generally would not have chosen. In response to questioning by the post-conviction court, co-counsel agreed that he and trial counsel were attempting to select jurors who they believed could comprehend the issues during the guilt phase of the trial, even though they did not like the prospective jurors' answers to questions involving the penalty phase. Co-counsel testified that they did not have a strong mitigation case and that residual doubt might have been their strongest argument during the penalty phase.

Co-counsel testified that the parties had possession of the completed juror questionnaires for some time prior to jury selection and that the defense team had a meeting during which they discussed those prospective jurors whom they wanted and did not want on the jury. Co-counsel did not recall whether he and lead counsel had a strategic reason for failing to exhaust all of their peremptory challenges. He explained that in determining whether to exercise a challenge, they had to examine the prospective juror's replacement, utilizing both the questionnaires and their notes about each prospective juror. Co-counsel further explained that he and lead counsel were making

complex decisions based upon the prospective juror's replacement and those prospective jurors who they believed would comprehend their experts and the DNA evidence.

Co-counsel testified that he did not have a strategic reason for declining to object to the State's questioning prospective jurors first. He stated that while he had made the objection in prior cases, he had never won the objection or heard of any other defense attorney who had. He said he did not have a strategic reason for declining to question prospective jurors about their attitudes on race other than he did not believe race was an issue that needed to be overcome in the case. Co-counsel stated that he would not question the prospective jurors about implicit bias unless he felt it was necessary based upon a prospective juror's responses to the questionnaire, responses during voir dire, or demeanor. He explained, "I've got to pick a jury that's still going to be able to listen to us and like us the next day. I don't mean in a popularity kind of sense. I mean in a willing-to-give-me-a-fair-shot kind of sense because you win or lose those jurors at the beginning in my opinion."

Co-counsel recalled that there were two to three hundred crime scene photographs and described the photographs as "[h]orrendous." Trial counsel attempted to limit the photographs shown to the jury. Co-counsel stated that he wanted some of the crime scene photographs introduced because they were relevant to the defense's claims regarding the forensic evidence. Once the trial court became aware of the number of photographs, the court ordered the parties to meet and attempt to reach an agreement regarding which photographs should be admitted. Co-counsel believed the State agreed to not enter ten to fifteen of the photographs, but he could not recall the number of photographs to which the trial court had to determine the admissibility due to the parties' inability to reach an agreement. Co-counsel explained that he did not object to the admissibility of every single photograph because "[y]ou lose too much credibility if you can't agree on just the basic start of how do we do business."

Co-counsel did not recall a meeting with the defense team during which they decided that Dr. Funte's testimony regarding three autopsies performed by another forensic examiner was an issue. Co-counsel did not believe that the issue was of particular importance because the defense knew the cause of the victims' deaths. He explained, "I can't think of a time when I've been about to win a murder trial over the cause of death. It could happen. This just wasn't that case."

Co-counsel testified that the defense retained Dr. Aldridge to consult with them about their cross-examination of the children at trial. The defense team decided that co-counsel should cross-examine the children at trial because he appeared "more approachable and less threatening" than lead counsel. The family did not allow the defense to meet with the children prior to trial. Co-counsel recalled that he spent a great

deal of time preparing to show the discrepancies between what he believed C.J.'s testimony would be and C.J.'s statements to the police. Co-counsel was not confident that he would get a single answer that he wanted when he undertook the cross-examination of the children. He stated that, however, the children basically agreed to everything that the prosecutor said on direct examination and then agreed with everything that co-counsel said on cross-examination. Co-counsel also stated that while he had wanted the jury to see C.J.'s video-recorded statements to the police, co-counsel could only present the recordings as impeachment if C.J. disagreed with co-counsel on cross-examination, and C.J. never disagreed with him. Co-counsel said he ended the cross-examination because the defense team felt co-counsel had "gotten the best we could do and we could only mess up after that."

Co-counsel testified that although the defense obtained some of C.J.'s medical records, co-counsel did not recall seeing a report of C.J.'s evaluation from Center of Pediatric Neuropsychology approximately two months after the murders. According to the report, C.J. "displayed relatively intact storage abilities for both verbal and visual memory; however, his ability to consistently recall information appear[ed] compromised." The report stated that C.J. displayed significant impairments in many areas of executive functioning, including "consistent long-term recall from memory." Co-counsel agreed that he would have wanted to use the result of this evaluation to impeach C.J.'s testimony.

When questioned regarding his failure to utilize C.J.'s medical records, which were in the possession of the the defense team prior to trial and which reflected that C.J. had impairments in functioning and had been prescribed medication to treat mental health issues, co-counsel testified that while there was "no question" that C.J. had mental health issues based upon his video-recorded statements to the police, co-counsel was concerned that bringing out such information during cross-examination would offend the jury. Co-counsel explained that the defense team believed they were "walking a narrow line" between trying to get the necessary information from C.J. and doing as little damage as possible in the way of offending the jury. Co-counsel also expressed concern that introducing evidence of C.J.'s mental health issues would give "whoever is the smartest from a medical standpoint person on the jury" a reason to disregard C.J.'s testimony on cross-examination that was favorable to the defense.

Co-counsel acknowledged that he would have wanted to attack the reliability and voluntariness of the Petitioner's confessions to the police and to his mother. The Petitioner's confessions were recorded as part of *The First 48* television production, and an edited portion of the questioning and the Petitioner's statements were included in the episode. Because the entire recording of the Petitioner's statements to the police and his mother was unavailable, the defense convinced the trial court to exclude the portion of

the recording that was available. Co-counsel recalled that the Petitioner's statement was "bad," that the available portion of the recording of the statement was "much worse," and that he suspected an unedited recording of the interview would have been "even worse." The trial court found that the State could not present the edited recording of the Petitioner's statements unless the defense opened the door to allow for the admission of such evidence. Co-counsel stated that the defense's "number one strategy was not screwing that up" and that one of the ways in which the defense could open the door was to argue that the Petitioner made other statements during the interview that were edited out of the recording.

Co-counsel testified that he and lead counsel did not believe that grounds existed to file a "generic" motion to suppress the Petitioner's statements. Co-counsel noted that the trial court essentially suppressed some of the statements in excluding the edited video. He also noted that at trial, trial counsel moved to suppress the Petitioner's statements to his mother, arguing that his mother was acting as an agent of the Memphis Police Department when she spoke to him in the interview room. However, the trial court denied the motion. Co-counsel agreed that the Petitioner testified at trial that his statements were coerced and that an officer threatened him.

Co-counsel did not recall having any reason to believe the Petitioner was under the influence of drugs or alcohol when he made statements to the police. Co-counsel testified that the defense team discussed whether the Petitioner's alcohol and marijuana use on the night of the murders affected his mental state as it related to the offenses. The defense team did not retain an expert to explore the theory, but co-counsel did not believe voluntary intoxication was a strong defense.

Co-counsel identified a report from Dr. Robert Parr, a clinical psychologist, regarding a psychological assessment of the Petitioner in October 1991 when the Petitioner was sixteen years old. The assessment reflected that the Petitioner had limited intellectual functioning, was naïve and immature, had simplistic and concrete thought processes, was generally rebellious and negative, and had problems with impulse control, a high potential for acting out and using poor judgment, and feelings of social alienation. The defense team explored whether the Petitioner's deficits had any bearing on the voluntariness and reliability of his statements, and they retained Dr. Richard Leo, a false confessions expert. Trial counsel had the Petitioner prepare a handwritten statement of what he maintained occurred to Dr. Leo, and trial counsel also provided Dr. Leo with the edited video from *The First 48* to review. Dr. Leo did not provide any substantive opinions to the defense. Co-counsel recalled that the defense team determined that Dr. Leo's testimony was not necessary because they had been able to persuade the trial court to exclude the recording of the Petitioner's statements and they were running the risk of opening the door to the admission of the recording by challenging the confessions as

false. Co-counsel stated that abiding by the parameters set forth by the trial court in granting the defense's motion to exclude the edited video was "among our most important priorities." Co-counsel did not recall why Dr. Leo only performed eight hours of work on the case.

Co-counsel testified that he was aware that a company called Granada Entertainment Group ("Granada") filmed the homicide investigation for *The First 48* and that the defense never obtained any footage shot by Granada other than the actual edited episode that was aired. Co-counsel identified a memorandum prepared by Ms. Geiser to trial counsel in which she stated that she reached out to Granada on February 10, 2009. According to the memorandum, Granada asserted protection under the media shield law and stated that they recycle the raw or unused footage after each episode is produced. Co-counsel stated that the defense team did not seek to challenge Granada's assertion of the media shield law since the raw footage did not exist. Co-counsel did not know the reason for waiting until August 10, 2010, to file a request under *Brady* for the State to produce the raw footage. He said that lead counsel questioned an officer on cross-examination at trial regarding the missing footage and that co-counsel questioned officers about the role of *The First 48* and its crew. Co-counsel stated that they were careful to avoid opening the door for the State to introduce the edited recording of the Petitioner, but they wanted the jury to know that the missing footage was a "screw up." Co-counsel testified that the only reason he believed that trial counsel did not request a missing evidence instruction regarding the missing footage was the trial court's warning about the defense opening the door to the admission of the edited footage. Co-counsel did not believe that the defense team interviewed any of the crew members with *The First 48* and stated that they did not have a strategic reason for not doing so.

Due to the "technical" nature of the DNA evidence, the defense team retained Bode Technologies to consult with them and ensure that the testing conducted by the State was adequate and that trial counsel understood the testing and the results. The defense team also retained Ms. Jeanine Barrett as a gang expert in order to explore the defense theories about whether the murders could have been caused by a "gang hit."

Co-counsel testified that trial counsel did not file a motion in limine to prevent improper comments by the prosecution during the closing arguments. He stated that it never occurred to him to address potential problems involving prosecutorial misconduct pretrial unless he had a good faith reason for doing so. He did not know why he did not object to the prosecutor's argument during rebuttal closing arguments in the penalty phase, stating, "And now Jessie is begging for his life. Did Marissa get a jury? What about Shindri? Did she get a jury? Do[es] somebody have to find aggravating circumstances for her to get the death penalty?"

- 33 -

Co-counsel testified that the mitigation strategy during the penalty phase was based upon the significant trauma suffered by the Petitioner as a child. Ms. Shettles prepared numerous memoranda to trial counsel regarding the information that she found relating to the Petitioner's history. She also prepared a mitigation timeline and a document summarizing the Petitioner's significant life events and themes. Co-counsel stated that trial counsel did not call any of the Petitioner's family members as witnesses during the penalty phase because none of them were willing to testify on the Petitioner's behalf. Co-counsel said Ms. Shettles was the only witness called by the defense in mitigation because trial counsel believed they could present all of the pertinent information about the Petitioner through her. Co-counsel believed Ms. Shettles was able to allude to the Petitioner's intellectual impairments during her testimony.

The defense team retained Dr. James S. Walker, a clinical neuropsychologist, to evaluate the Petitioner. Co-counsel said the defense team was aware that the Petitioner had some deficits and that they wanted to explore how the deficits could configure into their defense. Dr. Walker evaluated the Petitioner and issued a report, which was entered as an exhibit during the post-conviction hearing. According to the report, Dr. Walker diagnosed the Petitioner under Axis I with adjustment disorder with depressed and anxious mood, alcohol dependence, cannabis dependence, and cognitive disorder not otherwise specified based upon the Petitioner's verbal learning problems. Dr. Walker diagnosed the Petitioner under Axis II with antisocial personality characteristics and under Axis IV with current psychosocial stressors of incarceration and legal problems. The Petitioner had a Global Assessment of Functioning score of sixty, which co-counsel acknowledged indicated that the Petitioner had deficiencies. Dr. Walker concluded that the Petitioner was competent to stand trial and did not appear to have a viable insanity defense. Dr. Walker identified several mitigating factors, including physical abuse suffered by the Petitioner as a child, the violent neighborhood in which he was raised, his brother's violent history and intoxication on the night of the murders, the Petitioner's significant academic difficulties and verbal learning problems, the family's neglect of him as a child, his prior criminal history, his intoxication on the night of the murders, and his chances of being a violent adult based upon genetic testing and the abuse he suffered as a child.

Dr. Walker noted that the Petitioner reported that his arrest was the result of a false confession and detailed his conversation with the Petitioner about what occurred on the night of the murders. Dr. Walker noted that factors consistent with a false confession included the absence of a recorded statement, the presence of only the written reports of the officers involved, and the several hours of interrogation prior to the confession. Dr. Walker also noted that the Petitioner had reason to fear for his life if incarcerated after being identified as a child killer. However, Dr. Walker also noted that the Petitioner was not easily led or influence by others and was not unduly suggestible or easily talked into

endorsing false information during the "non-threatening context of a psychological evaluation." Dr. Walker stated that the Petitioner's version of the events seemed "unlikely." Dr. Walker explained:

> For example, the autopsy reports describe the victims as being horrifically injured prior to their deaths, for what must have represented a lengthy, and very noisy, set of events. Yet [the Petitioner] did not report hearing the sounds that would accompany such torture, or even suspicion that extreme violence was taking place in the next room. The fact that he admittedly left the severely injured children there without seeking medical assistance also raises concerns regarding his potential involvement.

Co-counsel testified that he had conversations with Dr. Walker about his findings and that the defense team decided against calling Dr. Walker to testify due to his findings of antisocial personality characteristics. At times during his testimony, co-counsel referred to the Petitioner's diagnosis as "antisocial personality disorder." Co-counsel stated that he viewed antisocial personality as "one of the more dangerous labels in the criminal justice system" because such a diagnosis does not result in as much empathy or sympathy as other more serious mental health diagnoses. He recalled that lead counsel strongly felt that such a diagnosis should not be presented to the jury. Co-counsel stated that he and lead counsel believed that the best chance in mitigation was based on residual doubt with "one juror saying 'I went along and made the deal to convict him, but I'm not giving this guy the death penalty.'"

Co-counsel testified that the defense team retained Dr. Geraldine Bishop to conduct a psychological evaluation of the Petitioner. Co-counsel stated that Dr. Bishop expressed reluctance to work on the case once she learned of the facts. He did not recall why Dr. Bishop performed the majority of her work in September and October of 2010, and co-counsel believed that Dr. Bishop had been retained prior to that time. The defense team did not retain a neurologist to evaluate the Petitioner.

Co-counsel testified that during the opening statements of the penalty phase, he told the jury that the case had more aggravating circumstances than he had ever seen in an effort to "buy credibility" with the jury. He stated that he did not object to a jury instruction indicating that jurors could not have any sympathy for the Petitioner because co-counsel believed the instruction was a correct statement of the law.

On cross-examination, co-counsel testified in February 2015, he loaned his file in this case to the OPCD under the agreement that they would make a copy of it and return it to him. Approximately one month prior to the post-conviction hearing, co-counsel contacted the OPCD to obtain a copy of his file as he had been promised, but the OPCD

refused to provide a copy of the file. As a result, co-counsel was unable to review his entire file in the OPCD's possession prior to testifying.

Co-counsel testified that the murders occurred in March 2008 and that the trial occurred in September 2010. He believed the case was tried on its third setting and stated that he would have requested a continuance if he felt that it was necessary. The State had open-file discovery and maintained the physical evidence in a large room in the courthouse.

Co-counsel had no recollection of the Petitioner's wearing stun cuffs at trial. Co-counsel did not recall discussing or litigating the issue. Co-counsel stated that he did not have a strategic reason to refrain from objecting to the trial court's order for the Petitioner to wear stun cuffs if such an order was issued. The State entered as an exhibit an order entered by the trial court on September 17, 2010, requiring the Petitioner to be in stun cuffs during the trial.

Co-counsel stated that in evaluating the prospective jurors, trial counsel used a numbering system in which lead counsel and co-counsel individually rated each prospective juror and then discussed them. Co-counsel testified that he and lead counsel did not feel that a jury would impose a sentence of less than death if the Petitioner was convicted. Rather, they believed they had a stronger defense related to the guilt phase and considered the defense in weighing each prospective juror. Co-counsel stated that he used sticky notes and a juror sheet in evaluating the jurors, all of which would have been maintained in his case file.

Co-counsel noted that Juror 1 had military experience. Co-counsel explained that while he generally did not like to choose jurors with military experience because he believed they would favor the police, he believed Juror 1's knowledge of ballistics and other forensic issues based upon his military experience was valuable to the defense. Juror 1 answered in his questionnaire, "I believe the death penalty is the appropriate form of punishment in some murder cases, and I can return a verdict of death if I believed it was warranted in a particular case, depending on the evidence, the law, and what I learned about the defendant." Co-counsel said this was a common answer by prospective jurors in death penalty cases.

Co-counsel testified that in prior cases, he and Ms. Shettles had interviewed witnesses together but that in this case, only a few lay witnesses were willing to talk to the defense. Co-counsel agreed that during the penalty phase, Ms. Shettles was able to testify about all the information she had discovered during her investigation regardless of whether the evidence constituted hearsay. He stated that although Ms. Shettles was

unable to provide a diagnosis or an expert opinion, she was able to present evidence related to the Petitioner's mental health to the jury.

Co-counsel testified that trial counsel retained Mr. Richard Earnest as a crime scene expert, hoping he would challenge the State's theory that one person committed the crimes. However, Mr. Earnest was unable to definitively state that a single person could not have committed the crimes. Co-counsel stated that the defense chose to retain Dr. Aldridge as an expert in interviewing children of trauma over another expert because she had testified for the State more often, which made it more difficult for the State to cross-examine her.

Co-counsel agreed that C.J. made inconsistent statement to the police as to the identity of the perpetrator. Co-counsel believed he played portions of C.J.'s video-recorded statement to the police at trial for impeachment purposes. Later during the post-conviction hearing, the post-conviction court found that according to the trial transcript, co-counsel asked during a jury-out hearing to play portions of C.J's video-recorded statement as inconsistent statements and that the State argued that C.J's statements were not inconsistent with his testimony on cross-examination. The post-conviction court stated that following a break and before the trial court issued a ruling, trial counsel announced that they did not have any further questions.

Lead counsel testified that at the time of the Petitioner's case, he was in private practice and that approximately ninety percent of his practice was criminal defense. He was appointed to represent the Petitioner in general sessions court approximately one week after the Petitioner was arrested, and lead counsel and co-counsel were appointed to represent him after he was indicted. Lead counsel stated that he worked more on the guilt/innocence aspect of the case, while co-counsel worked more on the mitigation aspect. Lead counsel said they were both familiar with every witness and every aspect of the trial. Approximately two months after the Petitioner's trial, lead counsel left private practice and joined the Shelby County Public Defender's Office. As a result, a portion of his file was incorporated into co-counsel's file, and the other portion of the file was placed into storage and was later destroyed by water damage.

Lead counsel did not recall any discussion with the Petitioner about his wearing stun cuffs while in Nashville for jury selection. Lead counsel did not recall the trial court's entering an order requiring that the Petitioner wear stun cuffs or the Petitioner's wearing stun cuffs at trial. Lead counsel stated that had he been aware that the Petitioner was wearing stun cuffs, he would have strenuously objected.

Lead counsel testified that in selecting a jury in a death penalty case, "the issue is do you want guilt/innocence or mitigation people." He stated that trial counsel sought

jurors who they believed would be favorable in the guilt phase of the trial because they believed that due to the number of victims and the Petitioner's prior murder conviction, it would be "extremely difficult" to find a juror who would not vote for the death penalty. Lead counsel said he did not intend to question all of the prospective jurors to ensure that they would be able to return a verdict of life imprisonment in the event that they convicted the Petitioner of the charges. He explained that, generally, if a prospective juror stated that he could not return any sentence less than death under the facts of the case, lead counsel likely would challenge the prospective juror for cause eventually but that he preferred to use the prospective juror to educate the rest of the jury. Lead counsel stated that based upon his experience, there were certain prospective jurors that he liked and did not like based upon their religion, occupation, or sexual orientation and that "a lot of it is just gut feeling, how they look at you, how they look at my client."

Trial counsel had the jury questionnaires one to two weeks before trial, and the parties spent one to two days individually questioning those prospective jurors who the State or the defense believed were problematic based upon their responses to the questionnaires. When questioned about why he did not move to strike Juror 1 for cause, lead counsel explained that he conducted voir dire different from many other attorneys and that he often used jurors with extreme views who would offend other jurors with their answers. He stated that he did not want jurors to get along and tried to choose jurors with personalities that would clash. He said he did not question the prospective jurors about race or implicit bias because he did not believe the case involved racial issues.

Lead counsel testified that he had worked with Ms. Geiser and Ms. Shettles on previous cases and that while they discussed different avenues to pursue, it was not necessary for him to instruct them on which witnesses to interview. Lead counsel said that he did not personally interview the lay witnesses and the officers involved in the case and that he probably interviewed the medical examiner. He stated that he always met with the medical examiner if the medical examiner agreed to do so. He testified that he did not object to Dr. Funte's testimony at trial regarding the autopsies performed by Dr. Laboy as violating the Petitioner's confrontation rights because the defense was not disputing the cause of the victims' deaths. Rather, their defense was that the Petitioner was not the perpetrator. Lead counsel believed that objecting too often at trial could "turn the jury off" and make it appear as if the attorney is trying to hide something.

Lead counsel testified that co-counsel wanted to cross-examine the children at trial and that co-counsel likely believed that lead counsel would frighten the children. Lead counsel explained that co-counsel wanted "treat these kids with kid gloves" and that lead counsel, generally, was more aggressive in cross-examining witnesses. Lead counsel had no independent recollection of ever seeing a report on C.J. from the Center for Pediatric Neuropsychology. Lead counsel did not believe he would have questioned C.J. about his

cognitive memory problems from the report. He explained that with any issue involving a jury, he wanted to "walk them down the path" without giving them the final answer, which was "usually pretty obvious," in order to allow the jury to "figure it out and then they would think they'd figured out the whole thing." He stated that "you want the jury to think they're smart and they can figure the crime out because all these people watch *Law and Order* TV shows and crime shows." He also stated that based upon the fact that C.J had a knife embedded in his skull and the physician's testimony regarding the process required to remove the knife, "[t]here's absolutely no doubt in any juror's mind that child had brain damage."

Lead counsel testified that it was "pretty obvious" that the children did not have an independent recollection of the offenses. He said the children had been around family members and other adults while they were discussing the offenses and that the children were repeating what they had heard. He stated that he wished the jury had believed the children because he did not think the children's testimony was consistent with the State's theory and, instead, created reasonable doubt.

Lead counsel testified that prior to trial, he was aware that the State intended to introduce evidence of confessions made by the Petitioner to the police and to his mother. The defense team retained Dr. Leo as a false confession expert, and lead counsel stated that they used Dr. Leo in part to set up an argument that the State should not be allowed to use any of the edited video of the Petitioner's confession from *The First 48* because the false confession expert did not have access to the entire interview. Lead counsel attempted to obtain the unedited footage and had a telephone conversation with someone from the production company, who stated that the recordings are edited immediately and the unused footage is quickly discarded. Lead counsel stated that the person confirmed to him that one of the reasons for the procedure was to avoid being "dragged" into litigation.

Lead counsel did not have an independent recollection of the mitigation theory used at trial but testified that the theory was likely based on the value of the Petitioner's life and on residual doubt. He did not recall whether he or co-counsel questioned Ms. Shettles at trial, and he did not have any independent recollection of Dr. Bishop.

On cross-examination, lead counsel testified that he had represented defendants in a "[c]ouple hundred" homicide cases, including fifty capital cases, and had tried over one hundred jury trials. Lead counsel stated that in the Petitioner's case, the State maintained the physical evidence and the State's file in a room on the second floor of the courthouse and that "[i]t was a room full of paper." He said that he and the prosecutor spent "hundreds of hours" together in the room reviewing the material and that the prosecutor provided him with a copy of any document that lead counsel requested. Lead counsel and the prosecutor met about the photographs that the State intended to present at trial,

and the trial court held a hearing prior to trial regarding any photographs to which the defense objected.

Lead counsel testified that the defense team did not call Dr. Leo as a witness at trial because the defense team was able to convince the trial court to exclude the edited video recording of the Petitioner's confession and the trial court warned the defense team that they could open the door to the admissibility of the video if they were not careful about what they said or argued. Lead counsel stated that the trial court's ruling was a "huge" win because the video was "terrible" and "damning." He explained that the defense team did not present Dr. Earnest as a witness at trial because he was unable to conclude that one person could not have committed the offenses. Lead counsel said the defense team did not call Dr. Walker as a witness because he gave the Petitioner a diagnosis related to antisocial personality. Lead counsel stated, "To me as a defense lawyer in a homicide case, I cannot think of a worse diagnosis unfortunately than antisocial and that's what I was worried about in this case."

Ms. Rachael Geiser, a licensed private investigator, testified that she had been an investigator since May 1999, had conducted the guilt/innocence investigation in the Petitioner's case, and had worked on capital cases prior to the Petitioner's case. Lead counsel asked Ms. Geiser to be the investigator in the case in March 2008 shortly after he was appointed to represent the Petitioner in the general sessions court. She agreed to work pro bono at that point because the Petitioner had not yet been indicted. In addition to her general duties as an investigator, Ms. Geiser assisted in the coordination of experts related to the fact investigation, discussed trial strategy with the defense team, subpoenaed and coordinated witnesses, and met with the Petitioner and trial counsel to prepare for trial. Ms. Geiser stated that she was in regular contact with trial counsel and that the preparation for trial involved a collaborative effort. She assisted trial counsel in developing the defense theory that the Petitioner did not commit the offenses.

Ms. Geiser agreed that the defense team wanted to attack the reliability and voluntariness of the Petitioner's statements and that the Petitioner testified at trial that the statements were coerced. She testified that once the defense received discovery from the State, she learned that the Petitioner did not provide an official statement to the police and that his statements were summarized in a supplemental police report. The defense also received in discovery the interview of the Petitioner's mother with police during which she detailed the Petitioner's confession to her. The defense team retained Dr. Leo, a false confessions expert from San Francisco, California, with whom Ms. Geiser had worked on prior cases. Ms. Geiser testified that Dr. Leo requested that the Petitioner write out his version of the events and that the Petitioner complied with the request. Dr. Leo also requested the unedited footage from *The First 48*. Ms. Geiser said that the defense team was unable to obtain the unedited footage, which hindered Dr. Leo's ability

to determine whether the Petitioner's confessions were false. She sent Dr. Leo the police supplemental report, which summarized the Petitioner's statement, and the edited footage from *The First 48*. Ms. Geiser said Dr. Leo did not issue a report because he was unable to provide any substantive opinions.

Ms. Geiser testified that the episode of *The First 48* aired in July 2008, which was when the defense team first learned how damaging the Petitioner's interview was. The Petitioner was indicted in December 2008, and Ms. Geiser was appointed as the investigator shortly thereafter and then officially had the subpoena power to obtain the footage. She said she issued a subpoena to Granada Entertainment USA, which filmed the footage for *The First 48*, for the unedited footage as quickly as she could in February 2009 and that she believed she also requested the names of the field producers who may have been present during the Petitioner's interview with police. On February 26, 2009, Granada's attorney submitted a letter to Ms. Geiser, stating that the unedited footage was no longer available, declining to provide the names of any producers, and maintaining that the information she sought to obtain was protected by the media shield law.

Ms. Geiser testified that during the time in which she was attempting to obtain unedited footage from Granada for the Petitioner's case, she also was attempting to obtain unedited footage and the identities of the film crew members on another case. She stated that the second case involved a hearing during which Granada's counsel alleged that the information was protected by the media shield law. During the hearing, a witness testified that no unedited raw footage existed because the editors cut or discarded the footage during the editing process. The witness also testified that an employee would review the footage and type a rough draft of a transcript of what everyone said during the recording. Ms. Geiser stated that a transcript could have existed in the second case, as well as in the Petitioner's case, but the trial court in the second case held that the defense was not entitled to the transcript.

Ms. Geiser was never able to obtain the names of the film crew members other than the name of cameraman listed in discovery as being present at the crime scene. She did not know whether the same cameraman was present during the filming of the Petitioner's interview with police and his conversation with his mother. Ms. Geiser did not interview any of the crew members involved in the Petitioner's case. She testified that when she was working on the second case, she interviewed a field producer from Granada who had worked on cases filmed in Louisiana and who informed her that generally the cameraman sets up the video camera in the police department's homicide office to record an officer's interview with a suspect and then walks away. The field producer was unable to confirm to Ms. Geiser that the cameraman "did it here."

Ms. Geiser testified that the defense team retained Ms. Barrett as a gang expert to consult with them about whether the offenses could have been committed by a gang. Ms. Geiser believed Ms. Barrett opined that the offenses could have been committed by a gang and that it was possible that an Asian gang committed the offenses. Ms. Geiser did not believe Ms. Barrett was asked to prepare a report, and she did not testify at trial.

Ms. Geiser testified that the defense team retained Mr. Ernest, a ballistics expert, to assist in deciphering the crime scene and that one of the primary defense theories was that one person could not have committed the offenses. Ms. Geiser had a telephone conversation with Mr. Ernest during which he opined that one person could have committed the offenses. As a result, the defense team did not have him prepare a report.

Ms. Geiser stated that she sent various reports, case summaries, and other documents to Dr. Walker to assist in his evaluation of the Petitioner. She did not recall why Dr. Walker did not testify. She recalled that Dr. Walker's report included a possible antisocial diagnosis. She testified that based upon her experience in working on death penalty cases, an antisocial diagnosis was damaging because "[j]uries don't respond well to it typically."

On cross-examination, Ms. Geiser testified that she never had any issues in obtaining discovery from the State. She also accompanied one of the trial counsel to view the State's physical evidence on a few occasions. Although she did not attend the jury selection in Nashville, Ms. Geiser sat next to the Petitioner throughout the trial and spoke to him while he was in the holding cell during breaks. She said that she never observed him wearing any type of shocking equipment and that she did not recall the Petitioner or anyone else complaining that he was wearing such equipment.

In response to questioning by the post-conviction court, Ms. Geiser testified that an antisocial diagnosis was not evidence that a defense team would want to present to a jury in a capital case. She said the decision not to present a mental health expert who made such a diagnosis was "[p]retty typical," especially after arguing throughout the guilt phase that the client is innocent.

Ms. Glori Shettles, who had been a mitigation specialist for twenty-five years, was the mitigation specialist on the Petitioner's defense team. She obtained records pertaining to the Petitioner and his family and interviewed multiple witnesses. She prepared a chronological timeline based on those records and a summary of the Petitioner's significant life events and themes based upon the records and interviews and provided the documents to trial counsel. She testified that the significant events included a dysfunctional family from the time of the Petitioner's birth; the abandonment and lack of affection, love, and nurturing by his mother; the neglect and deprivation of food; the

witnessing of domestic violence; the use of excessive corporal punishment by both parents; the witnessing of inappropriate sexual behavior by his mother; his retention twice in the fourth grade due to truancy; his exposure to drug use; his use of drugs with his mother; the recommendation of mental health counseling at the age of fourteen due to many issues including poor impulse control and anger; his witnessing of intentional physical abuse of his younger brother by his mother; his obtaining his GED in prison; his effect on his son; and his good employment history. Ms. Shettles also prepared a list of possible mitigating circumstances, which was provided to defense counsel and to the jury.

Ms. Shettles testified that the Petitioner's mother had a son with Mr. Joseph Shaw, with whom his mother sought to continue to have a relationship. Ms. Shettles stated that at the age of eighteen, the Petitioner witnessed his mother place the child in scalding hot water, injuring him and requiring hospitalization. Ms. Shettles said the likely intended purpose of the Petitioner's mother in injuring the child was to get the attention of Mr. Shaw, and Mr. Shaw went to the hospital to check on the child. The Tennessee Department of Children's Services investigated the child's injuries. The Petitioner's mother claimed that the injuries were accidental and that the child's injuries were caused by bleach and not by hot water.

Ms. Shettles testified that she interviewed a woman who began a relationship with the Petitioner after she watched *The First 48* episode. The woman told her that the Petitioner revealed that he was sexually abused by a family member when he was ten or eleven years old. Ms. Shettles also interviewed Mr. James Hathaway, a prison inmate who had known the Petitioner and his family throughout his life. According to Ms. Shettles's memorandum of the interview, Mr. Hathaway had a prior brain injury, which resulted in memory issues. Mr. Hathaway stated that the Petitioner's mother often left her children home alone with no food; that the Petitioner had anger issues, which caused the Petitioner's family to be afraid of him; that the Petitioner possessed guns as a juvenile; that Mr. Hathaway and the Petitioner were in prison together after the Petitioner was convicted of second degree murder; that the Petitioner made money in prison by selling drugs to inmates; that the Petitioner's family never contacted him while he was in prison; that the Petitioner volunteered to participate in a gang program while in prison, which was contrary to the information that Ms. Shettles received from the Security Threat Group coordinator; and that Mr. Hathaway did not believe the Petitioner committed the murders.

Ms. Shettles testified that she was the only witness presented on behalf of the defense during the penalty phase. She became aware that she might testify approximately two months prior to trial. She did not recall whether she met with trial counsel regarding

her testimony before she testified. She stated that co-counsel instructed her "just to talk," which meant "just tell the social history, tell the story."

Ms. Shettles testified that she worked with some mental health experts on the Petitioner's case, but she did not recall working with Dr. Bishop. Ms. Shettles did not recall whether Dr. Bishop had information regarding the Petitioner's mother's scalding her son with hot water. Ms. Shettles identified letters and emails regarding Dr. Bishop and stating that Ms. Shettles was Dr. Bishop's primary contact on the case.

On cross-examination, Ms. Shettles testified that the defense team had a "very good" working relationship, that they had previously worked together on other cases, and that she did not recall any problems amongst the defense team. She stated that dealing with the Petitioner's family was difficult and that whenever she met with members of his family, she believed she had to spend as much time with them as they would allow because she was afraid that she would not have another opportunity to speak with them. Ms. Shettles recalled that the mother of the Petitioner's fourteen-year-old son did not want her son involved in the trial. Ms. Shettles was with the Petitioner during the trial and brought him clothes to wear each day of the trial. She did not recall seeing him wearing stun cuffs.

In response to questioning by the post-conviction court, Ms. Shettles testified that in preparing for her testimony during the penalty phase, she drafted a social history of the Petitioner's life that included information received from the Petitioner, people who she had interviewed, and records that she had obtained. Ms. Shettles stated that the purpose of her testimony at trial was to inform the jury about the Petitioner's life in hopes that that the jury would find something from his childhood or the events in his life that would lead them to impose a sentence less than death. She recalled that she testified about social issues, the traumatic events in the Petitioner's life, his mother's abuse, his problems at school, his issues with incarceration, and his mother's scalding his half-brother. Ms. Shettles noted that Dr. Bishop had emailed her, requesting the hospital records of the Petitioner's half-brother. Ms. Shettles obtained the hospital records and testified at trial regarding the scalding incident. She recalled that following her testimony, the Petitioner's mother became extremely upset with Ms. Shettles and followed her out of the courtroom.

Ms. Shettles agreed that the defense team consulted with many experts, who provided information regarding mitigation themes and the Petitioner's background and that she was able to testify to the information during the penalty phase. She did not recall the prosecutors interrupting her or asking her many questions. She believed that in testifying at sentencing, she had "more free reign" to provide information than an expert because her testimony related to factual information as to what occurred in the

- 44 -

Petitioner's life rather than an expert's opinion. She further explained that she believed that the defense team felt that the opinions of the experts with whom they consulted may have been more harmful than helpful to the Petitioner. She agreed that she was able to get information to the jury that would otherwise have come in through expert witnesses without being in "that confrontational mode."

The Petitioner presented Dr. Marilyn Miller, an associate professor in the Department of Forensic Science at Virginia Commonwealth University, as an expert in crime scene reconstruction, forensic science, and serology. She testified that she was asked to review the crime scene investigation performed by the officers and to determine whether reconstruction of the crime scene was possible. She reviewed "a good bit" of the evidence collection methods employed by the officers, the trial testimony, and the trial exhibits.

Dr. Miller testified that at least thirty people were in and out of the crime scene over the course of the investigation and that "at least one" person and possibly more who entered the crime scene were not members of the Memphis Police Department. She criticized the presence of the film crew for *The First 48* at the crime scene, stating, "Why would you run the risk of changing or altering or losing or contaminating evidence that's at a scene?" She noted that the fact that some of the victims survived the attacks also could have affected the crime scene. She stated that it appeared from a photograph that a cameraman at the crime scene was not wearing personal protective equipment and that the failure to wear such equipment creates the potential for contamination of the crime scene. She noted that although Sergeant Mullins testified at trial that he wore booties while at the crime scene, he should have worn other protective clothing.

Dr. Miller identified instances in which evidence was moved at the crime scene. She testified that the toilet seat in the bathroom was lowered, raised, and lowered again; that the boards were shown in different locations in photographs; and that a sweatshirt and a pillow were moved and then photographed. She stated that by moving evidence, "[i]t may change or alter something." She said that moving evidence with blood on it could change the pattern of the blood or force it off of the object, which would affect any conclusions about how the evidence was created.

Dr. Miller testified that in this case, the detectives were responsible for investigating the crime scene and determining what evidence to collect and process. She stated that the search for evidence at a crime scene and the determination of what evidence to collect and process should be performed by crime scene investigators, who understand the nature of the evidence and the use of enhancement methods to find the evidence. She said that in many cases, the detectives are not up-to-date on the investigation methods.

Dr. Miller noted trial testimony that only one perpetrator could have committed the offenses because the crime scene was so small, and she testified that she was unable to reconcile the opinion with the number of people who entered the crime scene in the small area. She agreed that it was "possible" that a sole perpetrator could have committed the offenses. She testified that another reason used at trial to support the claim that the offenses were committed by a sole perpetrator was that the offenses could have been "easily" committed through "a careful sequencing of the events." She said that if a sole perpetrator committed the offenses, she expected that perpetrator to have a great amount of blood on him or her and that a number of blood fingerprints or palm prints and footwear impressions would have been discovered throughout the house with one person responsible for those prints or impressions. Dr. Miller was unable to discern any specific footwear impressions but noted footwear patterns on some of the wooden boards that resulted from a surface that was not stained with blood touching or stepping on the boards. She stated that no examination was performed on the footwear impression transfer patterns on the wooden boards.

Dr. Miller testified that a perpetrator who stabs a victim commonly cuts himself or herself with the knife and that as a result, she reasonably expected to find the perpetrator's blood at the crime scene. She understood that none of the Petitioner's blood was found at the crime scene and that there was only one fingerprint belonging to the Petitioner among the evidence collected from the home. She said no cuts were on the Petitioner's hands at the time of his arrest, which she found to be "highly unusual" due to the number of sharp force trauma wounds inflicted on the victims. She stated that since 2015, crime scene investigators process the handles of weapons for DNA and examine shoe laces of a suspect "if we're trying to tie a shoe into a particular person because they've touched that area." She said that while these types of investigations were not common at the time of the offenses, they "certainly could be done subsequently."

Dr. Miller testified that the wooden boards could have been used as weapons based upon the blood stain patterns, the infliction of blunt force trauma on some of the victims, and the condition of the broken or splintered boards. She noted that the Petitioner did not have any splinters or any evidence of prior splinters on his hands when he was arrested, which Dr. Miller believed to be unusual given the number of blunt force wounds caused by the wooden boards and the condition of the broken or splintered boards.

Dr. Miller testified that although most blood stain analysts and crime scene reconstruction experts prepare a report of their findings, which will then be subject to peer review, Sergeant Mullins failed to prepare a report. She stated that Sergeant Mullins also improperly relied upon the witness statements of the two surviving children and the Petitioner's statement in reaching his conclusions. She explained that the foundation of

crime scene reconstruction is to base the findings on the blood stain patterns and the physical evidence at the scene and that statements from witnesses should not be considered.

On cross-examination, Dr. Miller testified that she did not conclude that one person could not have committed the offenses. She stated that it was "equally possible" that more than one perpetrator committed the offenses due to the amount of bloodshed and the physical evidence. She explained that "based on … improper investigative techniques, we may or may not be able to know precisely one or the other" and that "[i]t's not a sole perpetrator to the exclusion of the possibility that there were others based on the evidence."

Dr. Miller testified that the methodology used in investigating the crime scene was tainted or flawed in that many of the blood stain patterns possibly could have led to the collection or testing of other evidence. She also testified that the tainted methodology possibly may have changed the evidence or the crime scene and led to erroneous conclusions. She suggested that "there could have been some differences that would have prevented the methodology from being flawed."

On redirect examination, Dr. Miller testified that had she been present in the courtroom when Sergeant Mullins testified, she could have assisted the defense team in developing a cross-examination of Sergeant Mullins regarding the various errors of methodology. On recross examination, Dr. Miller stated that she would have told defense counsel that it was possible that one perpetrator could have committed the offenses but that this conclusion was "not to the exclusion of all of the other possibilities." She did not know whether the perpetrator was wearing gloves while stabbing the victims in order to protect him from cuts. She believed a sufficient time had passed before the offenses were discovered to allow the perpetrator to dispose of his clothing.

In response to questioning by the post-conviction court, Dr. Miller agreed that her testimony was based upon the proper procedures that should be followed by a crime scene reconstructionist and that she was not asked to render an opinion regarding the correctness of the conclusions reached. She testified that Sergeant Mullins misidentified two patterns of impact spatter in one of the bedrooms as castoff stains.

Deputy Carlos Atkins with the Shelby County Sheriff's Department testified that he was the Petitioner's escort officer during the trial and that he was trained and certified in operating stun cuffs. Deputy Atkins identified the trial court's order to have stun cuffs applied to the Petitioner. He did not accompany the Petitioner to Nashville for jury selection. He recalled placing a stun cuff on the Petitioner's left ankle. He stated that

during the guilt phase of the trial, the Petitioner was wearing slacks and a long sleeve, button up shirt and that the slacks covered the stun cuff.

Deputy Atkins testified he placed a stun cuff on the Petitioner during the sentencing hearing when the Petitioner was wearing his jail uniform. Deputy Atkins stated that the jury was present during this sentencing hearing. He recalled the Petitioner saying that since the jury already thought that he was a "monster," there was no need for him to wear street clothes and that he would just wear his jail uniform. Deputy Atkins never activated the stun cuff.

On cross-examination, Deputy Atkins testified that he placed the stun cuff on the Petitioner on two separate days, the day in which the Petitioner wore his jail uniform during the trial and the day when the Petitioner returned for a sentencing hearing in order to sign paperwork. The Petitioner was not wearing a stun cuff when he testified at trial. Deputy Atkins stated that before he placed the stun cuff on the Petitioner on the day that he wore his jail uniform, Deputy Atkins told a man and a woman, who were speaking to the Petitioner while he was in the holding cell, that a stun cuff would be placed on the Petitioner. Deputy Atkins agreed that the two days during which the Petitioner wore a stun cuff were far apart in time.

In response to questioning by the post-conviction court, Deputy Atkins agreed that he placed stun cuffs on the Petitioner on only two occasions. He also agreed that the first time that the Petitioner wore stun cuffs was during the sentencing phase of the trial after the verdict had been returned and when the Petitioner decided to remain in his jail uniform. Deputy Atkins stated that he placed a stun cuff on the Petitioner "that day." Deputy Atkins stated that the second occasion during which the Petitioner wore a stun cuff occurred much later on during another proceeding.

The post-conviction court, which also was the trial court, recalled that there were never any problems with the Petitioner throughout the proceedings. The court stated that the sheriff requested an order allowing stun cuffs to be placed on the Petitioner in the event that "something occurred" such that he believed the stun cuffs were necessary. The court explained that it went ahead and entered the order so that it did not have to stop the proceedings to enter an order in the event stun cuffs became necessary.

The State presented the testimony of Deputy Keley Gray with the Shelby County Sheriff's Department, who worked on the Gang Unit inside the jail. Deputy Gray escorted the Petitioner to Nashville for jury selection and back to Memphis and accompanied the Petitioner throughout the trial. Deputy Gray testified that the Petitioner never wore a stun cuff during the proceedings. Deputy Gray stated that Deputy Atkins would have been responsible for placing the stun cuff on the Petitioner because he was

certified to do so but that Deputy Gray would have known if Deputy Atkins had placed the stun cuff on the Petitioner.

On cross-examination, Deputy Gray testified that if the Petitioner was wearing street clothes, the stun cuff would be placed so that it would not have been seen underneath the trouser. Deputy Gray recalled that the Petitioner was wearing street clothes during the guilt phase of the trial and that the Petitioner was wearing a stun cuff on his ankle on the "sentencing date." On redirect examination, Deputy Gray clarified that the "sentencing date" was the day in which the trial court sentenced the Petitioner. Deputy Gray did not believe the jury was present on the day in which the Petitioner wore a stun cuff.

The State also presented the testimony of Assistant District Attorney General Ray Lepone, who was the prosecutor at trial and in charge of the discovery. He testified that he had worked with both trial counsel on numerous homicide cases and always had an open-file policy, which he stated meant "they're going to see everything in my file unless it's something protected by statute where the judge orders that neither one of us can see it or that it's protected." He maintained the State's file in a conference room, and when lead counsel sought to view the file, General Lepone either accompanied lead counsel into the room or left lead counsel and Ms. Geiser in the room alone to view the file.

General Lepone testified that each of the children were evaluated and that the records of their evaluations were placed in separate folders that were labeled and had blue checkmarks, which General Lopone stated he made on the folders to indicate that he was present when lead counsel reviewed the file. He recalled discussing the reports with lead counsel and stated that Dr. Vicki Brewer, who evaluated the children, was on the State's witness list provided to the defense. He also stated that he announced on the record during a hearing that he was turning over the names of those who treated and evaluated the children to the defense and that lead counsel responded that the defense team would issue subpoenas if they believed it was necessary.

General Lepone testified that the children made many different statements and that their forensic interviews were "all over the place." He stated that the defense's cross-examination of the children was "amazing" and that they did a "fabulous job." He noted that co-counsel was able to get C.J. to agree with him on everything and that co-counsel was able to bring out the different suspects whom the children had identified and the inconsistencies in their forensic interviews.

On cross-examination, General Lepone agreed that during the State's rebuttal closing argument in the guilt phase of the trial, he stated that "C.J. knows who put the knife in his head. He knows it and he told you who did it" and that C.J. solved the case.

General Lepone also agreed that the prosecutor who gave the initial closing argument referred to C.J. as the "hero of the case" because he survived in a bathtub with a knife in his head for forty hours. General Lepone noted that Lieutenant Davidson also referred to C.J. as a "hero" multiple times during his testimony. General Lepone recalled that the other prosecutor also argued to the jury, "C.J. knows what happened because he was there and he saw [the Petitioner] do it. I wanted you to see C.J. I wanted you to hear C.J."

General Lepone testified that the only defense theory that could have been presented was that the Petitioner was not the perpetrator because the defense did not have a valid argument that the murders were committed in self-defense or constituted second degree murder. The State initially believed that a gang could have committed the offenses. General Lepone stated that as a result, police officers "actually build in a lot of the defense" for the Petitioner because they searched for "the worst of the worst" and interviewed gang members, including members of the Gangster Disciples. Law enforcement sought the assistance of FBI profilers, who stated that a Mexican gang could have committed the murders. Law enforcement identified numerous possible suspects and prepared numerous supplemental reports, all of which were provided to the defense in discovery. General Lepone stated that the defense presented this information to the jury, including evidence that Mr. Cecil Dotson was a Gangster Disciple and had an altercation with another gang member one or two weeks prior to the murders.

General Lepone testified that based upon information from experts regarding the trauma and nature of the injuries suffered by the children, he and the other prosecutors decided early in the case that it would not be prudent to attempt to talk to the children. General Lepone said that when the State called the children as witnesses, the prosecution had "no idea what they were going to say or if they would every say anything" but that the prosecution knew that the jury would want to at least hear from C.J. General Lepone agreed that it was clear from the defense's cross-examination of C.J. that they wanted to call C.J.'s identification of the Petitioner as the perpetrator into question. General Lepone stated that co-counsel "did an amazing job" in cross-examining the children and "pretty much washed the entire direct examination away." He said he did not believe "there's anything else those lawyers could have done with information in our file to attempt to discredit those children after they got up here and pretty much told the jury what they had to tell them."

General Lepone testified that he recalled discussing Dr. Brewer's report of her neuropsychological evaluation with lead counsel. General Lepone did not discuss the report with co-counsel and did not know whether he made a copy of the report or provided it to Ms. Geiser. General Lepone stated that lead counsel told him that the portion of the report regarding C.J.'s memory could be proven through any of the State's

evidence. General Lepone noted that C.J. had a knife in his head, lay in a bathtub for forty hours, and underwent brain surgery. He explained, "I don't think it was any secret that somebody could stand up without any of that documentation and start to question the child's memory." He stated that his conversation with lead counsel involved whether C.J.'s long-term memory issues would benefit the State or the defense, and General Lepone believed the child's long-term memory issues benefitted the State at trial. He explained that C.J.'s initial identification of the Petitioner as the perpetrator while at the hospital involved short-term memory and that C.J. was unable to remember the events as well by the time of the trial due to his issues with long-term memory. General Lepone noted that instead of focusing on C.J's long-term memory issues, the defense focused on the inconsistent statements made by the children. He stated that at trial, "that was probably the worst day for the State [due to] how effectively they cross-examined those children."

General Lepone testified that the Petitioner testified at trial regarding his entire version of the events and kept saying, "Look at the tape." The State argued that as a result, the edited version of the Petitioner's interview should be admitted, but the trial court denied the request. General Lepone noted that the Petitioner testified that as he was talking to his mother in the interview room, he was also whispering to his mother that he did not commit the offenses. General Lepone stated that while the Petitioner's mother also denied that the Petitioner whispered to her, the edited recording would have established that the Petitioner's claims were untrue.

Following the hearing, the post-conviction court entered digital copies of the files from co-counsel, Ms. Geiser, and Ms. Shettles as late-filed exhibits. The post-conviction court entered an order finding that co-counsel had given the defense's original trial file to the OPCD based upon representations from the OPCD that a copy of the file would be provided to him and that the OPCD then refused to provide a copy to co-counsel in order to allow him to prepare for his testimony at the post-conviction hearing. The post-conviction court found that as a result, co-counsel was unable to recall the reasoning for some of the decisions made regarding the trial when questioned about them at the post-conviction hearing. The post-conviction court also found that the OPCD violated the court's order requiring them to provide to the State a copy of all the materials from the defense team's trial file that were relevant to the issues raised in the petition.

The Petitioner did not testify at the post-conviction hearing. On May 16, 2019, the post-conviction court entered a 109-page order addressing the Petitioner's claims raised in his various petitions and denying the Petitioner's request for post-conviction relief. This appeal followed.

**ANALYSIS**

The Petitioner contends that (1) he received ineffective assistance of counsel at trial and on direct appeal; (2) the AOC and the Chief Justice of the Tennessee Supreme Court improperly vacated the post-conviction court's orders granting the Petitioner's request for funding of experts; (3) the State improperly failed to preserve the videotape of the Petitioner's custodial interrogation by police and his interactions with this mother; (4) the State improperly withheld evidence; (5) the use of a stun cuff during the trial violated the Petitioner's due process rights; (6) a juror's service on the jury violated the Petitioner's constitutional rights; (7) the Petitioner's convictions and death sentences were the result of juror misconduct; (8) the State made improper comments during closing arguments; (9) the Petitioner's convictions and death sentences and Tennessee's execution method are unconstitutional; and (11) cumulative error warrants relief.

The Post-Conviction Procedure Act provides for relief when a petitioner's "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden of proving allegations of fact by clear and convincing evidence falls to the petitioner seeking relief. T.C.A. § 40-30-110(f). The post-conviction court's findings of fact are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Accordingly, the reviewing court defers to the post-conviction court's findings regarding the credibility of witnesses, the weight and value of witness testimony, and the resolution of factual issues. *Id.* Questions of law and mixed questions of law and fact are reviewed de novo. *Id.*

## I. Ineffective Assistance of Counsel

The Petitioner maintains that trial counsel were ineffective in their investigation prior to trial, during jury selection, during both phases of the trial, and on appeal. He asserts that trial counsel were ineffective prior to trial in failing to (1) pursue the suppression of the Petitioner's statements to the police and to his mother; (2) obtain the unedited video recording of the Petitioner's interview with the police and his interactions with his mother; (3) and challenge the State's failure to preserve the unedited video recording. He asserts that trial counsel were ineffective during jury selection in failing to (1) challenge the trial court's death qualification procedures; (2) question prospective jurors about racial and implicit bias; (3) rehabilitate prospective jurors; (4) challenge a juror for cause; and (5) exhaust their peremptory challenges. The Petitioner argues that trial counsel were ineffective during both phases of the trial in failing to (1) object to the use of a stun cuff on the Petitioner; (2) present evidence of C.J.'s long-term memory deficits; (3) object to the introduction of photographs of the crime scene; (4) object to the

forensic pathologist's testimony about three autopsies that she did not perform; (5) effectively challenge the testimony of the State's witnesses; (6) object to testimony as inflammatory and irrelevant; (7) prepare the Petitioner for his testimony; (8) present mitigating evidence during the penalty phase; (9) make a proper opening statement during the penalty phase; (10) prevent and/or challenge the State's improper comments during closing arguments; and (11) object to various jury instructions. The Petitioner also asserts that trial counsel were ineffective in failing to raise challenges on direct appeal to an officer's testimony as inflammatory and irrelevant and to the trial court's jury instructions.

Under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, the accused is guaranteed the right to effective assistance of counsel. *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016). To prevail on a claim that he was denied his constitutional right to effective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficient performance caused prejudice to the defense. *Kendrick*, 454 S.W.3d at 457 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A claim may be denied for failure to establish either deficiency or prejudice, and the reviewing court need not address both components if a petitioner has failed to establish one. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Each element of a claim of ineffective assistance of counsel is a mixed question of fact and law reviewed de novo. *Kendrick*, 454 S.W.3d at 457.

"Establishing deficient performance requires showing 'that counsel's representation fell below an objective standard of reasonableness,' which standard is measured by 'professional norms' prevailing at the time of the representation." *Garcia v. State*, 425 S.W.3d 248, 256-57 (Tenn. 2013) (quoting *Strickland*, 466 U.S. at 688). So long as counsel's representation was "'within the range of competence demanded of attorneys in criminal cases,'" counsel will not be deemed to have performed deficiently. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Deficient performance requires a showing of errors so serious that "'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id*. (quoting *Strickland*, 466 U.S. at 687).

The reviewing court should not second-guess strategic choices or measure counsel's performance by "'20-20 hindsight.'" *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997) (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). In reviewing counsel's professional decisions, a "'fair assessment ... requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Goad*, 938 S.W.2d at 369 (quoting *Strickland*, 466 U.S. at 689). Strategic decisions based on a thorough investigation of law and relevant facts are virtually

unchallengeable. *Felts*, 354 S.W.3d at 277. However, deference is only given to strategic decisions which "are informed ones based upon adequate preparation." *Moore*, 485 S.W.3d at 419.

In determining prejudice, the reviewing court must decide if there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Calvert v. State*, 342 S.W.3d 477, 486 (Tenn. 2011) (quoting S*trickland*, 466 U.S. at 694). A reasonable probability is "'a probability sufficient to undermine confidence in the outcome.'" *Id*. (quoting *Strickland*, 466 U.S. at 694). The reasonable probability standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). In evaluating whether a petitioner satisfied the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687). In other words, "a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the [petitioner] of a fair trial and called into question the reliability of the outcome." *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). When challenging a death sentence, the petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" *Henley*, 960 S.W.2d at 579-80 (quoting *Strickland*, 466 U.S. at 695); *see Cullen*, 563 U.S. at 198.

### A.  Pretrial Investigation

### 1. Failure to Seek Suppression of the Petitioner's Statements

The Petitioner asserts that trial counsel were ineffective in failing to seek suppression of his statements to Deputy Director Armstrong and to his mother. The Petitioner argues that Deputy Director Armstrong continued questioning him after he invoked his right to remain silent, that his statement to Deputy Director Armstrong was an involuntary product of police coercion, and that his mother elicited his statement to her while she was acting as an agent for the State and after he had invoked his right to counsel. The State responds that the Petitioner has failed to establish that he is entitled to relief. We agree with the State.

"In order to succeed in proving ineffective assistance of counsel with respect to counsel's failure to file a motion to suppress the evidence, [a petitioner] must satisfy both prongs of the *Strickland* test, showing that counsel's failure to file the motion was deficient and that the deficient performance prejudiced the defense." *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 687), *abrogated on*

*other grounds by Brown v. Jordan*, 563 S.W.3d 196 (Tenn. 2018). To demonstrate prejudice, the petitioner must show a reasonable probability that the motion would have been granted and that the outcome of the proceeding would thereby have been altered. *See Jason Lee Holley v. State*, No. M2017-00510-CCA-R3-PC, 2017 WL 5197295, at *5 (Tenn. Crim. App. Nov. 9, 2017), *perm. app. denied* (Tenn. Feb. 14, 2018). "In essence, the petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing." *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011).

### a. Invocation of the Right to Remain Silent

The Petitioner asserts that trial counsel were ineffective in failing to file a motion to suppress his statement to Deputy Director Armstrong on the basis that the Petitioner invoked his right to remain silent to Lieutenant Mason and Sergeant Stark prior to his interview with Deputy Director Armstrong. Although the Petitioner made a general claim in his pro se post-conviction petition that trial counsel were ineffective in failing to timely file a motion to suppress his confession, he offered no basis in his petition to support the claim and only alleged in his amended petition that Deputy Director Armstrong coerced him into confessing as a basis for seeking suppression of his confession. The post-conviction court did not address the issue of whether trial counsel were ineffective in failing to seek to suppress the confession on the basis that the Petitioner invoked his right to remain silent. Therefore, the issue is waived. *See Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020) ("Tennessee appellate courts may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection.").

Furthermore, on direct appeal, the Petitioner argued that he had invoked his right to remain silent. *See Dotson*, 450 S.W.3d at 52-53. The Tennessee Supreme Court reviewed the issue for plain error and rejected the Petitioner's argument, concluding that the Petitioner said "he did not wish to speak with Lieutenant Mason and Sergeant [Max] any longer and asked to speak with other officers" and that the Petitioner's "request to speak to officers other than those conducting the interview did not amount to an invocation, ambiguous or unambiguous, of his right to remain silent." *Id*. at 53. Accordingly, the Petitioner has failed to establish deficiency or prejudice.

### b. Involuntary Confession

The Petitioner asserts that he confessed only after Deputy Director Armstrong threatened to kill him or place him among Shelby County Jail inmates who would do so.

The Petitioner maintains that as a result, his confession was involuntary and that trial counsel were ineffective in failing to file a motion to suppress on that basis.

Grounded in both the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, the voluntariness test recognizes that coerced confessions are inherently unreliable. *Dickerson v. United States*, 530 U.S. 428, 433 (2000); *State v. Climer*, 400 S.W.3d 537, 567-68 (Tenn. 2013). Similarly, the use of coerced confessions violates article I, section 9 of the Tennessee Constitution, which states that "in all criminal prosecutions, the accused … shall not be compelled to give evidence against himself." The test for voluntariness for confessions under this provision of the Tennessee Constitution "is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *see State v. Freeland*, 451 S.W.3d 791, 815 (Tenn. 2014).

The voluntariness test is distinct from the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966). *Dickerson*, 530 U.S. at 434-35; *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978); *Climer*, 400 S.W.3d at 567-68. While *Miranda* questions whether a suspect received certain warnings and knowingly and voluntarily waived his or her rights, "the essential inquiry under the voluntariness tests is whether a suspect's will was overborne so as to render the confession a product of coercion." *Climer*, 400 S.W.3d at 568 (citing *Dickerson*, 530 U.S. at 433-35; *Smith*, 933 S.W.2d at 455). A suspect's subjective perception alone is insufficient to support a conclusion of involuntariness of a confession. *Smith*, 933 S.W.2d at 455 (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Brimmer*, 876 S.W.2d at 79.

In determining the voluntariness of a confession, the court must examine the totality of the circumstances surrounding the statement or confession, including "'both the characteristics of the accused and the details of the interrogation.'" *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434). The circumstances relevant to this determination are:

> "[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food,

sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse."

*Id.* (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)).

The Petitioner did not testify or otherwise present any evidence during the post-conviction hearing that Deputy Director Armstrong threatened him and, thus, coerced him into confessing. Rather, the Petitioner relies upon his own testimony at trial that after several hours of questioning, he confessed to committing the offenses only after Deputy Director Armstrong threatened to either kill him or house him with Shelby County Jail inmates who would kill him. The Petitioner also testified at trial that when he spoke to his mother, he leaned across the table and told her that "they [were] trying to put this on me" and that they were watching him.

The Petitioner's mother, however, testified at trial that the Petitioner did not say anything about the police when she met with him in the interview room. Rather, she testified that when she entered the interview room, she asked him "were they trying to put it on him, what's going on." She stated that the Petitioner held his head down and did not respond. The post-conviction court relied upon this testimony, which contradicted the Petitioner's testimony, in finding that the Petitioner failed to establish that his confession was coerced.

Deputy Director Armstrong also offered detailed testimony at trial regarding his questioning and conversations with the Petitioner leading up to the Petitioner's confession, which was inconsistent with the Petitioner's testimony regarding the interview. Deputy Director Armstrong's detailed testimony about the interview did not include any threats on the Petitioner's life. Lead counsel questioned Deputy Director Armstrong extensively on cross-examination regarding his questions, comments, and statements during the interview leading up to the Petitioner's confession, and Deputy Director Armstrong never testified that he threatened to kill the Petitioner or to place him with inmates who would kill him.

The question of whether Deputy Director Armstrong threatened and, thus, coerced the Petitioner into confessing is a factual issue that the Petitioner had the burden at the post-conviction hearing of proving by clear and convincing evidence. *See Smith v. State*, 357 S.W.3d 322, 335 (Tenn. 2011) (stating that a petitioner seeking post-conviction relief has the burden of proving factual allegations by clear and convincing evidence); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (noting that questions regarding whether the defendant was in custody, interrogated, or confessed of his own volition are primarily factual issues binding on the appellate court, whereas the trial court's application of law to the facts is reviewed de novo). "'Evidence is clear and convincing when there is no

serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). Given the lack of evidence presented by the Petitioner at the post-conviction hearing and the trial testimony of Deputy Director Armstrong and the Petitioner's mother, which contradicted the Petitioner's trial testimony, we conclude that the Petitioner failed to establish by clear and convincing evidence that he was threatened and, thus, coerced into giving his confession. Conflicting trial testimony from witnesses does not amount to clear and convincing evidence. Because the evidence in the record fails to establish that the Petitioner would have been successful had trial counsel filed a motion to suppress, the Petitioner did not demonstrate prejudice.

### c. The Petitioner's Statement to His Mother

The Petitioner contends that trial counsel were ineffective in failing to file a pretrial motion to suppress his statement to his mother. He argues that his mother was acting as an agent for the State and elicited the statement from him after he invoked his right to counsel. Although trial counsel did not file a motion to suppress prior to trial, they filed a motion during the trial, challenging the admission of the Petitioner's statement to his mother on this basis. *See Dotson*, 450 S.W.3d at 53-54. The trial court conducted an evidentiary hearing, during which the Petitioner's mother testified, and the trial court denied the motion. *Id.* The Petitioner raised the trial court's denial of the motion as an issue on direct appeal. *Id.* Reviewing the issue for plain error due to trial counsel's failure to file a motion to suppress prior to trial, the Tennessee Supreme Court held that "[n]othing in the record supports the [Petitioner's] claim that Ms. Shaw was acting as a state agent or that Ms. Shaw's conversation with the [Petitioner] amounted to interrogation." *Id.* at 55. During the post-conviction hearing, the Petitioner did not present any additional proof that he claims trial counsel could have presented had they filed the motion prior to trial. Accordingly, the Petitioner is not entitled to relief regarding this issue.

### 2. Failure to Obtain the Raw Video Footage of the Petitioner's Statements

The Petitioner challenges trial counsel's failure to obtain *The First 48* raw video footage of his interview with the police and his conversation with his mother. He asserts that lead counsel was deficient in failing to issue a subpoena requiring the production of the unedited video prior to or at the preliminary hearing and, instead, issuing a subpoena at a later date after the raw footage had been destroyed. The Petitioner contends that had lead counsel issued a subpoena sooner, a reasonable probability exists that lead counsel would have been able to prevail against Granada's assertion of protection under the media shield law and that the trial court would have relied upon the raw footage to

suppress the Petitioner's statements. The State responds that the evidence fails to establish that trial counsel were deficient or that any deficiency resulted in prejudice. We agree with the State.

As found by the post-conviction court, trial counsel attempted to obtain a copy of the unedited footage, but trial counsel's efforts were unsuccessful. The post-conviction court found that Granada destroyed the unedited footage "sometime before the final cut of the episode which aired on July 15, 2008, just about four months after the Petitioner's arrest." Lead counsel testified that he spoke to someone from the production company, who stated that the recordings were edited immediately and that the unused footage was quickly discarded in order for the production company to avoid being "dragged" into litigation. The Petitioner failed to establish that the unedited recording would have been available had lead counsel sought to obtain the recording prior to the preliminary hearing. Once trial counsel learned that the unedited footage had been destroyed, they filed a motion seeking to preclude the State from presenting the edited recording of the Petitioner's interview with police and his interactions with his mother, and the trial court granted the motion, which lead counsel characterized as a "huge" win. The Petitioner failed to establish that trial counsel were deficient in this regard. *See Aaron Malone v. State*, No. W2016-00666-CCA-R3-PC, 2017 WL 1404374, at *14 (Tenn. Crim. App. Apr. 18, 2017) (concluding that trial counsel was not deficient in failing to seek unedited footage from *The First 48* when he had recently sought similar footage for another defendant and knew that such footage typically was destroyed); *Adrian Deangelo Todd v. State*, No. W2012-00442-CCA-MR3-PC, 2013 WL 1908861, at *10 (Tenn. Crim. App. May 7, 2013) (holding that trial counsel did not perform deficiently "for being unable, despite his best efforts, to procure any additional footage" from *The First 48*).

### 3. Failure to Challenge the State's Failure to Preserve the Unedited Video Recording

The Petitioner asserts that trial counsel were ineffective in failing to challenge the State's failure to preserve the unedited video recording of his interview with police and his interactions with his mother as violating his due process rights under both the United States and Tennessee Constitutions and pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). The Petitioner also asserts that the State acted in bad faith in failing to preserve the evidence in violation of *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). He argues that had trial counsel raised the claims, a reasonable probability exists that the trial court would have granted the motion and would have either dismissed the indictment, precluded the State from introducing the Petitioner's statements into evidence, or instructed the jury that it could infer that the events depicted by the raw footage were unfavorable to the State.

In *State v. Ferguson*, our supreme court held that "the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *Ferguson*, 2 S.W.3d at 915-16). Upon determining that the due process clause under the Tennessee Constitution was broader than the due process clause under the United States Constitution, the Tennessee Supreme Court rejected the "bad faith" analysis adopted by the United States Supreme Court which provided that "'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Id.* at 784-85 (quoting *Youngblood*, 488 U.S. at 58). Rather, the Court in *Ferguson* adopted a balancing approach requiring the trial court to determine "'[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair.'" *Id.* at 785 (quoting *Ferguson*, 2 S.W.3d at 914).

The State argues that the Petitioner waived his claims by failing to raise them in his post-conviction petition. The Petitioner alleged in his amended post-conviction petition that trial counsel were ineffective in failing to request a missing evidence jury instruction in regard to the unedited footage from *The First 48*. He argued that "[s]ince counsel did not seek access to information held by Granada until after it was effectively destroyed, counsel should have at least sought a missing evidence instruction, a remedy available under *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999)." The Petitioner did not argue that the State acted in bad faith in violation of *Arizona v. Youngblood* as it related to his claim of ineffective assistance of counsel, and the post-conviction court did not address the issue in its order. Accordingly, this issue is waived. *See Holland*, 610 S.W.3d at 458. The Petitioner, however, raised in his amended petition trial counsel's failure to assert a *Ferguson* violation, and the post-conviction court addressed the issue as it related to the claim regarding trial counsel's failure to request a missing evidence jury instruction. We conclude the issue of whether trial counsel were ineffective in failing to raise a *Ferguson* claim is properly before this court.

Whenever a *Ferguson* claim is raised, the trial court must first determine "whether the State had a duty to preserve the evidence." *Merriman*, 410 S.W.3d at 785. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Id.* (quoting *Ferguson*, 2 S.W.3d at 917). To meet the constitutionally material evidence standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (footnote omitted).

If the proof establishes that the State had a duty to preserve the evidence and that the State failed in its duty, the court must conduct a balancing analysis, considering the following factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Ferguson*, 2 S.W.3d at 917 (footnote omitted). The trial court must balance these factors to determine whether a trial would be fundamentally fair absent the missing evidence. *Merriman*, 410 S.W.3d at 785. If the trial court concludes that a trial would be fundamentally unfair absent the missing evidence, "the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.* at 786.

Although the Petitioner argues on appeal that the trial court could have dismissed the case, precluded the State from introducing his statements, or provided a jury instruction, the Petitioner only raised a narrow issue in the post-conviction court that trial counsel should have requested a jury instruction on the destroyed evidence, and the post-conviction court only addressed trial court's failure to seek a jury instruction as a remedy for a *Ferguson* violation. Thus, the Petitioner has waived any issue on appeal regarding trial counsel's failure to seek to dismiss the case or preclude the State from introducing his statements due to a *Ferguson* violation, and our analysis is limited to trial counsel's failure to request a missing evidence jury instruction. *See Holland*, 60 S.W.3d at 458.

The only evidence presented at the post-conviction hearing regarding trial counsel's failure to request the jury instruction was co-counsel's testimony that they likely did not request a missing evidence jury instruction due to fear that they would open the door to the introduction of the edited recording of the Petitioner's interview with the police and his interactions with his mother. During the post-conviction hearing, the Petitioner did not present the edited recording that was in trial counsel's possession during the trial proceedings. Co-counsel testified that while the Petitioner's statement was "bad," the available portion of the recording of his statement was "much worse." Lead counsel described the recording as "terrible" and "damning," and the Petitioner did not present the edited version of the recording in the post-conviction court to refute trial counsel's testimony regarding the "damning" nature of the edited recording. General Lepone stated that the edited recording would have refuted the Petitioner's claims that he also was whispering to his mother while speaking to her in the interview room. The trial court granted trial counsel's motion in limine to exclude the edited recording at trial due to the unavailability of the unedited footage. However, the trial court warned trial

counsel of the limitations of its ruling and the possibility that trial counsel could open the door to the introduction of the edited recording. Co-counsel emphasized the importance placed by trial counsel in exercising care to avoid opening the door to the admission of the edited recording. Co-counsel testified that trial counsel's strategy prioritized keeping the jury from viewing the edited footage, and such reasonable strategic decisions are virtually unchallengeable. *Felts*, 354 S.W.3d at 277. Furthermore, the evidence fails to demonstrate that the trial court would have granted a request for a missing evidence instruction while denying the State the opportunity to present the portion of the recording that was available. The Petitioner is not entitled to relief regarding this issue.

## B. Jury Selection

### 1. Failure to Challenge the Trial Court's Death Qualification Procedure

The Petitioner challenges trial counsel's failure to object to the "death qualification" of prospective jurors, arguing that "death qualified" jurors are more likely to convict a defendant of the most serious charged offense. He also argues that when voir dire focuses on the death penalty, the parties and the trial court convey the impression to prospective jurors that they believe the defendant is guilty, that the "real" issue is the appropriate penalty, and that the defendant deserves the death penalty. Tennessee appellate courts have repeatedly rejected federal and state constitutional challenges to the process of "death qualification," including those raised by the Petitioner. *See, e.g., State v. Willis*, 496 S.W.3d 653, 756-57 (Tenn. 2016) (appendix) (rejecting constitutional challenges to the exclusion of jurors who were not "death qualified" and the use of a "death qualified" jury); *State v. Odom*, 137 S.W.3d 572, 601 (Tenn. 2004) (appendix) (rejecting the argument that "the death qualification process skews the make-up of the jury and results in a relatively prosecution-prone guilt-prone jury"); *State v. Reid*, 91 S.W.3d 247, 289-90 (Tenn. 2002) (appendix) (rejecting a state constitutional challenge to the removal of jurors for cause when those jurors opposed the imposition of the death penalty due to "sincerely held" religious, moral, or philosophical beliefs); *State v. Hall*, 958 S.W.2d 679, 717 (Tenn. 1997) (appendix) (rejecting claim that the manner of selecting "death qualified" jurors unconstitutionally results in juries that are prone to conviction); *State v. Jones*, 789 S.W.2d 545, 547 (Tenn. 1990) (rejecting claim that "death qualification" of jury violated the Sixth Amendment by depriving the defendant of a fair and impartial jury). Trial counsel, therefore, were not deficient, and the Petitioner is not entitled to relief.

### 2. Failure to Question Prospective Jurors About Racial and Implicit Bias

The Petitioner asserts that trial counsel neglected to ensure that he had a fair trial by an impartial jury by failing to question prospective jurors about racial and implicit

bias. The post-conviction court credited trial counsel's testimony that they did not consider race to be an issue in this case. Co-counsel testified that he would have asked questions regarding racial bias if he had any indication from a juror's answers or demeanor that he needed to explore the topic. The Petitioner has not pointed to anything in the juror's answers in their questionnaires or during voir dire suggesting that co-counsel should have explored the topic. The Petitioner also has failed to demonstrate that the jury had any actual bias against him. The Petitioner has established neither deficiency nor prejudice.

### 3. Failure to Rehabilitate Prospective Jurors

The Petitioner maintains that trial counsel were ineffective in failing to rehabilitate six prospective jurors, who were discharged by the trial court after they stated that they could not impose the death penalty. The State responds that the Petitioner did not establish deficient performance or prejudice, noting that the trial court and the State attempted to rehabilitate each of the six prospective jurors to no avail.

Parties are granted "'an absolute right to examine prospective jurors'" to determine whether they are competent. *State v. Kiser*, 284 S.W.3d 227, 279 (Tenn. 2009) (quoting T.C.A. § 22-3-101). The standard for determining when a prospective juror may be excused for cause due to the juror's views on the death penalty is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quotation omitted). A juror's biases need not "be proven with 'unmistakable clarity.'" *Id.* The trial court, however, "must have the 'definite impression' that a prospective juror could not follow the law." *State v. Austin*, 87 S.W.3d 447, 473 (Tenn. 2002) (quoting *State v. Hutchison*, 898 S.W.2d 161, 167 (Tenn. 1994)), *abrogated on other grounds by State v. Urshawn Eric Miller*, No. W2019-00197-SC-DDT-DD, __ S.W.3d __, 2021 WL 5810574, at *6 (Tenn. Dec. 7, 2021). "'Clearly, the extremes must be eliminated—i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence.'" *Morgan v. Illinois*, 504 U.S. 719, 734 n. 7 (1992) (quoting *Smith v. Balkcom*, 660 F.2d 573, 578 (5th Cir. 1981)). "Where attempts to rehabilitate a juror who has refused to impose the death penalty would be futile, refusal to engage in such useless efforts rarely constitutes deficient performance under *Strickland.*" *Detrick Cole v. State*, No. W2008-02681-CCA-R3-PD, 2011 WL 1090152, at *9 (Tenn. Crim. App. Mar. 8, 2011) (citing *Simon v. Epps*, 344 Fed. Appx. 69, 84 (5th Cir. 2009)).

The transcript of voir dire reflects that each of these prospective jurors who were excused by the trial court maintained that they were unable to return a sentence of death due to their religious beliefs. They continued to adhere to their position even after the

trial court and/or the State further questioned them and explained the law. The trial court excused the prospective jurors as a result. The Petitioner did not question trial counsel during the post-conviction hearing about their decision against attempting to rehabilitate these prospective jurors. Nevertheless, the record reflects that these prospective jurors were adamant and unequivocal in their position that they could not return a sentence of death despite attempts by the trial court and the State to rehabilitate them. Because additional efforts to attempt to rehabilitate these prospective jurors would have been futile, trial counsel's performance was not deficient. *See Detrick Cole*, 2011 WL 1090152, at *10. The Petitioner's claim of prejudice is "speculative because the Petitioner has failed to present any testimony as to whether the prospective jurors could have been rehabilitated." *Id.* (citing *State v. Hale*, 892 N.E.2d 864, 904 (Ohio 2008)).

### 4. Failure to Challenge Juror 1

The Petitioner asserts that trial counsel were ineffective in failing to challenge Juror 1 for cause or exercise a peremptory challenge to strike the juror, who stated during voir dire that he did not "see that there can be mitigating circumstances to kill a child." The Petitioner argues that Juror 1's views substantially impaired his ability to consider mitigating evidence during the penalty phase. The State responds that the post-conviction court properly found trial counsel made a reasonable strategic decision not to challenge Juror 1 and that the Petitioner has failed to establish prejudice.

Trial counsel is "'accorded particular deference when conducting *voir dire*,'" and the actions of trial counsel during voir dire "'are considered to be matters of trial strategy.'" *William Glenn Rogers v. State*, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *36 (Tenn. Crim. App. Aug. 30, 2012) (quoting *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)). Accordingly, "'[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates that entire trial with obvious unfairness.'" *Id.* (quoting *Hughes*, 258 F.3d at 457).

The post-conviction court credited the testimony of trial counsel that they focused on selecting jurors who they believed could potentially understand the defense and the lack of physical forensic evidence against the Petitioner. Co-counsel explained that they did so because they believed they had a better chance of a favorable outcome during the guilt phase rather than the penalty phase. Co-counsel testified that he likely believed Juror 1 would be favorable to the defense during the guilt phase due to his knowledge of firearms as a result of his prior military experience, and the trial record reflects that lead counsel focused his questions to Juror 1 during voir dire upon his knowledge of firearms. The record supports the post-conviction court's finding that trial counsel made a

reasonable strategic decision against seeking to exclude Juror 1 by either challenging him for cause or exercising a peremptory challenge.

### 5. Failure to Exhaust Peremptory Challenges

The Petitioner maintains that trial counsel were ineffective in failing to exhaust their peremptory challenges, which hindered their ability to challenge on direct appeal Juror 1's service on the jury. *See State v. Schmeiderer*, 319 S.W.3d 607, 633 (Tenn. 2010) ("The failure to correctly excuse a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him."), *abrogated on other grounds by State v. Urshawn Eric Miller*, No. W2019-00197-SC-DDT-DD, __ S.W.3d __, 2021 WL 5810574, at *6 (Tenn. Dec. 7, 2021). However, as the post-conviction court found and we have concluded, trial counsel made a reasonable strategic decision in selecting the jury and against seeking to exclude Juror 1 as a juror. The Petitioner is not entitled to relief regarding this issue.

### C. At Trial

### 1. Failure to Object to the Use of Stun Cuffs

The Petitioner submits that trial counsel were ineffective in failing to challenge the use of a stun cuff as violating his due process rights. He argues that the post-conviction court's analysis of prejudice was "limited" and based upon an erroneous view of the record and that, as a result, a remand for "further proceedings" is necessary. The State responds that the Petitioner failed to establish that trial counsel were ineffective and that the post-conviction court's prejudice analysis is sufficient to allow this court to properly review the issue.

"It is a well-settled principle of due process that every defendant in a criminal case be afforded the 'physical indicia of innocence.'" *State v. Hall*, 461 S.W.3d 469, 497 (Tenn. 2015) (citing *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973); *Mobley v. State*, 397 S.W.3d 70, 100 (Tenn. 2013)). Our supreme court has recognized that "[t]he use of visible restraints undermines the physical indicia of innocence and the related fairness of the fact-finding process." *Mobley*, 397 S.W.3d at 100 (citing *Deck v. Missouri*, 544 U.S. 622, 630 (2005)). There is a legal presumption against the use of visible restraints at trial. *Id.* at 99 (citing *Willocks v. State*, 546 S.W.2d 819, 820-21 (Tenn. Crim. App. 1976)). The use of a restraint that is not visible to the jury, such as a stun belt, does not implicate the concern of the physical indicia of innocence to the extent that a visible restraint does. *Id.* at 100. However, regardless of their visibility, physical restraints can interfere with a defendant's ability to offer testimony in his or her own behalf and to communicate with counsel, and "physical restraints can undermine the

- 65 -

symbolic yet concrete objective of maintaining a dignified judicial process." *Id.* (citing *Deck*, 544 U.S. at 631-32).

In February 2013, more than two years after the Petitioner's trial, the Tennessee Supreme Court issued its opinion in *State v. Mobley*, addressing the use of stun belts as physical restraints and concluded that their use is governed by the same principles and procedures that apply to the use of any other in-court physical restraint. *Id.* at 101. Thus, the State has the burden of demonstrating that the physical restraints are necessary and serve a legitimate interest, "such as preventing escape, protecting those present in the courtroom, or maintaining order during trial." *Id.* (citations omitted). In determining whether to require a defendant to wear physical restraints, the trial court should consider all relevant circumstances, including, but not limited to: "(1) the defendant's circumstances, such as record of past behavior, temperament, and desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a less onerous but adequate means of providing security." *Id.* (citations omitted). The relevant circumstances should be considered "against the backdrop of affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process." *Id.*

The trial court is required to make particularized findings on the issue. *Id.* "[T]he better practice is to hold a hearing on the issue so that factual disputes may be resolved and evidence surrounding the decision may be adduced and made part of the record." *Id.* (citing *Willocks*, 546 S.W.2d at 822). The decision of whether to require the use of physical restraints is a matter within the discretion of the trial court. *See id.* "The trial court must employ the least drastic security measure necessary to accomplish the objective." *Id.* at 99.

In *Mobley*, both trial counsel and the petitioner offered testimony during the post-conviction hearing regarding the use of a stun belt on the petitioner at trial. *Id.* at 96-98. Trial counsel agreed to a suggestion that a stun belt be placed on the petitioner at trial after the petitioner initially refused to dress out in street clothes for the trial. *Id.* at 95-96. Trial counsel testified at the post-conviction hearing that he did not believe the use of the stun belt would affect the proceedings because the stun belt was not visible to the jury, and trial counsel did not recall discussing the stun belt's use with the petitioner. *Id.* at 97. The petitioner alleged that the stun belt interfered with his ability to testify because the stun belt was always "'on his mind.'" *Id.* at 102. The post-conviction court denied relief, finding that trial counsel was not deficient and that any deficiency did not result in prejudice because the stun belt was not visible to the jury. *Id.* at 101-02.

On appeal, our supreme court determined that trial counsel's agreeing to the suggested use of a stun belt without discussing it with the petitioner fell outside the range of competence demanded of trial counsel. *Id.* at 102. The supreme court concluded that the post-conviction court failed to make adequate findings related to prejudice because the court did not address the petitioner's claim that the stun belt was "'on his mind'" while testifying at trial. *Id.* The supreme court remanded the case to the post-conviction court for a hearing to address the circumstances leading to the decision to require the petitioner to wear a stun belt, whether trial counsel's performance was deficient, whether the use of the stun belt had an adverse effect on his demeanor or his ability to testify at trial, and whether any adverse effect sufficiently undermined the outcome of the trial. *Id.* at 103.

In the present case, the post-conviction court found that on September 17, 2010, prior to the beginning of voir dire, the trial court entered an order providing for the use of stun cuffs for security during trial proceedings. The post-conviction court noted that the record did not include a motion for stun cuffs or a transcript of any discussion related to the use of stun cuffs. The post-conviction court found that no member of the defense team recalled the Petitioner's wearing or complaining about wearing a stun cuff. The post-conviction court credited Deputy Atkins's testimony that the Petitioner did not wear a stun cuff during the guilt phase but wore a stun cuff on his left ankle during the capital sentencing hearing and during the non-jury sentencing hearing before the trial court sometime after the trial. The post-conviction court found that Deputy Atkins testified that the Petitioner was not wearing the stun cuff when he testified during the guilt/innocence phase of the trial but that Deputy Atkins recalled the Petitioner wearing the stun cuff when he chose to wear his jail clothes for the capital sentencing hearing. The post-conviction court stated that according to the trial transcript, the Petitioner changed into his jail clothes for closing arguments during the penalty phase of the trial. The post-conviction court noted that Deputy Atkins testified that the stun cuff was not visible and found that "[t]here has been no evidence presented of any prejudice which resulted from [the] Petitioner having worn the stun cuff for the limited time during the closing arguments of counsel at sentencing and in the non-jury sentencing hearing."

Although the trial court entered an order providing for the use of stun cuffs at trial, the post-conviction court found that none of the members of the defense team recalled the Petitioner's wearing stuff cuffs or complaining about wearing them at trial. The trial record did not include a motion for the use of stun cuffs or a transcript of any discussion regarding the use of stun cuffs. The trial court's order did not include a certificate of service, and the Petitioner did not present any evidence that trial counsel were aware of the order. Trial counsel were not deficient in failing to object to the order or the use of stun cuffs when they had no knowledge of the order or the utilization of the stun cuffs.

The Petitioner asserts that the post-conviction court failed to make sufficient findings for a determination of prejudice. He also asserts that the post-conviction court's finding that he did not wear a stun cuff until closing arguments during the penalty phase is contrary to the evidence presented at the post-conviction hearing. Deputy Atkins testified that he placed a stun cuff on the Petitioner's ankle on "the day" in which the Petitioner declined to change out of his jail uniform during the penalty phase. While the trial record established that the Petitioner appeared before the jury in his jail uniform shortly before closing arguments began during the penalty phase, Deputy Atkins's testimony, although somewhat confusing, does not appear to indicate that Deputy Atkins placed the stun cuff on the Petitioner only after he insisted on wearing his jail uniform while before the jury. Rather, Deputy Atkins's testimony indicates that he placed the stun cuff on the Petitioner at some point on that same day, which was the date in which proof was presented during the penalty phase. Even if the Petitioner wore a stun cuff during the presentation of the proof at the penalty phase, he failed to present clear and convincing evidence of any fact establishing any deficiency that resulted in prejudice.

The post-conviction court found that the stun cuff was not visible. The Petitioner does not challenge this finding but, instead, claims that like the court in *Mobley*, the post-conviction court failed to make any finding regarding the effect of the stun cuff on the Petitioner's ability to testify and to communicate with trial counsel. *See Mobley*, 397 S.W.3d at 102-03. While the petitioner in *Mobley* wore a stun belt when he testified at trial and alleged that the stun belt was "on his mind" when he testified, the Petitioner was not wearing the stun cuff when he testified during the guilt phase, and he did not testify during the penalty phase or during the post-conviction hearing. The Petitioner did not present any other proof that the stun cuff affected his decision not to testify during the penalty phase or affected his ability to communicate with trial counsel. Accordingly, the Petitioner has failed to establish prejudice.

## 2. Failure to Present Evidence of C.J.'s Long-Term Memory Deficits

The Petitioner challenges trial counsel's failure to present evidence that a neuropsychological evaluation from LeBonheur Children's Medical Center dated approximately two months after the homicides provided that C.J. had long-term memory deficits. He asserts that trial counsel "could have" utilized the report to challenge C.J.'s competency as a witness and his testimony identifying the Petitioner as the perpetrator and to support Dr. Aldridge's testimony.

In rejecting the Petitioner's claim, the post-conviction court found that General Lepone credibly testified that he recalled discussing the evaluation with lead counsel, who indicated that it would be obvious to jurors that C.J. had some brain damage once they viewed the image of his brain with a knife in it and the other evidence presented at

trial. The post-conviction court noted lead counsel's testimony that he would not have wanted to use a psychological report to cross-examine the child. The court also noted that trial counsel's file included an evaluation of C.J. performed in November 2009, approximately one and one-half years after the evaluation by LeBonheur, in which it was noted that both C.J.'s long-term and short-term memory was intact. The court found that trial counsel used "very effective strategies" to thoroughly challenge C.J.'s competency and testimony at trial and that the Petitioner did not present any proof establishing otherwise.

In rejecting the Petitioner's separate claim that the State wrongfully withheld the report from the defense, the post-conviction court found that General Lepone and lead counsel both testified that they recalled discussing the evaluation and that General Lepone specifically recalled the details of their discussion. The Petitioner correctly notes that lead counsel never testified to discussing the evaluation with General Lepone. The Petitioner, however, acknowledges that regardless, the evidence does not appear to preponderate against the post-conviction court's finding that the State made the evaluation available to the defense. We agree with the Petitioner's assessment. *See Kendrick*, 454 S.W.3d at 457.

The Petitioner first claims that trial counsel should have utilized the evaluation to challenge C.J.'s competency to testify as a witness at trial. In Tennessee, a witness is presumed competent to testify unless a specific rule or statute provides otherwise. Tenn. R. Evid. 601. "Virtually all witnesses may be permitted to testify: children, mentally incompetent persons, convicted felons." Tenn. R. Evid. 601, Advisory Commission Comment. "Before testifying, every witness shall be required to declare that the witness will testify truthfully by oath or by affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so." Tenn. R. Evid. 603.

The record reflects that the defense considered whether C.J. had memory deficits. Co-counsel's file includes handwritten notes from a conference call with Dr. Aldridge a few weeks before trial in which co-counsel questioned whether the trauma affected C.J.'s memory. Co-counsel's file also includes records received by Ms. Geiser around the same time period from Youth Villages dated March 2010 indicating that C.J.'s memory was "intact" and from Case Management, Inc. of a psychiatric evaluation in November 2009 stating that his long-term and short-term memory was "intact." Accordingly, these records, dated one and one-half to two years after C.J.'s initial evaluation and less than one year prior to trial, provided that C.J. was no longer suffering from long-term memory deficits. Furthermore, this court has recognized that a witness's inability to remember details does not affect a witness's competency to testify but goes to the weight and value to his or her testimony, which is to be resolved by the trier of fact. *See e.g., State v.*

*Bashan Murchison*, No. E2014-01250-CCA-R3-CD, 2016 WL 659844, at *17 (Tenn. Crim. App. Feb. 12, 2016); *State v. Larry Eugene Culpepper*, No. M2005-00685-CCA-R3-CD, 2006 WL 1896358, at *7 (Tenn. Crim. App. Nov. 20, 2006); *see also* Tenn. R. Evid. 617 (allowing a party to impeach a witness by offering evidence that "a witness suffered from impaired capacity at the time of an occurrence or testimony"). The Petitioner failed to present clear and convincing evidence that C.J. had long-term memory deficits at the time of trial, and, regardless, any such memory impairment did not render him incompetent to testify as a witness. We conclude that the Petitioner has not established deficiency or prejudice.

Although the Petitioner asserts that trial counsel were deficient in failing to utilize the evaluation to impeach or otherwise challenge the reliability of C.J.'s testimony at trial, trial counsel offered extensive testimony regarding their strategy in challenging C.J.'s identification of the Petitioner as the perpetrator. Trial counsel were prepared to impeach C.J. with his recorded statement in which he identified other possible perpetrators. However, both children who testified essentially agreed with everything suggested by co-counsel on cross-examination, and, as a result, there was no testimony on which to impeach using the prior statements. Co-counsel testified that he believed their testimony on cross-examination was beneficial to the defense in creating reasonable doubt as to the Petitioner's identify as the perpetrator. Although co-counsel initially agreed he would have used the evaluation to impeach C.J.'s testimony, he later testified to the difficulties of challenging the children's testimony without alienating the jury and stated that he would not have wanted to present evidence of C.J.'s mental deficiencies due to fear that it would provide jurors with a reason to disregard C.J.'s testimony on cross-examination. Lead counsel likewise testified that he would not have wanted to use the evaluation on the cross-examination of C.J. Trial counsel also presented the testimony of Dr. Aldridge to challenge the reliability of C.J.'s identification of the Petitioner during interviews and the reliability of the testimony of both children on direct examination. We conclude that trial counsel made reasonable strategic decisions in challenging the reliability of the children's identification of the Petitioner as the perpetrator.

The Petitioner failed to demonstrate how evidence that C.J. had long-term memory impairments approximately two months after the offenses affected his statement, made shortly after the offenses occurred, identifying the Petitioner as the perpetrator. The Petitioner also failed to demonstrate how the evidence that C.J. had long-term memory impairments approximately two months after the offenses affected his testimony at trial in light of reports of subsequent evaluations conducted prior to trial indicating that he no longer suffered from such impairments. In light of the shortcomings of the evidence presented by the Petitioner at the post-conviction hearing and trial counsel's efforts to challenge C.J.'s identification of the Petitioner as the perpetrator though their cross-

examination of C.J. and the testimony of Dr. Aldridge, we conclude that the Petitioner did not establish that trial counsel's failure to present evidence of the initial evaluation resulted in prejudice.

The Petitioner alleges in a one-sentence footnote that trial counsel also were deficient in failing to challenge C.J.'s testimony with records indicating that he had a "global assessment of functioning level of fifty" and was taking antipsychotic medication. The Petitioner waived this ground for relief by offering no other argument or citation to authorities in support thereof. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

### 3.  Failure to Object to Crime Scene Photographs

The Petitioner maintains that trial counsel were ineffective in failing to object to crime scene photographs as cumulative to other evidence presented at trial, graphic in nature, and unfairly prejudicial. The State responds that trial counsel were not deficient in limiting their objections to only some of the crime scene photographs and that the Petitioner failed to establish prejudice.

Co-counsel testified that once the trial court learned of the number of photographs in the case, the court ordered the parties to meet in an effort to reach an agreement regarding the admission of some of the photographs. The trial court then ruled upon the admissibility of the photographs upon which the parties were unable to agree. In denying relief, the post-conviction court relied in part on co-counsel's testimony that he did not object to the admission of every photograph of the crime scene because he believed he would lose credibility with the trial court in doing so and that trial counsel wanted some of the crime scene photographs admitted because the photographs supported their defense. The trial court ruled on the admissibility of the photographs challenged by the defense. In the post-conviction court and on appeal, the Petitioner made a general assertion that trial counsel should have objected to all two hundred of the crime scene photographs that were introduced at trial. However, we conclude that trial counsel made a reasonable strategic decision against objecting to every crime scene photograph sought to be admitted by the State.

On appeal, the Petitioner specifically claims that trial counsel were ineffective in failing to object to three crime scene photographs of the child homicide victims. On direct appeal, the Petitioner challenged the admission of the crime scene photographs of the child victims. *See Dotson*, 450 S.W.3d at 92 (appendix). The Tennessee Supreme Court affirmed this court's determination that the Petitioner waived the issue by failing to object to the admission of the photographs at trial. *Id.* This court also concluded that

- 71 -

even if the issue was not waived, the trial court did not err in admitting the photographs, recognizing that the photographs "were relevant to supplement the testimony of the medical examiner and the treating physician regarding the victims' injuries and to support the aggravating circumstances alleged by the State." *Id.* Accordingly, the Petitioner was not prejudiced by trial counsel's failure to object to the admission of these three photographs at trial.

### 4. Failure to Object to the Forensic Pathologist's Testimony

The Petitioner contends that trial counsel were ineffective in failing to object to Dr. Funte's testimony regarding the autopsies of Mr. Seals, Mr. Cecil Dotson, and one of the child victims when Dr. Funte did not conduct the autopsies. The Petitioner maintains that Dr. Funte's testimony violated his constitutional rights to confrontation, to due process, and to be free from cruel and unusual punishment.

In denying relief, the post-conviction court credited trial counsel's testimony that they did not object to Dr. Funte's testimony because they were not contesting the cause of the victims' deaths as part of their defense. Furthermore, the Petitioner challenged the admission of Dr. Funte's testimony on direct appeal. *See Dotson*, 450 S.W.3d at 70-72. The Tennessee Supreme Court addressed the issue under the plain error doctrine, reviewed the status of the law that the time, and concluded that the admission of Dr. Funte's testimony did not breach a clear and unequivocal rule of law given the uncertainty of the status of the law at the time of the trial and the appeal. *Id.* It was not until the Tennessee Supreme Court released its opinion in *State v. Hutchison*, 482 S.W.3d 893, 908-14 (Tenn. 2016), approximately one and one-half years after the court issued its opinion on the direct appeal in the Petitioner's case, that the supreme court addressed the standard to be employed in determining whether a forensic pathologist's testimony about an autopsy that he or she did not perform violated a defendant's confrontation rights. The Court also concluded that granting relief for the admission of Dr. Funte's testimony was not necessary to do substantial justice, reasoning that the Petitioner "did not contest the causes of the victims' deaths or any other conclusions or information contained in the autopsy reports or in Dr. Funte's testimony. Nor did the autopsy reports or Dr. Funte's testimony implicate the [Petitioner] or tie him to these homicides." *Dotson*, 450 S.W.3d at 72. Accordingly, trial counsel were not deficient in failing to object to Dr. Funte's testimony, and their failure to object did not result in prejudice.

### 5. Failure to Effectively Challenge the Testimony of the State's Witnesses

The Petitioner contends that trial counsel failed to effectively challenge testimony of some of the State's witnesses through cross-examination. Trial counsel's decision regarding whether to cross-examine a witness regarding an issue "is a strategic or tactical

choice, if informed and based on adequate preparation." *Lawrence Warren Pierce v. State*, No. M2005-02565-CCA-R3-PC, 2007 WL 189392, at *7 (Tenn. Crim. App. Jan. 23, 2007) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)); *see Rachel Kay Bond v. State*, M2018-01324-CCA-R3-PC, 2019 WL 4508351, at *20 (Tenn. Crim. App. Sept. 19, 2019). "[S]trategic decisions during cross-examination are judged from counsel's perspective at the point of time they were made in light of the facts and circumstances at that time." *Johnnie W. Reeves v. State*, No. M2004-02642-CCA-R3-PC, 2006 WL 360380, at *10 (Tenn. Crim. App. Feb. 16, 2006) (citing *Strickland*, 466 U.S. at 690).

The Petitioner asserts that trial counsel were ineffective in failing to question officers about a discrepancy in a police report regarding the date on which the officers interviewed the Petitioner. He argues that a police report incorrectly noted that the interview occurred on March 5, 2008, when the interview actually occurred on March 4th, that trial counsel continued to reference the interview as occurring on March 5th even after an officer acknowledged the error, and that trial counsel failed to question the officers about the error on cross-examination. The Petitioner, however, failed to question trial counsel about this issue at the evidentiary hearing. Rather, the post-conviction court found that the defense team "more than sufficiently investigated the discovery and prepared for trial" and that trial counsel planned their defense around the lack of physical evidence connecting the Petitioner to the offenses and strategically focused on the issues and emphasized the points important to the defense theory. The evidence does not preponderate against the post-conviction court's findings. Additionally, the Petitioner has failed to demonstrate how the failure to emphasize the discrepancy in the date affected the verdict. The Petitioner has established neither deficiency nor prejudice.

The Petitioner next contends that trial counsel were ineffective in their cross-examination of Mr. Willie Hill regarding his Facebook friend, Roderick. While hospitalized, C.J. screamed the names "Roderick" and "Cassandra" prior to identifying the Petitioner as the perpetrator, and at trial, C.J. testified that he had previously stated that "Roderick" and "Cassandra" entered the home and that "Roderick" shot Mr. Cecil Dotson. During cross-examination of Mr. Hill, lead counsel showed Mr. Hill a photograph of Mr. Hill's Facebook friend Roderick, and Mr. Hill denied knowing him. Mr. Hill acknowledged having a sister named Cassandra. Photographs of both Roderick and Cassandra were entered as exhibits at trial. The State then presented the testimony of Roderick, who confirmed that he was depicted in the photograph but denied knowing Mr. Hill. Roderick testified that he was sixteen years old at the time of the trial and was thirteen years old in March of 2008 when the offenses occurred. The Petitioner argues that trial counsel's cross-examination of Mr. Hill about his Facebook friend Roderick led the State to introduce proof about Roderick's age which undermined the theory that Roderick committed the offenses. He contends that trial counsel were deficient in their cross-examination, which "backfired."

The Petitioner did not question trial counsel at the evidentiary hearing regarding their decision to pursue this line of cross-examination. Trial counsel had presented evidence at trial that there was a dispute between Mr. Hill and Mr. Cecil Dotson, and they had presented evidence that someone named "Roderick" may have shot Mr. Cecil Dotson and that someone named "Cassandra" may have been present. During the cross-examination of Mr. Hill, they questioned him regarding his online acquaintance with Roderick and regarding his sister Cassandra. Because cross-examination is regarded as a strategic decision, the testimony of trial counsel is important to determine whether the strategic decision was informed and based on adequate preparation. Under the facts and circumstances of this case, the Petitioner has failed to present clear and convincing evidence that trial counsel's strategic decision was not based on adequate preparation. Furthermore, in light of the evidence presented at trial establishing the Petitioner's guilt, we conclude that the Petitioner has failed to establish a reasonable probability that but for any deficiency in the cross-examination of Mr. Hill, the result of the proceeding would have been different. *See Calvert*, 342 S.W.3d at 486. The Petitioner is not entitled to relief regarding this issue.

The Petitioner contends that trial counsel were ineffective in failing to challenge Sergeant Mullins's qualifications as a bloodstain pattern expert. The Petitioner argues that Sergeant Mullins "used incorrect terminology," incorrectly identified several impact spatters as castoff stains, failed to issue a report, improperly relied upon the statements of the surviving victims and the Petitioner in reaching his conclusions, and testified to opinions that were outside his expertise.

At trial, Sergeant Mullins testified that he had been employed with the Memphis Police Department for twenty-two years and had been assigned to the Homicide Bureau for approximately seven years, during which time he had been involved in the investigation of 600 to 700 homicides and went to 500 or more "death scenes," involving suicides, homicides, and deaths from unknown causes. He had attended a basic crime scene investigation school and a "school" on bloodstain pattern analysis "to help in determining blood stain patterns on a crime scene and what that can tell you." He had served as the case officer in murder cases on several occasions and had entered the crime scene in almost all of those occasions. The State tendered Sergeant Mullins as an expert in general crime scene investigation and in bloodstain pattern analysis. The prosecutor informed the trial court, "I have discussed this with the defense." Lead counsel announced that he had no objections, and the trial court accepted Sergeant Mullins as an expert in general crime scene investigation and bloodstain pattern analysis.

Although the trial record reflects that the prosecutors and trial counsel discussed the State's decision to qualify Sergeant Mullins as an expert prior to doing so, the Petitioner never questioned trial counsel or General Lepone regarding this discussion at

the post-conviction hearing. The Petitioner also failed to otherwise question trial counsel regarding their decision to not object to Sergeant Mullins's qualifications as an expert. Regardless, the Petitioner has failed to establish that Sergeant Mullins was not qualified to testify as an expert in bloodstain pattern analysis.

Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." When determining the admissibility of expert testimony, the trial court must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to give an opinion within the limits of the witness's expertise. *State v. Davidson*, 509 S.W.3d 156, 208 (Tenn. 2016); *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). The key factor in making this determination is "whether the witness's qualifications authorize him or her to give an informed opinion *on the subject at issue*." *Stevens*, 78 S.W.3d at 834. "The witness may acquire the necessary expertise through formal education or life experiences." *State v. Reid*, 91 S.W.3d 247, 302 (Tenn. 2002) (appendix) (citation omitted). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." *Id.* Testimony regarding blood spatter evidence, generally, must be presented through an expert due to the complexity of the evidence and the predication of the opinion upon specialized knowledge unfamiliar to most lay persons. *State v. Halake*, 102 S.W.3d 661, 670-71 (Tenn. Crim. App. 2001). "Blood spatter analysis is a complicated subject, as the analyst studies the blood spatter and determines what blow created the spatter, thereby recreating the events of the crime." *Id.* at 672 (citations omitted).

The trial court properly accepted Sergeant Mullins as an expert in bloodstain pattern analysis based upon his training and extensive experience. Following the Petitioner's trial, this court issued multiple opinions upholding a trial court's finding that Sergeant Mullins was qualified as an expert in bloodstain pattern analysis. *See State v. William Langston*, No. W2015-02359-CCA-R3-CD, 2017 WL 1968827, at *11 (Tenn. Crim. App. May 12, 2017); *State v. William Lanier*, No. W2011-01626-CCA-R3-CD, 2013 WL 5739793, at *13 (Tenn. Crim. App. Oct. 18, 2013); *State v. Aaron Malone*, No. W2009-02047-CCA-R3-CD, 2011 WL 1005487, at *12 (Tenn. Crim. App. Mar. 22, 2011). The Petitioner's allegations that Sergeant Mullins used incorrect terminology, incorrectly identified some impact spatters as castoff stains, failed to issue a report, and improperly relied upon the statements of the surviving victims and the Petitioner relate to

the weight to be afforded to Sergeant Mullins's testimony and not to its admissibility.[2] *See Shipley v. Williams*, 350 S.W.3d 527, 551 (Tenn. 2011) ("Once the minimum requirements are met, any questions the trial court may have about the *extent* of the witness's knowledge, skill, experience, training, or education pertain only to the weight of the testimony, not to its admissibility."). The Petitioner asserts that Sergeant Mullins's testimony that the four adult victims were moved either close to or after their deaths was an opinion "which only a forensic pathologist would hold the expertise to address." The Petitioner, however, waived this argument by failing to cite to any authority in his brief to support his claim. *See* Tenn. Ct. Crim. App. R. 10(b). Rather, we conclude that Sergeant Mullins was properly qualified to testify as an expert in bloodstain pattern analysis and that the Petitioner failed to establish any prejudice resulting from trial counsel's failure to object to Sergeant Mullins's testimony on this basis.

The Petitioner also appears to challenge Sergeant Mullins's qualifications as an expert in crime scene investigation, arguing that Sergeant Mullins incorrectly testified that control samples of carpet were taken to provide examiners visual samples without bloodstains when the samples actually were taken to ensure background substrate was not interfering with tests of bloodstained samples. The Petitioner did not question trial counsel about their decision not to challenge Sergeant Mullins's qualifications as an expert in crime scene investigation and does not otherwise explain how any mistaken belief by Sergeant Mullins regarding the reason for obtaining a controlled sample of carpet rendered him unqualified as a crime scene investigation expert, especially in light of Sergeant Mullins's training and experience in investigating 600 to 700 homicides. The Petitioner established neither deficiency nor prejudice.

Finally, the Petitioner asserts that trial counsel were ineffective in failing to cross-examine Sergeant Mullins on his conclusions and methodology, which Dr. Miller maintained were improper. The Petitioner did not question trial counsel during the evidentiary hearing about their cross-examination of Sergeant Mullins. In rejecting the claim, the post-conviction court found that trial counsel testified that they planned their defense around the lack of physical evidence connecting the Petitioner to the offenses. The court found that trial counsel "strategically focused on the issues which were beneficial to their case and emphasized the points which were important to the defense." The trial record reflects that lead counsel conducted an extensive cross-examination of Sergeant Mullins during which lead counsel took advantage of Sergeant Mullins's designation as an expert in crime scene investigation to question him about the numerous items of evidence collected from the scene, the importance of testing each of the items, and the lack of the Petitioner's DNA or other forensic evidence connecting the Petitioner

---

[2] The Petitioner does not challenge Sergeant Mullins's testimony as unreliable under the standards set forth in *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997).

to each of the items.  Lead counsel also utilized his cross-examination of Sergeant Mullins to suggest that multiple perpetrators were involved and that the offenses were gang-related.  Given the extensive nature of lead counsel's cross-examination of Sergeant Mullins, the Petitioner has failed to establish that lead counsel was deficient.

### 6.  Failure to Object to a Police Officer's Testimony Regarding the Crime Scene

The Petitioner faults trial counsel for their failure to challenge Sergeant Walter Davidson's testimony regarding his reaction to the crime scene as irrelevant and inflammatory.  The Petitioner specifically contends that trial counsel were ineffective in failing to object to the following exchange between the prosecutor and Sergeant Davidson, who was the case coordinator, on direct examination:

> Q  And as the case officer and obviously just ten months experience with homicides but you had some prior experience with robbery, were you aware of any homicide detective on your team, no matter how many years of experience they had, that had ever seen anything like this?
>
> A  No, no one.  I mean, I would say in the state, never had something where, you know, four adults and two children, I mean, children are rarely victim of homicides.  And it was very—I mean, to have a two-month-old child that lives, stabbed in the head, it was, you know, it was a tough thing to handle, I'll just say.
>
> ….
>
> Q  After seeing something like this, did you want to get the person or persons who actually did it or where you just looking to solve it and close it?
>
> A  No, I wouldn't have rested.  I wanted to catch the person responsible.
>
> ….
>
> Q  Well, I mean, isn't it fair to say that even as a police officer that you wish you would have never been on duty the night this call came in?
>
> A  Right.  And, you know, we handled the case and even two and a half years later you kind of start to all right, it's behind—you know, it's behind me.  And then preparing for trial, looking at photographs, it's like I

told my wife that there were photographs of things that I did as far as one of the child's—his throat was slit and I actually, you know, had the child's head in my hand and moving it in a way where we could take pictures and I had forgotten about that. And, you know, seeing the pictures like oh, God, just kind of brought it all back.

The Petitioner did not question trial counsel during the evidentiary hearing regarding their decision not to object to the testimony. Nevertheless, lead counsel testified that he believed objecting too often at trial could "turn the jury off" and make it appear as if the attorney is trying to hide something. "'There is no obligation on a lawyer to object at every opportunity.'" *Matthew Whitehair v. State*, No. M2019-00517-CCA-R3-PC, 2020 WL 916061, at *19 (Tenn. Crim. App. Feb. 26, 2020), *perm. app. denied* (Tenn. July 21, 2020) (quoting *State v. Donald Craig*, No. 85-10-III, 1985 WL 3866, at *3 (Tenn. Crim. App. Nov. 27, 1985)). In rejecting the Petitioner's claim, the post-conviction court found that trial counsel planned the defense around the lack of physical evidence connecting the Petitioner to the offenses and focused on those issues important to the defense. Accordingly, the Petitioner has failed to show that trial counsel were deficient in failing to object. Moreover, given the evidence presented at trial regarding the victims' extensive injuries and the brutality of the scene, we cannot conclude that trial counsel's failure to object to Sergeant Davidson's comments regarding his own reaction to the crime scene resulted in prejudice.

### 7. Failure to Prepare the Petitioner to Testify

The Petitioner argues that trial counsel were ineffective in failing to discuss his potential testimony with him and in allowing him to take the witness stand. The Petitioner, however, did not testify at the evidentiary hearing. *See* T.C.A. § 40-30-110(a) ("The petitioner shall appear and give testimony at the evidentiary hearing if the petition raises substantial questions of fact as to events in which the petitioner participated…."); *Timothy Evans v. State*, No. E2017-00400-CCA-R3-PC, 2018 WL 1433396, at *4 (Tenn. Crim. App. Mar. 22, 2018) (concluding that because the petitioner did not testify at the post-conviction hearing, he did not support the factual allegations regarding his claim that trial counsel failed to adequately prepare him for cross-examination by clear and convincing evidence). The Petitioner also did not question trial counsel at the evidentiary hearing about the steps taken in preparing him to testify at trial. Therefore, he has failed to present clear and convincing evidence that trial counsel did not prepare him to testify.

### 8. Failure to Present Mitigating Evidence

The Petitioner asserts that trial counsel failed to meaningfully investigate, develop, and present mitigating evidence during the penalty phase. He faults trial counsel for only

presenting one witness during the penalty phase and argues that trial counsel failed to adequately prepare Ms. Shettles to testify and failed to present evidence revealed by Ms. Shettles's investigation. The Petitioner also argues that trial counsel were ineffective in failing to call Dr. Walker and Dr. Bishop during the penalty phase. The State responds that the defense team conducted a meaningful investigation and that trial counsel made reasonable strategic decisions to not present Dr. Walker and Dr. Bishop as witnesses and to present Ms. Shettles as the only witness during the penalty phase. The State further responds that the Petitioner failed to establish that any deficiency resulted in prejudice.

"Capital defendants possess a constitutionally protected right to provide the jury with mitigation evidence that humanizes the defendant and helps the jury accurately gauge the defendant's moral culpability." *Davidson v. State*, 453 S.W.3d 386, 402 (Tenn. 2014) (citing *Porter v. McCollum*, 558 U.S. 30, 41 (2009); *Williams v. Taylor*, 529 U.S. 362, 393 (2000)). Capital defense attorneys are obligated to thoroughly investigate the defendant's background. *Id.* (citing *Williams*, 529 U.S. at 396). "Defense counsel should make an effort to discover all reasonably available mitigating evidence and all evidence to rebut any aggravating evidence that the State might introduce." *Id.* (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).

Counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. *Strickland*, 466 U.S. at 691; *Davidson*, 453 S.W.3d at 402. In determining whether counsel breached this duty, we must review counsel's performance for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as viewed from counsel's perspective at the time. *See Wiggins*, 539 U.S. at 523. "Defense counsel should investigate the defendant's medical history, educational history, employment and training history, family and social history, adult and juvenile correctional experiences, and religious and cultural influences." *Davidson*, 453 S.W.3d at 402 (citing *Wiggins*, 539 U.S. at 524). Counsel, however, "is not required to investigate every conceivable line of mitigating evidence, no matter how unlikely it is to help the defense. Nor must counsel present mitigating evidence in every case." *Id.* Nevertheless, "'strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitation of the investigation.'" *Id.* (quoting *Wiggins*, 539 U.S. at 533). In determining whether counsel's actions were reasonable, the court should "'consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.'" *Id.* (quoting *Wiggins*, 539 U.S. at 527).

If counsel was deficient, the prejudice prong "depends on whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* In assessing the probability of a different outcome, the court "should consider the totality of the available mitigation evidence—including evidence known before trial and evidence discovered by post-conviction counsel." *Id.* (citing *Sears v. Upton*, 561 U.S. 945, 955-56 (2010)). The three factors that a reviewing court should consider in determining whether counsel's deficient performance of mitigation evidence prejudice the defendant are:

> (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination.

*Id.* at 403 (citing *Nichols v. State*, 90 S.W.3d 576, 598 (Tenn. 2002)).

In denying relief, the post-conviction court found that Ms. Shettles prepared a sixty-eight-page mitigation timeline covering the time period from the birth of the Petitioner's parents to approximately six weeks after the offenses occurred, a set of witness summaries that spanned multiple pages, and a three-page, bullet point summary of significant life events and themes. The court noted that Ms. Shettles believed she gathered all available records, that she spent a large amount of time with the Petitioner, and that she testified during the penalty phase regarding the Petitioner's background and the mitigating factors in his social history. Ms. Shettles expressed that the case was difficult because the Petitioner and the victims were from the same family and that while many family members agreed to speak to her, they were unwilling to testify on the Petitioner's behalf during the penalty phase. The court found that "[d]espite these hurdles, the defense team was able to gather the social history information available for mitigation."

The post-conviction court found that even though the Petitioner claimed trial counsel were ineffective in presenting Ms. Shettles as the only witness during the penalty phase, the Petitioner did not present family members or any other lay witnesses during the post-conviction hearing, and the Petitioner did not testify at the post-conviction hearing to establish any mitigating evidence that was not provided at trial. The post-conviction court found that although trial counsel recognized that Dr. Walker's report included favorable mitigation evidence, they determined that potential prejudice from the finding of antisocial characteristics outweighed the benefit of pursuing expert psychological testimony, and they made a strategic decision to avoid presenting the Petitioner's diagnosis of antisocial characteristics to the jury. The court recognized that Dr. Walker's report contained other potentially damaging information. For example, although Dr. Walker noted that the Petitioner claimed his confession was coerced, Dr.

Walker described the Petitioner as not being "a man who is easily led or influenced by others." Dr. Walker described the Petitioner's version of the events that occurred on the night of the offenses as "unlikely" and noted that the evidence was inconsistent with the Petitioner's claims that he heard no noises indicating that the victims were tortured or suffered horrific injuries prior to their deaths. The court found that "[c]learly, the statements Petitioner made to Dr. Walker about the events on the evening of the offenses had numerous discrepancies with his trial testimony and other statements."

The post-conviction court found that the evidence established that Dr. Bishop was unable to reach any conclusions supporting a mental health defense or any type of post-traumatic stress disorder diagnosis. The court also found that trial counsel made a strategic decision to present the testimony of Ms. Shettles in order to present as much mitigating evidence as possible without subjecting her to "the type of damaging cross-examination that would have occurred with an expert and any accompanying report." The court concluded that the Petitioner failed to carry his burden of proof to establish deficiency or prejudice.

According to the evidence presented at the post-conviction hearing, Ms. Shettles and Ms. Geiser interviewed the Petitioner and family members multiple times. Ms. Shettles also maintained contact with a woman who began a relationship with the Petitioner following the offenses. Ms. Shettles obtained the Petitioner's birth records, school records, juvenile court records, records from the health department, records from his incarceration, records pertaining to his prior second degree murder conviction, and a psychological report of an evaluation of the Petitioner in October 1991. She also obtained Mr. Cecil Dotson's school and juvenile court records and various records related to the Petitioner's parents. She prepared and provided trial counsel with an extensive mitigation timeline, summaries of witness interviews and mitigation themes, a summary of significant life events and themes, and a list of applicable mitigating circumstances.

Trial counsel retained Dr. Walker, a clinical neuropsychologist, to evaluate the Petitioner, and Ms. Shettles provided him with the various records and documents that she had obtained. Dr. Walker diagnosed the Petitioner with adjustment disorder with depressed and anxious mood, alcohol and cannabis dependence, cognitive disorder not otherwise specified based upon the Petitioner's verbal learning problems, antisocial personality characteristics, psychosocial stressors due to his incarceration and legal problems, and a Global Assessment of Functioning Score of sixty. Trial counsel decided against calling Dr. Walker as a witness during the penalty phase due to his diagnosis involving antisocial personality. Both counsel testified that they considered this diagnosis to be one of the worst labels or diagnoses that a criminal defendant can have. Ms. Geiser testified that the decision to not present a mental health expert who made such a diagnosis was "[p]retty typical," especially when the defense theory in the guilt phase

was that the client was innocent. Co-counsel stated that the defense team intended to pursue residual doubt as a mitigator during the penalty phase.

The defense also retained Dr. Bishop, a psychologist, who was reluctant to work on the case once she learned of the circumstances of the offenses. Although the record does not include a report prepared by Dr. Bishop, the record includes a letter written by Dr. Bishop to co-counsel following the trial in which she stated that she was unable to conclude that a mental heath defense was justified or that the Petitioner had any "hard signs" of post-traumatic stress disorder. Instead, trial counsel decided to present Ms. Shettles as a witness to testify about the Petitioner's background and information. They acknowledged that Ms. Shettles was able to provide information to the jury about the Petitioner's background without being subjected to the level of cross-examination to which the State would have subjected a mental health expert.

Like the post-conviction court, we conclude that trial counsel made a reasonable strategic decision to call Ms. Shettles as the lone witness during the penalty phase. The Petitioner failed to identify any lay witnesses who he believed trial counsel should have called as witnesses, and he failed to present the testimony of those lay witnesses at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). The Petitioner also failed to present any evidence that Dr. Bishop would have provided favorable testimony for the defense had she been called as a witness.

In challenging trial counsel's decision to not call Dr. Walker as a witness, the Petitioner relies upon letters written by Dr. Walker and Dr. James R. Merikangas in preparation for post-conviction proceedings. Dr. Walker stated that he did not recall meeting with trial counsel after issuing a "draft" report, and Dr. Merikangas stated in part that he believed Dr. Walker's finding of antisocial personality characteristics was incorrect and that antisocial personality characteristics differed from antisocial personality disorder. However, the letters were not entered as substantive proof to support the Petitioner's claims of ineffective assistance of counsel. Rather, the letters were marked as exhibits for identification only as part of the Petitioner's offer of proof in support of his claim regarding the denial of funding to retain Dr. Walker and Dr. Merikangas in furtherance of the Petitioner's post-conviction claims. *See State v. Lowe*, 552 S.W.3d 842, 864 (Tenn. 2018) (explaining that in making an offer of proof, the party should have the exhibit marked for identification only and not otherwise introduced). In entering the exhibits for identification purposes, the Petitioner did not request that they be considered as substantive evidence; the post-conviction court did not consider the letters as substantive evidence in analyzing the Petitioner's claim of ineffective assistance of

counsel; and we likewise decline to consider the letters as substantive evidence to support the Petitioner's claim, particularly in light of the fact that the statements in the letters were not made under oath and the State was not afforded the opportunity to cross-examine these mental health experts.

Furthermore, the Petitioner has failed to establish that the fact that Dr. Walker found him to have antisocial personality characteristics rather than antisocial personality disorder rendered trial counsel's strategic decision against presenting Dr. Walker as a witness unreasonable. Rather, the testimony of trial counsel and Ms. Geiser established that the problematic language was "antisocial." Furthermore, the fact that the Petitioner located another mental health expert during the pendency of the post-conviction proceedings who disagreed with Dr. Walker's diagnosis did not render trial counsel's strategic decision against presenting Dr. Walker as a witness unreasonable. A defense attorney "'is not required to question a diagnosis put forth by a professional expert in the field.'" *David Lynn Jordan v. State*, No. W2015-00698-CCA-R3-PD, 2016 WL 6078573, at *61 (Tenn. Crim. App. Oct. 14, 2016) (quoting *Christa Gail Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54 (Tenn. Crim. App. Apr. 25, 2011)).

The record reflects that Ms. Shettles, who has many years of experience as a mitigation investigator, conducted a thorough investigation of the Petitioner's background. Each member of the defense team testified that they met regularly to discuss their progress and share ideas. Ms. Shettles's files included numerous emails between the members of the defense team in which they kept everyone apprised of their progress and any issues that arose.

The Petitioner asserts that although Ms. Shettles obtained a large amount of mitigation information, trial counsel failed to present much of the information during the penalty phase. The Petitioner asserts that trial counsel failed to present the following information from the mitigation timeline prepared by Ms. Shettles: the Petitioner was retained once in the first grade and twice in the fourth grade; he was referred to the Memphis City Schools Mental Health Center in late 1988 or early 1989; he was fourteen years old while in the fifth grade; he was diagnosed with a learning disability in January 1989 and previous testing indicated a full-scale I.Q. of eighty-four; his biological father was physically and verbally abusive to the Petitioner's mother and siblings; his full-scale I.Q. was found to be eighty in January 1989; a treatment plan from the Memphis City Schools Mental Health Center in January 1989 indicated that the Petitioner fell within the mildly intellectually disabled range and had significantly impaired intellectual functioning; the Petitioner qualified for special education services in June 1989; the Petitioner failed all of his classes in the seventh grade, and his mother refused to schedule home visits or to cooperate with the staff of the Memphis City Schools Mental Health

Center; the Petitioner left special education services in April 1991 at the request of a parent; he was sixteen years old while in the eighth grade; formal reports of child abuse and neglect in the Dotson household were made; the Petitioner quit school after completing the eighth grade because he believed he was too old for his classmates; a psychological assessment in October 1991 reflected that the Petitioner had limited intellectual functioning; his mother informed police that he needed rehabilitative services; the city schools refused to allow the Petitioner to enroll in school after he was suspended on several occasions; the results of a Standardized Group Intelligence Test taken at the age of twenty-one showed that the Petitioner recognized words at a second grade level, spelled at a third grade level, and had arithmetic abilities at a fourth grade level; a mental health evaluation in December 1994 reflected no indications of well-entrenched patterns of antisocial behavior; and he failed his GED test twice in 1997.

The Petitioner contends that trial counsel failed to present the following information from summaries of witness interviews prepared by Ms. Shettles: during one incident, the Petitioner's mother broke all of the front windows of their apartment and overturned a couch; she never told her children that she loved them or showed them any affection; the Petitioner rarely saw his father following his parents' separation; his mother often left her children alone without adult supervision to spend time with various men; the Dotson family moved on a yearly basis; food was "locked up," and the Dotson children stole money to buy food because they were hungry; his mother often called her father for help due to physical abuse by the Petitioner's father; the Petitioner's grandmother observed that he seemed to have "something wrong with him" from the time that he was a small child; the Petitioner sometimes beat his head against a wall whenever he became angry; his mother used a belt to spank the children, and his sister ran away from home as a result; his family struggled financially when he was young; and he had a difficult time adjusting following his release from prison. The Petitioner asserts that trial counsel failed to present evidence obtained by Ms. Shettles from the Petitioner's then-girlfriend that the Petitioner was sexually abused by a family member when he was ten or eleven years old.

Ms. Shettles, however, testified to the majority of the information about which the Petitioner complains. She testified during the penalty phase about the Petitioner's difficult childhood, his academic struggles, his learning disability, his father's physical abuse of his mother, which he and his siblings witnessed, his family's moving often, his disciplinary problems, his mother's refusal to attend the Petitioner's counseling sessions, his family's financial difficulties, his and his brother's stealing money for food because their food was locked away, and his witnessing his mother's abusing his half-brother. Thus, the Petitioner has failed to establish that trial counsel were deficient in this regard.

Although Ms. Shettles did not specifically testify about the Petitioner's I.Q. scores and specific results of other intelligence testing, the spankings of the Petitioner and his siblings by his mother, the sexual abuse of the Petitioner, or his difficulty in adjusting after his release from prison following his second degree murder conviction, we cannot conclude that any deficiency of trial counsel in failing to present this evidence resulted in prejudice. Ms. Shettles offered extensive testimony at trial regarding the Petitioner's background, as well as testimony about the prison system and life in the prison system in support of trial counsel's argument that life imprisonment or life imprisonment without parole was a more appropriate sentence. She offered substantially similar testimony regarding the Petitioner's learning disability and academic failures. She also testified about instances in which the Petitioner's mother abused him and his siblings by locking up food while leaving them in order to be with other men and about an instance during which the Petitioner witnessed her abuse his half-brother by placing him in scalding water.

The jury applied numerous aggravating circumstances for each first degree murder conviction. With respect to the Petitioner's conviction for the first degree murder of Mr. Cecil Dotson, Sr., the jury applied three aggravating circumstances: the Petitioner has been "previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person"; the Petitioner knowingly created a great risk of death to two or more persons in the course of murdering Mr. Cecil Dotson, Sr.; and the Petitioner committed "mass murder." *See* T.C.A. §§ 39-13-204(i)(2), (3), (12). With respect to the Petitioner's convictions for the first degree murder of Ms. Williams, Mr. Seals, and Ms. Roberson, the jury applied the same three aggravating circumstances, as well as two additional aggravating circumstances: the murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the Petitioner or another; and the murder was knowingly committed while the Petitioner had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit any first degree murder. *See* T.C.A. §§ 39-13-204(i)(6), (7). With respect to the Petitioner's convictions for the first degree murders of the two children, the jury applied the same five aggravating circumstances, as well as two additional aggravating circumstances: the victim was less than twelve years old and the Petitioner was eighteen years old or older; and the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. *See* T.C.A. §§ 39-13-204(i)(1), (5).

On direct appeal, the Tennessee Supreme Court reviewed the evidence supporting each aggravating circumstance and determined that the evidence was overwhelming. *See Dotson*, 450 S.W.3d at 78-81. Our supreme court stated that "the murders and assaults the [Petitioner] perpetrated are some of the most horrendous ever committed in

Tennessee." *Id.* at 84. Given the overwhelming evidence supporting the aggravating circumstances and the extent of the mitigating evidence presented during the penalty phase, we cannot conclude that there is a reasonable probability that the result of the proceedings would have been different had trial counsel presented the additional mitigating evidence identified by the Petitioner. *See Davidson*, 453 S.W.3d at 402. The Petitioner is not entitled to relief regarding this issue.

The Petitioner also asserts that trial counsel's failure to call Dr. Walker as a witness or present his report during the penalty phase deprived the Petitioner of adequate proportionality review on appeal. The Petitioner did not raise this claim in his post-conviction petition, and the post-conviction court did not address the claim in its order. Therefore, this claimed is waived. *See Holland*, 610 S.W.3d at 458.

### 9. Improper Comments During Opening Statements

The Petitioner submits that co-counsel was ineffective when he told the jury during the opening statements of the penalty phase that the case had "more aggravating circumstances than [he had] ever seen before," and, thus, essentially acknowledged that the Petitioner deserved the death penalty. The record does not support the Petitioner's claim that co-counsel essentially acknowledged to the jury that the Petitioner deserved the death penalty. Rather, co-counsel told the jury that the case had "more aggravating circumstances than [he had] ever seen before" while explaining to the jury that the number of aggravating or mitigating circumstances, alone, was not determinate of the Petitioner's punishment. He informed the jury that each juror was responsible for weighing the aggravating and mitigating circumstances to each his or her own conclusion regarding the appropriate punishment. Co-counsel explained to the jury that if one juror concluded that the mitigating circumstances justified a sentence of life imprisonment, regardless of the number of aggravating circumstances proven by the State, the death penalty would not be the applicable punishment. *See* T.C.A. § 39-13-204(h) (requiring that a death sentence be unanimously found by the jury); *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988) (providing that jurors need not unanimously agree on mitigating circumstances).

In denying relief, the post-conviction court credited co-counsel's testimony that the defense team believed that obtaining a sentence less than death would be difficult if the Petitioner was convicted at trial and that co-counsel made the statement in an effort to maintain credibility with the jury. We conclude that co-counsel made a reasonable strategic decision to acknowledge the number of aggravating circumstances while explaining the weighing process to the jury and to, instead, focus upon establishing mitigating circumstances. We decline to second-guess this reasonable strategic decision, and we conclude that co-counsel was not deficient during his opening statement. *See*

*Henley*, 960 S.W.2d at 579 (providing that reviewing courts should not second-guess strategic choices).

### 10.  Failure to Object to the State's Comments During Closing Argument

The Petitioner argues that trial counsel were ineffective in failing to file a pretrial motion in limine to prevent the State from making improper closing arguments and in failing to object to several statements made by the State during closing arguments in both phases of the trial.  The State responds that the Petitioner failed to question trial counsel during the evidentiary hearing about the majority of the prosecutor's comments and that trial counsel were not otherwise ineffective in failing to object to the comments or in failing to file a pretrial motion in limine.  We agree with the State.

"'The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions.'"  *Richard Lloyd Odom v. State*, No. W2015-01742-CCA-R3-PD, 2017 WL 4764908, at *36 (Tenn. Crim. App. Oct. 20, 2017) (quoting *Derek T. Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010)).  Trial counsel may decide against objecting for several valid reasons, including not wishing to emphasize the unfavorable statements. *Derek T. Payne*, 2010 WL 161493, at *15 (citing *Gregory Paul Lance v. State*, No. M2005-01765-CCA-R3-PD, 2006 WL 2380619, at *6 (Tenn. Crim. App. Aug. 16, 2006)).  "Accordingly, trial counsel must be given the opportunity to explain why they did not object to the allegedly prejudicial remarks."  *Richard Lloyd Odom*, 2017 WL 4764908, at *36.  "'Without testimony from trial counsel or some evidence indicating that [their] decision was not a tactical one, we cannot determine that trial counsel provided anything other than effective assistance of counsel.'"  *Id.* (quoting *State v. Leroy Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007)).

In his appellate brief, the Petitioner lists thirty-one statements made by the prosecutor during closing arguments in the guilt phase and one remark during closing arguments in the penalty phase that the Petitioner maintains were improper.  During the post-conviction hearing, however, the Petitioner only questioned co-counsel about his failure to object to remarks by the prosecutor during rebuttal closing arguments during the penalty phase  Because the Petitioner failed to question trial counsel about the prosecutor's comments during closing arguments of the guilt phase, the Petitioner has not demonstrated how trial counsel's failure to object to the remarks was anything other than a tactical decision.  Furthermore, the Petitioner raised many of the challenged statements on direct appeal, and this court concluded that the Petitioner failed to establish plain error.  *See Dotson*, 450 S.W.3d at 99-101 (appendix).  Accordingly, the Petitioner has

established neither deficiency nor prejudice with regard to the prosecutor's comments during closing arguments of the guilt phase.

The Petitioner objects to the following statement from the prosecutor's closing argument on rebuttal in the penalty phase: "And now Jessie is begging for his [life]? Did Marissa get a jury? What about Shindri? Did she get a jury? Did somebody have to find aggravating circumstances for her to get the death penalty?" The Petitioner maintains that the prosecutor's remarks during the rebuttal closing arguments of the penalty phase were improper comments on the Petitioner's exercise of his constitutional right to a jury trial. This court has recognized that a prosecutor's negative comment on a defendant's exercise of his right to a jury trial was improper. *See State v. Anthony M. Bond*, No. W2005-01392-CCA-R3-CD, 2006 WL 2689688, at *8-9 (Tenn. Crim. App. Sept. 20, 2006) (holding that the prosecutor's statements blaming the defendant for the lengthy trial and jury sequestration were improper insofar that the prosecutor asked the jury to penalize the defendant for exercising his constitutional right to a jury trial). Other jurisdictions also have recognized that a prosecutor is prohibited from negatively commenting on a defendant's exercise of his constitutional right to a jury trial. *See, e.g.*, *United States v. Ochoa-Zarate*, 540 F.3d 613, 618-19 (7th Cir. 2008); *Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001); *Frazier v. State*, 13 A.3d 83, 95-96 (Md. Ct. Spec. App. 2011); *Barnes v. State*, 408 P.3d 209, 214 (Okla. Crim. App. 2017). We conclude that the prosecutor improperly commented on the Petitioner's exercise of his constitutional right to a jury trial and that trial counsel, therefore, were deficient in failing to object to the comments.

Nevertheless, we conclude that the Petitioner failed to establish prejudice because the prosecutor's improper comments were harmless beyond a reasonable doubt. *See State v. Jackson*, 444 S.W.3d 554, 590-92 (Tenn. 2014) (employing a standard of harmless beyond a reasonable doubt to a prosecutor's comments on a defendant's exercise of her constitutional right to remain silent and not testify at trial). In determining whether the prosecutor's comments were harmless beyond a reasonable doubt, we must consider "the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt." *Id.* at 591 (citations omitted). The prosecutor's comments were made during rebuttal closing arguments in the penalty phase after the Petitioner had been convicted of the offenses and while the prosecutor was arguing to the jury about the weighing of the aggravating and mitigating circumstances. Although the trial court did not provide a curative instruction because trial counsel did not object to the comments, the trial court instructed the jury that arguments of counsel do not constitute evidence. The trial court also instructed the jury on the aggravating circumstances that the State was required to prove beyond a reasonable doubt, the applicable mitigating circumstances, and the law regarding the jury's duty to weigh the aggravating and mitigating circumstances. The evidence

supporting the applicable aggravating circumstances was overwhelming. Accordingly, we conclude that the prosecutor's comments, although improper, were harmless beyond a reasonable doubt and that the Petitioner failed to establish prejudice.

Finally, the Petitioner argues that trial counsel were deficient in failing to file a motion in limine seeking to preclude the prosecution from making improper comments during closing arguments. Co-counsel testified that he would have filed a motion if he had a good-faith basis to believe such a motion was necessary. As noted by the State, the Petitioner presented no proof demonstrating a good faith basis to anticipate that the State would engage in improper closing arguments. The Petitioner argues that in *State v. Jackson*, 444 S.W.3d at 590 n.49, the Tennessee Supreme Court noted a history of improper closing arguments by prosecutors in Shelby County. However, the opinion in *Jackson* was filed approximately four years after the Petitioner's trial and, thus, did not serve as notice for counsel to file a motion in limine. Furthermore, the Petitioner failed to cite any caselaw establishing that a motion in limine would serve to preserve all objections to any of the prosecutor's comments for purposes of appeal or that based upon the motion in limine, the trial court would have made a blanket ruling prior to trial instead of waiting to rule on each individual objection made by trial counsel during closing arguments. The Petitioner established neither deficiency nor prejudice.

## 11. Failure to Object or Request Jury Instructions

The Petitioner challenges trial counsel's failure to object to the order of the jury instructions listing first degree murder as the first option and not guilty as the final option and to the requirement in the instruction that the jury unanimously agree that he was not guilty of first degree murder before considering the lesser included offenses. The Petitioner maintains that when lesser included offenses are charged, the highest degree charged should not be the first instruction but that the order must begin with the lesser charges to ensure that the jury reliably considers the defendant's defense. The Petitioner acknowledges that the Tennessee Supreme Court upheld "acquittal-first" jury instructions in *State v. Davis*, 266 S.W.3d 896, 905 (Tenn. 2008), but maintains that *Davis* was "wrongly decided." We are bound by the rulings of the Tennessee Supreme Court, and we conclude that trial counsel were not deficient in failing to raise an objection.

The Petitioner faults trial counsel for failing to object to the portion of the eyewitness identification instruction, which allowed jurors to consider "the degree of certainty expressed by the witness regarding the identification" when evaluating the creditability of the eyewitnesses' identification. However, the Tennessee Supreme Court approved the use of this language in a jury instruction in *State v. Dyle*, 899 S.W.2d 607, 612 (Tenn. 1995). The Petitioner asserts that "research and court opinions" since *Dyle* and prior to the Petitioner's trial "combine to establish flaws in the assumptions

underlying the Court's *Dyle* opinion."  *Dyle*, however, was and remains the controlling authority for instructing a jury on eyewitness testimony in Tennessee.  We are bound by the rulings of the Tennessee Supreme Court, and we conclude that trial counsel were not deficient in failing to raise an objection that is contrary to binding caselaw.

The Petitioner submits that trial counsel were ineffective in failing to object to instructions regarding how the jury should weigh aggravating and mitigating circumstances.  He maintains that the instructions were "contradictory" and suggested that jurors had to impose both a sentence of life imprisonment without parole and a death sentence if they unanimously found an aggravating circumstance.  The trial court's instructions mirrored the language in Tennessee Code Annotated section 39-13-204(f) through (g).  Accordingly, trial counsel were not deficient.

The Petitioner maintains that trial counsel should have requested an instruction explaining the consequences of a hung sentencing jury.  However, Tennessee Code Annotated section 39-13-204(h) provides, "The judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on the effect of the jury's failure to agree on a punishment."  Although the Petitioner maintains that this provision is unconstitutional because jurors could mistakenly believe that their failure to agree on a sentence may require a new trial, this argument has been repeatedly rejected.  *See State v. Ivy*, 188 S.W.3d 132, 162 (Tenn. 2006) (appendix) (citing *State v. Stevens*, 78 S.W.3d 817, 850 (Tenn. 2002) (appendix); *State v. Vann*, 976 S.W.2d 93, 118 (Tenn. 1998) (appendix); *State v. Smith*, 893 S.W.2d 908, 926 (Tenn. 1994)).  Accordingly, trial counsel were not deficient in failing to request the jury instruction.

The Petitioner argues that trial counsel should have objected to the reasonable doubt instruction given during the penalty phase that reasonable double was not "doubt that may arise from a possibility."  On direct appeal, this court rejected Petitioner's challenge under the plain error doctrine to the same language of the reasonable doubt instruction given during the guilt phase, concluding that the instruction was constitutional and that the jury was not reasonably likely to have applied the burden of proof in an unconstitutional way.  *Dotson*, 40 S.W.3d at 96 (appendix).  Furthermore, the Tennessee Supreme Court has upheld the same language in a jury instruction defining reasonable doubt given during the penalty phase.  *See State v. Rimmer*, 250 S.W.3d 12, 30-31 (Tenn. 2008).  Therefore, the Petitioner has established neither deficiency nor prejudice.

The Petitioner also argues that trial counsel should have, during both phases of the trial, challenged as unconstitutional the reasonable doubt instruction stating that a conviction required "moral certainty."  However, "'the use of the phrase "moral certainty" by itself is insufficient to invalidate an instruction on the meaning of reasonable doubt.'"  *State v. Hall*, 976 S.W.2d 121, 159 (Tenn. 1998) (appendix) (quoting

*State v. Nichols*, 877 S.W.2d 722, 734 (Tenn. 1994)); *see Steven Ray Thacker v. State*, No. W2010-01637-CCA-R3-PD, 2012 WL 1020227, at *56 (Tenn. Crim. App. Mar. 23, 2012). Trial counsel were not deficient in this regard.

### D. Ineffective Assistance of Appellate Counsel

The Petitioner asserts that he received ineffective assistance of counsel on direct appeal. He maintains that trial counsel should have challenged the admission of Sergeant Davidson's testimony regarding his reaction to the scene as irrelevant and inflammatory. The Petitioner also maintains that appellate counsel should have raised various challenges to the jury instructions addressed above.

To establish ineffective assistance of counsel on appeal, the petitioner must demonstrate that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent appellate counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Campbell v. State*, 904 S.W.2d 594, 597 (Tenn. 1995). "Appellate counsel are not constitutionally required to raise every conceivable issue on appeal." *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). "Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel." *Campbell*, 904 S.W.2d at 597. A reviewing court gives "considerable deference" to counsel's judgment regarding which issues to raise on appeal, so long as the choices are within the "range of competence required of attorneys in criminal cases." *Carpenter*, 126 S.W.3d at 887. "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome,'" although the Tennessee Supreme Court has declined to hold that this is the "*only* way to show" deficiency. *Id.* at 888 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). When a claim of ineffective assistance of counsel is premised on the failure to preserve an issue on appeal, the reviewing court should determine the merits of the omitted issue. *Carpenter*, 126 S.W.3d at 888. "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* The strength of the omitted issue also has bearing on whether failure to raise the issue resulted in prejudice. *Id.*

We note that co-counsel and another attorney represented the Petitioner on direct appeal. *See Dotson*, 450 S.W.3d at 11. The Petitioner did not call appellate counsel as a witness during the post-conviction hearing, and the Petitioner did not question co-counsel during the hearing about the failure to raise the issues on direct appeal. The record reflects that counsel raised twenty-one issues on direct appeal in this court. *See Jessie Dotson v. State*, No. W2011-00815-CCA-R3-DD, 2013 WL 4728679, at *1 (Tenn. Crim.

App. June 25, 2013), *affirmed by Dotson*, 450 S.W.3d 1 (Tenn. 2014). The Petitioner has failed to demonstrate that the issues regarding the admission of Sergeant Davidson's testimony and the jury instructions were "'clearly stronger'" than the issues raised on direct appeal. *Carpenter*, 126 S.W.3d at 888 (quoting *Gray*, 800 F.2d at 646). We have held that the Petitioner's challenges to the jury instructions were without merit, and, therefore, counsel were not deficient in failing to raise the issues on direct appeal. *See id.* We have also held that the admission of Sergeant Davidson's comments regarding his own reaction to the crime scene did not result in prejudice given the evidence presented at trial regarding the victims' extensive injuries and the brutality of the offenses as depicted in the crime scene. Had trial counsel raised the issue of the admission of Sergeant Davidson's testimony on direct appeal, the Petitioner would not have been entitled to relief because any error in admitting the testimony was harmless. *See* Tenn. R. App. P. 36(b). Accordingly, the Petitioner has established neither deficiency nor prejudice.

## II. Denial of Expert Funding

The Petitioner next challenges the denial of funding by the AOC and the Chief Justice of the Tennessee Supreme Court in order to allow the Petitioner to retain certain experts for purposes of the post-conviction hearing. On March 2017, the Petitioner filed a motion in the post-conviction court seeking funding to retain Dr. Bhushan S. Agharkar, a psychiatrist, to evaluate the Petitioner. The Petitioner sought to compensate Dr. Agharkar at a rate of $350 per hour for up to fifty hours of substantive work for a total of $17,500 plus travel expenses. The post-conviction court entered an order granting the motion. In a subsequently-issued letter, an attorney with the AOC informed the Petitioner's counsel that the request for funding had been submitted to the AOC for authorization in accordance with Tennessee Supreme Court Rule 13, section 5. According to the letter, the AOC concluded that counsel had shown that the expert services were necessary to ensure that the Petitioner's constitutional rights were properly protected but that the hourly rate of $350 for the services sought exceeded the hourly rate authorized under Rule 13. The letter stated that AOC Director Deborah Taylor Tate concurred with the recommendation to approve Dr. Agharkar at the hourly rate of $250 as permitted by Rule 13 but not to approve his hourly rate of $350. The letter stated that pursuant to Rule 13, section 5, the Chief Justice of the Tennessee Supreme Court reviewed the materials provided to the AOC and concurred with Director Tate's decision and that "[t]he Chief Justice's decision is final."

In September 2017, the Petitioner filed a motion in the post-conviction court seeking to vacate his death sentences. He maintained that Dr. Agharkar did not agree to provide services at the hourly rate of $250, which the Petitioner contended was below the market rate for forensic psychiatric specialists with experience in capital case

assessments. The Petitioner argued that as a result, he was "precluded from accessing expert services necessary to protect his constitutional rights." The post-conviction court subsequently entered an order denying the Petitioner's motion. The Petitioner sought permission to pursue an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9, and the post-conviction court denied the request. The Petitioner filed an application for an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure in this court, and this court denied the application. *See Jessie Dotson v. State*, No. W2017-02550-CCA-R10-PD (Tenn. Crim. App. Mar. 29, 2018) (order). The Tennessee Supreme Court also denied the Petitioner's application for an extraordinary appeal. *See Jessie Dotson v. State*, No. W2017-02550-SC-R10-PD (Tenn. May 10, 2018) (order).

In June 2018, the Petitioner filed a motion seeking funds to retain the expert services of Dr. James R. Merikangas, a neurologist, at a rate of $250 per hour for substantive work and $125 for travel for a total of $10,000. The post-conviction court granted the motion on the same day. On August 15th, the Petitioner filed, and the post-conviction court granted, a motion seeking funds to retain the expert services of Dr. Richard A. Leo in the field of false confessions at an hourly rate of $150 for a total of $9,000 plus travel expenses. During a status hearing on September 12th, the Petitioner's counsel announced that the AOC had denied funding for the two experts and that the requests had been forwarded to the Chief Justice for his decision. On September 25th, the Petitioner filed, and the post-conviction court granted, a motion for funding the expert services of Dr. James S. Walker, a neuropsychologist, at the rate of $150 per hour for reviewing records and providing testimony for a total of $1,425. In each of the motions requesting funding, the Petitioner's counsel acknowledged that the fulfillment of the request may exceed the $25,000 limit for all expert services set forth in Tennessee Supreme Court Rule 13 but maintained that extraordinary circumstances existed to exceed the limit.

On the first day of the evidentiary hearing, the Petitioner's counsel announced that the AOC and the Chief Justice had denied counsel's requests for funding to retain the services of all three experts. Counsel argued that the denial of funding for these experts, as well as the denial of funding to retain Dr. Agharkar, resulted in a denial of the Petitioner's due process rights, his right to be free from cruel and unusual punishment, and his statutory rights of a fair post-conviction hearing. Counsel also argued that the denial of funding rendered them incompetent in their representation of the Petitioner and in violation of their ethical and statutory duties. The post-conviction court noted that whenever it approved funding for expert witnesses, it made it "very clear" that the order would be reviewed by the AOC and the Chief Justice and that the court did not receive a copy of their determinations. The court required the Petitioner to proceed with the evidentiary hearing but allowed him to enter letters from Dr. Merikangas, Dr. Walker,

- 93 -

and Dr. Leo as exhibits for identification purposes and as an offer of proof to establish that they were available to testify during the scheduled evidentiary hearing.

The Petitioner contends that AOC Director Tate and the Chief Justice improperly vacated the post-conviction court's orders approving funding to retain Dr. Agharkar, Dr. Merikangas, Dr. Walker, and Dr. Leo as expert witnesses. He asserts that the AOC Director and the Chief Justice (1) exercised judicial power in violation of the Tennessee Constitution; (2) violated the due process guarantees of the United States and Tennessee Constitutions by failing to provide the Petitioner with notice of the issues and evidence that they would consider when reviewing the post-conviction court's funding orders; and (3) denied the Petitioner's rights to a full and fair hearing, equal protection, and freedom from cruel and unusual punishment. The State responds that the actions of the AOC Director and the Chief Justice were authorized pursuant to Tennessee Supreme Court Rule 13, section 5, that this court is without jurisdiction to resolve any challenges to Rule 13, and that the Petitioner does not have an appeal as of right from the decision of the AOC Director and the Chief Justice pursuant to Tennessee Rule of Appellate Procedure 3(b). The State also responds that the Petitioner waived his claims regarding the improper exercise of judicial authority and the deprivation of a property right without due process by failing to raise the claims in the post-conviction court, that the appellate record is inadequate to review the Petitioner's claims regarding the funding of three of the experts, and that the Petitioner received a full and fair post-conviction hearing. We conclude that this court is without jurisdiction to address the Petitioner's challenges to Rule 13, section 5.

Tennessee Code Annotated section 40-14-207 provides for the compensation of attorneys appointed to represent indigent defendants in a criminal case, as well as the reimbursement of expenses and the funding of experts in capital cases. Subsection (b) provides:

> In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, the court in an *ex parte* hearing may, in its discretion, determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. If that determination is made, the court may grant prior authorization for these necessary services in a reasonable amount to be determined by the court. The authorization shall be evidenced by a signed order of the court. The order shall provide for the reimbursement of reasonable and necessary expenses by the administrative director of the courts as authorized by this part and rules promulgated thereunder by the supreme court.

Our supreme court has interpreted section 40-14-207(b) as applying to post-conviction cases. *Owens v. State*, 908 S.W.2d 923, 928 (Tenn. 1995). The Court, however, cautioned that the holding "should not be interpreted as a 'blank check' requiring trial courts to hold *ex parte* hearings and authorize funds in every case." *Id.* Rather, Tennessee Supreme Court Rule 13 sets forth the procedure to be followed when a petitioner requests and the post-conviction court rules upon a request for expert or investigative services. *See id.* "Rule 13 does not create rights" but "merely contains the procedural mechanism for implementing" section 40-14-207(b). *Id.* at n.10 (citing *Allen v. McWilliams*, 715 S.W.2d 28, 29 (Tenn. 1986)).

In order to authorize funding for an expert, the trial court must find particularized need for the requested services and that the expert's hourly rate is reasonable. Tenn. Sup. Ct. R. 13, § 5(c)(1). The defendant or petitioner must make every effort to obtain the services of an expert located within 150 miles of the court where the case is pending. Tenn. Sup. Ct. R. 13, § 5(b)(1). Section 5(d)(1) sets forth the maximum hourly rate for various categories of experts, and section 5(d)(5) provides that in a post-conviction capital case, the post-conviction court "shall not authorize more than *a total of* $25,000 for the services of *all* experts unless in its sound discretion the trial court determines that extraordinary circumstances exist that have been proven by clear and convincing evidence." (Emphasis in original.). "Once the services are authorized by the court in which the case is pending, the order and any attachment must be submitted in writing to the [AOC Director] for prior approval." Tenn. Sup. Ct. R. 13, § 5(e)(4). If the AOC Director denies the prior approval of the funding request, the claim shall be transmitted to the Chief Justice for disposition and prior approval. Tenn. Sup. Ct. R. 13, § 5(e)(5). "The determination of the [C]hief [J]ustice shall be final." *Id.*

The Petitioner raises numerous constitutional challenges to section 5(e)(4)-(5) and the actions of the AOC Director and the Chief Justice pursuant to those provisions. The State responds that the Petitioner does not have a right to appeal the decisions of the AOC Director and the Chief Justice pursuant to Tennessee Rule of Appellate Procedure 3(b). The State relies upon this court's opinion in *State v. Roger Todd*, in which this court held that Rule 3(b) did not provide a defendant an appeal of right from a trial court's order denying the defendant's expert funding requests. No. M2006-01940-CCA-R3-CD, 2007 WL 1582661, at *2 (Tenn. Crim. App. May 31, 2007). This court reasoned that the defendant was only appealing the trial court's order, which was not part of an appeal from a judgment of conviction. *Id.* This court recognized that review of the trial court's denial of funding for expert services may be obtained through an interlocutory appeal pursuant to Rule 9 or an extraordinary appeal pursuant to Rule 10 or when challenged as part of an appeal from a judgment of conviction pursuant to Rule 3(b). *Id.* (citation omitted).

The Petitioner, however, does not seek review of any direct actions taken by the post-conviction court related to funding as part of his challenge to the post-conviction court's judgment. In contrast to the Petitioner's prior application for an extraordinary appeal pursuant to Rule 10 in which he sought review of the post-conviction court's order denying his motion to vacate his death sentences in light of the denial of his expert funding request by the AOC Director and the Chief Justice, the Petitioner does not challenge any actions or omissions by the post-conviction court. *See Jessie Dotson v. State*, No. W2017-02550-CCA-R10-PD (Tenn. Crim. App. Mar. 29, 2018) (order). Rather, the Petitioner directly challenges the actions and determinations of the AOC Director and the Chief Justice in denying the Petitioner's expert funding requests. Tennessee Rule of Criminal Procedure 37(b) provides that "[t]he defendant or the state may appeal any order or judgment in a criminal proceeding when the law provides for such an appeal." Tennessee Supreme Court Rule 13, section 5(e)(5) states that the Chief Justice's determination with respect to requests for funding of expert witnesses "shall be final." Accordingly, the law does not provide an appeal of the Chief Justice's decision to deny the Petitioner's requests for funding of various expert witnesses.

We further conclude that we are without authority to decide the Petitioner's constitutional challenges to Rule 13, section 5(e)(4)-(5). The Tennessee Supreme Court has held that inferior courts do not have the authority to invalidate a Supreme Court Rule. *See Petition of Gant*, 937 S.W.2d 842, 846 (Tenn. 1996); *Petition of Tenn. Bar Ass'n*, 539 S.W.2d 805, 807 (Tenn. 1976); *Barger v. Brock*, 535 S.W.2d 337, 342 (Tenn. 1976); *see also Long v. Bd. of Prof'l Responsibility*, 435 S.W.3d 174, 184 (Tenn. 2014) ("Under Tennessee law, only the Tennessee Supreme Court may determine the facial validity of its rules."). "Rather, the Supreme Court, as the promulgator of the rule, is the rule's primary arbiter." *Petition of Gant*, 937 S.W.2d at 846 (citing *Allen v. McWilliams*, 715 S.W.2d 28 (Tenn. 1986)).

The Petitioner asserts that this court has jurisdiction to decide the constitutional challenges because the Tennessee Supreme Court promulgated Rule 13, section 5 pursuant to a legislative delegation of authority provided in Tennessee Code Annotated section 40-14-207(b) rather than pursuant to the Court's inherent constitutional authority to regulate courts. In *Petition of Gant*, the Tennessee Supreme Court held that the trial court did not have the authority to invalidate a provision of Rule 13 governing the hourly rate of attorneys appointed to represent indigent defendants. 937 S.W.3d at 845-46. The Court's reasoning was not that the provisions of the rule were the result of its inherent constitutional authority to regulate the courts. *See id.* Rather, in holding that the trial court lacked the authority to invalidate the Rule, the Court noted that its authority to promulgate rules prescribing compensation for appointed counsel was derived from statute. *Id.* at 845. Thus, the Tennessee Supreme Court's prohibition against inferior

courts' invalidating the Rules of the Tennessee Supreme Court applies regardless of the source of the Court's authority to promulgate the Rules.

The Petitioner also argues that inferior courts are not prohibited from ruling on as-applied constitutional challenges to Tennessee Supreme Court Rules. In *Long v. Board of Professional Responsibility*, the Tennessee Supreme Court held that only the Tennessee Supreme Court had the authority to consider facial challenges to its rules. 435 S.W.3d at 184. The appellant made facial challenges to the validity of Tennessee Supreme Court Rule 9 before a hearing panel of the Tennessee Board of Professional Responsibility and the chancery court to which the appellant appealed the panel's decision. *Id.* The Court did not determine whether the panel had the authority to decide as-applied challenges to a Tennessee Supreme Court Rule. *Id.* at n. 8. The Court noted that administrative agencies governed under the Uniform Administrative Procedures Act may rule upon as-applied constitutional challenges raised during hearings before those agencies. *Id.* (citing *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 455 (Tenn. 1995)). The Court further noted that Tennessee Supreme Court Rule 9 allows a trial court to reverse or modify a hearing panel's decision if the panel's decisions are in violation of statutory or constitutional provisions. *Id.* (citing Tenn. Sup. Ct. R. 9, § 1.3). However, the Uniform Administrative Procedures Act does not apply to post-conviction proceedings, and there is no rule granting the post-conviction court or this court authority to grant relief if the decisions of the AOC Director and the Chief Justice pursuant to Rule 13, section 5(e)(4)-(5) violate constitutional provisions. Accordingly, we do not have the authority to decide the Petitioner's constitutional challenges, and, therefore, he is not entitled to relief regarding this issue.[3]

## III. Failure to Preserve Evidence

The Petitioner alleges as a stand-alone claim that the State's failure to preserve the video recording of his interview with police officers and his interactions with his mother violated the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and article I, sections 8, 9, and 16 of the Tennessee Constitution. The post-conviction

---

[3] The Petitioner requests that this court reconsider its previous order denying his motion to supplement the appellate record with various documents and communication from AOC personnel regarding the denial of funds for expert witnesses. The Petitioner never presented these items during the post-conviction proceedings, and the post-conviction court denied the Petitioner's request to include the items in the appellate record. *See* Tenn. R. App. P. 24(e) (providing that the determination of the trial court concerning matters includable in the appellate record is conclusive "[a]bsent extraordinary circumstances"). We conclude that the motion to reconsider is not well-taken and is, therefore, denied. We further note that the documents that the Petitioner seeks to include in the appellate record relate to decisions by the Chief Justice and the AOC, which this court is without jurisdiction or authority to overturn. Therefore, inclusion of these documents in the appellate record is meaningless.

court found that issues related to the footage from *The First 48* were "available at trial" and that trial counsel investigated and litigated many issues related to the footage and successfully challenged the admissibility of the footage at trial. The court concluded that "[t]o the extent any issue overlaps with issues raised at trial, it would be previously determined, and any issues not raised previously would be waived." The Petitioner argues that the post-conviction court failed to make adequate findings of fact and conclusions of law as required by Tennessee Code Annotated section 40-30-111(b). However, we conclude that the post-conviction court's findings were more than sufficient to address the issue raised by the Petitioner. As reflected by the post-conviction court's findings and the record, the issues raised by the Petitioner regarding the State's failure to preserve the raw footage were available to be raised at trial and on direct appeal. Therefore, the issues are waived. *See* T.C.A. § 40-30-106(g).

## IV. Withholding of Evidence

The Petitioner maintains that the State wrongfully withheld C.J.'s neuropsychological evaluation at trial. In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963); *see Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). One of the prerequisites that a defendant must establish to constitute a due process violation under *Brady* is that the State suppressed the information. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). However, as we have concluded, the evidence does not preponderate against the post-conviction court's finding that General Lepone made the report available to lead counsel prior to trial and discussed it with him. Because the State did not suppress the report, the Petitioner failed to establish that he is entitled to relief.

## V. Use of Stun Cuff

The Petitioner maintains that the State violated his due process rights by attaching a stun cuff to him at trial. The post-conviction court found that the Petitioner waived the issue by failing to present it to the trial court and on direct appeal. The Petitioner contends that such errors require automatic reversal and that the record includes no evidence that he personally, affirmatively, voluntarily, and intelligently decided to forgo his due process stun cuff claim. However, in *Mobley v. State*, the Tennessee Supreme Court, relying on Tennessee Code Annotated section 40-30-106(g), held that the petitioner waived a stand-alone due process challenge to the use of a stun belt at trial raised during post-conviction proceedings when the petitioner did not present the issue to the trial court or on direct appeal. 397 S.W.3d at 104. The Court concluded that the issue of the use of a stun belt was more properly considered in the context of the petitioner's

ineffective assistance of counsel claim. *Id.* Thus, in accordance with our supreme court's decision in *Mobley*, we conclude that the Petitioner's stand-alone due process issue is waived.

## VI. Juror Misconduct

The Petitioner contends that members of the jury engaged in misconduct and that, as a result, he did not receive a fair trial. Shortly before the evidentiary hearing, the Petitioner filed a supplemental petition for post-conviction relief, alleging, in part, that his convictions and sentences were the product of premature deliberations, a coerced verdict, and racial animus and that the jurors received extraneous prejudicial information. He also filed a motion in limine regarding the admissibility of the jurors' testimony and attached the affidavits of a juror who served on the jury at the Petitioner's trial ("Juror 2") and an alternate juror.

Juror 2, an African-American man, stated in his affidavit that, initially, the jurors were friendly with each other but that they became less friendly as the trial continued. He stated that he believed at least nine of the jurors were more concerned about returning home than about the trial and the sentencing hearing. He noted that the other jurors paid close attention when the State was presenting its case but paid less attention when the defense presented its proof. Juror 2 stated that while he questioned how the Petitioner could have killed four adults by himself, the testimony of the surviving children led him to find the Petitioner guilty, even though the juror believed the children's testimony was coerced. Juror 2 recalled that during deliberations following the guilt phase, there was little discussion among the jurors and that everyone agreed on the Petitioner's guilt.

Describing the jury's deliberations following the penalty phase as "rushed," Juror 2 stated that he wanted to discuss the evidence that had been presented but that none of the other jurors wanted to have such a discussion. He also stated that he sought to share his perspective on gang violence based upon his prior experience but that none of the other jurors seemed interested in his perspective. He recalled that once he expressed his desire to discuss the issues surrounding sentencing further, the other jurors "came after" him and cursed him. He also recalled one female juror calling him a "bastard" and another female, Caucasian juror yelling at him and telling him to think of the children. He stated that the other jurors were "very vocal about wanting to get the whole thing over with and wanting to go home" and that "[b]ecause of the way the other jurors treated me, I felt pressured to vote to impose a death sentence on [the Petitioner], even though I was not one hundred percent sure that that is how I wanted to cast my vote."

Juror 2 stated that other jurors laughed at him whenever he became sick after eating at restaurants chosen by the other jurors and told him that he was not accustomed

to eating "good food."  He also stated that the jury foreperson was particularly rude to him and singled him out on multiple occasions, including comments about the Juror 2's clothing.  While Juror 2 said he was "not sure," he believed the jury foreperson singled him out because the juror was the only African-American male on the jury.  Juror 2 reiterated that he felt pressured to vote to impose a death sentence based on the way that the jury foreperson and the other jurors treated him and that he did not believe the Petitioner received a fair trial "based on the way the jury acted."

Juror 2 stated that while he "can't be sure," he believed another juror was using a cell phone during the course of the trial, even though the jury was sequestered.  Juror 2 also stated that he watched television for three days, even though their televisions were supposed to be disconnected.  He denied watching the news during those three days.  He said he chose to watch television alone instead of with the other jurors because he felt uncomfortable around them.

The alternate juror stated that during breaks throughout the trial, he overheard jurors discussing the case before both sides completed the presentation of their proof.  He stated that he rebuffed attempts by other jurors to discuss the case with him, including an attempt by the jury foreperson.  The alternate juror said he reported the jurors' conduct to a deputy after which the trial judge warned the jury against discussing the case until deliberations.

The alternate juror stated that after the prosecution had rested its case and before the defense had presented its case, a female juror entered the jury room and proclaimed that she was ready to vote and go home.  The alternate juror said that during the jury selection and throughout the trial, the same female juror appeared more concerned about her personal needs than her responsibility to hear the case.  The alternate juror recalled that the female juror solicited the other jurors to ask the trial court to work through the weekend so that she would be able to return home sooner.

The alternate juror stated that following the penalty phase, all of the jurors and the alternate jurors went out to dinner and that he noticed one of the jurors, an African-American man, who seemed uncomfortable.  When the alternate juror spoke to the juror in the restroom, the juror said he felt "abused" by the other jurors during the deliberations.  The alternate juror stated that the juror told him that other jurors called him names and directed multiple profanities toward him.  The juror told the alternate juror that he attempted to persuade the other members of the jury to evaluate and discuss the details of the evidence presented by both the State and the defense but that the other jurors appeared disinterested in doing so and wanted to vote guilty without deliberating further.  The alternate juror said the juror told him that due to the pressure and verbal abuse by the other members of the juror, he "just wanted to be out of there."

At the evidentiary hearing, the Petitioner's counsel argued that based upon the affidavits, the jury improperly engaged in premature deliberations and received extraneous prejudicial information and outside influences and that the verdict was coerced. The State responded that the jurors' testimony was inadmissible pursuant to Tennessee Rule of Evidence 606(b). The post-conviction court determined that the testimony of Juror 2 and the alternate juror and their affidavits were inadmissible. The court recognized the policy of protecting the sanctity of jury deliberations absent "some showing of the specific areas of impropriety." The court found that the information in the affidavits failed to show an area of impropriety that would render the testimony of Juror 2 and the alternate juror admissible.

On appeal, the Petitioner maintains that he is entitled to a new trial because the jurors deliberated prematurely, pressured Juror 2 to agree to impose the death penalty, and exhibited racial animus toward Juror 2. The Petitioner also maintains that the jurors were subject to extraneous prejudicial information and outside influences, noting that Juror 2 watched television and believed another juror used a cell phone. The State responds that the Petitioner waived the claims by failing to raise them on direct appeal and that the post-conviction court properly found the affidavits and testimony of Juror 2 and the alternate juror inadmissible pursuant to Tennessee Rule of Evidence 606(b).

Although the State asserts that the Petitioner should have presented the issue on direct appeal, this court has addressed claims of juror misconduct as stand-alone issues in post-conviction proceedings when the basis for the claims were first discovered by the Petitioner and his counsel during the pendency of the post-conviction proceedings. *See, e.g. Hubert Glenn Sexton, Jr. v. State*, No. E2018-01864-CCA-R3-PC, 2019 WL 6320518, at *16-18 (Tenn. Crim. App. Nov. 25, 2019); *Robert Faulkner v. State*, No. W2012-00612-CCA-R3-PD, 2014 WL 4267460, at *76-82 (Tenn. Crim. App. Aug. 29, 2014). No evidence was presented suggesting that trial counsel or the Petitioner was aware of or should have been aware of the conduct upon which the jury misconduct claim was based so as to allow them to raise the issue on direct appeal. Accordingly, we will address the issue on its merits.

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to a trial by an impartial jury. "An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *State v. Smith*, 418 S.W.3d 38, 45 (Tenn. 2013) (citing *State v. Adams*, 405 S.W.3d 641, 650-51 (Tenn. 2013); *Durham v. State*, 188 S.W.2d 555, 558 (Tenn. 1945)).

Tennessee Rule of Evidence 606(b) provides that during an inquiry into the validity of a verdict,

> a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Rule 606(b) is "'grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for jury testimony relating to extraneous influences.'" *Walsh v. State*, 166 S.W.3d 641, 646 (Tenn. 2005) (quoting *Tanner v. United States*, 483 U.S. 107, 121 (1987)). "The rule promotes full and frank discussion in the privacy of the jury room and protects jurors from harassment by the losing party who might seek to impeach the verdict" and "the overarching purpose" of Rule 606(b) is "to protect the integrity of the jury's deliberative process." *Id.* (citing *Tanner*, 483 U.S. at 108, 119-20; *Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 741 (Tenn. Ct. App. 1990)). Thus, "a juror is not permitted to testify about anything occurring during deliberations, including the juror's own internal thoughts, motivations, or emotions." *Id.* at 647 (citing Tenn. R. Evid. 606(b); *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)). Rule 606(b), however, allows juror testimony "if there has been: (1) extraneous prejudicial information, (2) outside influence, or (3) an antecedent agreement to be bound by a quotient or majority result." *Id.* (citations omitted).

Extraneous prejudicial information is defined as "information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Adams*, 405 S.W.3d at 650 (citations omitted). "An improper outside influence is any unauthorized 'private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.'" *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). The party challenging the validity of the verdict has the burden of presenting admissible evidence that the jury was exposed to extraneous prejudicial information or to an improper outside influence. *Id.* External influences that may warrant a new trial if prejudicial include: "'(1) exposure to news items about the trial; (2) consideration of facts not admitted in evidence; and (3) communication with non-jurors about the case.'" *Carruthers v. State*,

145 S.W.3d 85, 92 (Tenn. Crim. App. 2003) (quoting *Caldararo*, 794 S.W.2d at 742). Internal influences that do not constitute grounds for relief include: "'(1) discussions among jurors; (2) intimidation or harassment of one juror by another; (3) a juror's personal experiences not directly related to the litigation[;] and (4) a juror's subjective thoughts, fears, and emotions.'" *Id.* (quoting *Caldararo*, 794 S.W.2d at 742). Once the challenging party meets his or her burden of making an initial showing that the jury was exposed to extraneous prejudicial information or an improper outside influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or establish that the conduct was harmless. *Adams*, 405 S.W.3d at 651 (citing *Walsh*, 166 S.W.3d at 647).

Although the Petitioner contends the trial court erred in excluding evidence that the jury engaged in premature deliberations, this court has held that "post-verdict inquiries into whether a jury has prematurely deliberated are barred because premature deliberations do not involve extraneous prejudicial information or outside influence." *State v. Leath*, 461 S.W.3d 73, 110 (Tenn. Crim. App. 2013) (citing *State v. Frazier*, 683 S.W.2d 346, 353 (Tenn. Crim. App. 1984); *see, e.g. Hubert Glenn Sexton, Jr.*, 2019 WL 6320518, at *16; *State v. Steven Malone*, No. W2010-00947-CCA-R3-CD, 2011 WL 3912935, at *11 (Tenn. Crim. App. Sept. 7, 2011). Furthermore, evidence of the jurors' treatment of Juror 2, their hostility toward him during deliberations, and Juror 2's feelings of pressure to impose the death penalty by the other jurors relate to internal influences barred by Rule 606(b). *See Carruthers*, 145 S.W.3d at 92; *Caldararo*, 794 S.W.2d at 742.

Although Juror 2 acknowledged watching television, he denied watching the news, and Juror 2 did not state in his affidavit that he learned of any information about the case while watching television. "Before a new trial will be warranted, the extraneous information must be determined to have been prejudicial." *Leath*, 461 S.W.3d at 111 (citing *David Keen v. State*, No. W2004-02159-CCA-R3-PD, 2006 WL 1540258, at *31 (Tenn. Crim. App. June 5, 2006)). Furthermore, evidence that an unidentified juror may have used a cell phone, alone, is insufficient to meet the definition of "extraneous prejudicial information" or "improper outside influence." *See Adams*, 406 S.W.3d at 650.

The Petitioner argues that evidence that the verdict was the result of racial animus and coercion by other jurors is admissible as an exception to Rule 606(b) as recognized by the United States Supreme Court in *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). Following the verdict in *Pena-Rodriguez*, two jurors alleged that another juror made several remarks that the defendant was guilty of the sexual offenses due to his ethnicity. 137 S. Ct. at 862. The juror was alleged to have told other jurors that he "'believed the defendant was guilty because, in [the juror's] experience as an ex-law

enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women'"; that he believed "Mexican men are physically controlling of women because of their sense of entitlement"; that "'I think he did it because he's Mexican and Mexican men take whatever they want'"; that "'nine times out of ten Mexican men were guilty of being aggressive toward women and young girls'"; and that he did not believe the defendant's alibi witness was credible due in part to the fact that the witness was "'an illegal.'" *Id.* The Colorado state courts concluded that the evidence was inadmissible under Colorado's "no-impeachment rule," which was similar to the "no-impeachment" provisions in Rule 606(b) of the Federal Rules of Evidence and the Tennessee Rules of Evidence. *Id.*

The Supreme Court reversed, holding that the Sixth Amendment requires an exception to the "no-impeachment rule" when "a juror makes a clear statement that indicates that he or she relied on racial stereotypes or animus to convict a criminal defendant." *Id.* at 869. The Court reasoned that, contrary to other types of juror misconduct, "racial bias implicates unique historical, constitutional, and institutional concerns." *Id.* at 868. The Court clarified the narrow scope of its holding, explaining that

> [n]ot every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.

*Id.* at 869.

Juror 2, however, never alleged that the other jurors made clear statements exhibiting overt racial bias. While Juror 2 stated that he believed the other jurors engaged in hostile behavior toward him because he was African-American, he acknowledged that he was unsure. Furthermore, the conduct about which Juror 2 complained was directed toward him and not the Petitioner. As the Sixth Circuit recognized in a case in which a juror made derogatory statements about other jurors, "the challenged statement must suggest not just that a juror harbored racial bias, but also that this racial bias played a significant role '*in the juror's vote to convict*' the defendant."

*United States v. Brooks*, 987 F.3d 593, 604 (6th Cir. 2021) (quoting *United States v. Robinson*, 872 F.3d 760, 770 (6th Cir. 2017). While we do not condone the conduct of the other jurors in this case, *Pena-Rodriguez* requires "*express* statements of racial animus, not *neutral* statements that may suggest unexpressed racial bias." *Brooks*, 987 F.3d at 605 (emphasis in original). Accordingly, the Petitioner has failed to establish that the proposed testimony fell within the limited exception to Rule 606(b) set forth in *Pena-Rodriguez*. The Petitioner is not entitled to relief on this issue.

## VIII. The Prosecutor's Comments During Closing Arguments

The Petitioner cites to thirty-two instances in which he alleged that the prosecutor made improper comments during closing arguments in the guilt phase of the trial, and he claims this was a violation of article I, sections 8, 9, and 16 of the Tennessee Constitution and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The Petitioner also contends that the prosecutor improperly commented on the Petitioner's invocation of his right to a jury trial during rebuttal closing arguments in the penalty phase. In denying relief, the post-conviction court found that the Petitioner's claims of prosecutorial misconduct were waived and/or previously determined. The Petitioner asserts that the post-conviction court failed to make adequate findings of facts and conclusions of law. We conclude that the post-conviction court's findings are adequate for appellate review.

The Petitioner raised numerous challenges on direct appeal to the prosecutor's statements during closing arguments in both phases of the trial, and this court held that the prosecutor's comments did not rise to the level of plain error. *See Dotson*, 450 S.W.3d at 99-101 (appendix). To the extent that the Petitioner challenges the same statements by the prosecutor as a stand-alone claim, this claim is previously determined and cannot be the basis for post-conviction relief. *See* T.C.A. § 40-30-106(h); *Lemaricus Davidson v. State*, No. E2019-00541-CCA-R3-PD, 2021 WL 3672797, at *43 (Tenn. Crim. App. Aug. 19, 2021), *perm. app. denied* (Tenn. Dec. 8, 2021) (holding that the petitioner's challenge raised in post-conviction proceedings to the trial court's handling of juror questions throughout the trial was previously determined when the petitioner raised the issue on direct appeal). The remaining claims are waived because the Petitioner did not present the specific challenges on direct appeal even though he had the opportunity to do so. *See* T.C.A. § 40-30-106(g); *Richard Lloyd Odom*, 2017 WL 4764908, at *36.

## IX: The Constitutionality of the Death Penalty and the Method of Execution

The Petitioner challenges the proportionality reviewed employed by the Tennessee Supreme Court as violating article I, sections eight and sixteen of the Tennessee

Constitutions and the Eighth and Fourteenth Amendments to the United States Constitution. He specifically challenges the Court's limiting the pool of cases considered in the proportionality review to those cases in which a capital sentencing hearing was conducted and argues that "the appropriate sample for proportionality comparison must be every case in which the State charges a crime in which an element is the death of a human being." On direct appeal, the Petitioner challenged the constitutionality of the proportionality review, which limited the pool of cases for comparison to only those cases in which a capital sentencing hearing has been conducted. *Dotson*, 450 S.W.3d at 77-78. The Tennessee Supreme Court addressed the issue on its merits and rejected the Petitioner's claim. *Id.* at 78. Although the Petitioner did not argue on direct appeal that the Tennessee Supreme Court should expand its proportionality review to include not just all first degree murder cases but all homicide offenses, the ground could have been presented on direct appeal, and the Petitioner waived the claim by failing to do so. *See* T.C.A. § 40-30-106(g). Furthermore, the Tennessee Supreme Court has upheld the limitation of the pool of cases for comparison for purposes of proportionality review to those cases in which a capital sentencing hearing has been conducted. *See State v. Clayton*, 535 S.W.3d 829, 852-53 (Tenn. 2017); *State v. Pruitt*, 415 S.W.3d 180, 216-17 (Tenn. 2013).

The Petitioner argues that Tennessee's thirteenth juror rule violates the holding in *Hurst v. Florida*, 577 U.S. 92 (2016), issued after the Petitioner's direct appeal concluded, because the rules require the trial judge to make findings regarding the jury's verdict in the penalty phase of a capital trial. This court, however, has held that "the *Hurst* holding is inapt as a challenge to the thirteenth juror rule." *Lemaricus Davidson*, 2021 WL 3672797, at *50 (citing *Nicholas Todd Sutton v. State*, No. E2018-00877-CCA-R3-PD, 2020 WL 525169, at *7 (Tenn. Crim. App. Jan. 31, 2020)).

The Petitioner asserts that a death sentence violates the fundamental right to life and does not promote any compelling state interest. The Tennessee Supreme Court has rejected this claim. *See, e.g., State v. Sexton*, 368 S.W.3d 371, 427 (Tenn. 2012) (citing *State v. Hester*, 324 S.W.3d 1, 80 (Tenn. 2010); *State v. Bush*, 942 S.W.2d 489, 523 (Tenn. 1997) (appendix)).

The Petitioner maintains that the imposition of the death penalty disregards his rights under various treaties and international law in violation of the Supremacy Clause in Article VI, Clause 2 of the United States Constitution. Our supreme court has concluded that "'[t]he authorities appear to be universal that no customary or international law or international treaty prohibits a state from imposing the death penalty as a punishment for certain crimes.'" *Hester*, 342 S.W.3d at 80 (quoting *State v. Odom*, 137 S.W.3d 572, 599 (Tenn. 2004) (appendix)).

Relying upon the United States Supreme Court opinion in *Bush v. Gore*, the Petitioner argues that Tennessee lacks statewide standards for pursuing the death penalty and provides different treatment of person's fundamental right to life in violation of his right to equal protection. The Tennessee Supreme Court has rejected general challenges to the unlimited discretion to seek the death penalty vested in prosecutors in this state. *See State v. Keen*, 31 S.W.3d 196, 233 (Tenn. 2000) (appendix). This court has concluded that *Bush v. Gore*, a voting rights case, does not apply in the context of a criminal prosecution. *David Lynn Jordan v. State*, W2015-00698-CCA-R3-PD, 2016 WL 6078573, at *85 (Tenn. Crim. App. Oct. 14, 2016) (citing *Robert Faulkner v. State*, No. W2012-00612-CCA-R3-PD, 2014 WL 4267460, at *102 (Tenn. Crim. App. Aug. 29, 2014)).

The Petitioner maintains that his death sentences were imposed in an arbitrary and capricious manner, arguing that (1) no uniform standards or procedures for jury selection existed to ensure open inquiry concerning potentially prejudicial subject matter; (2) the Petitioner was prohibited from addressing each juror's misconceptions about matters relevant to sentencing; (3) the Petitioner was prohibited from presenting a final closing argument in the penalty phase since only the State is permitted a rebuttal argument; (4) the jury was required to agree unanimously to a life verdict in violation of *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), which prohibit a requirement that juries reach unanimous agreement as to the existence of mitigating circumstances; (5) a reasonable likelihood existed that jurors believed they were required to unanimously agree to the existence of the mitigating circumstances; and (6) the jury was not required to make the ultimate determination that death is the appropriate penalty. Each of these claims has been rejected by the courts of this state. *See, e.g., Richard Lloyd Odom*, 2017 WL 4764908, at *55; *David Lynn Jordan*, 2016 WL 6078573, at *85.

Relying upon *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Petitioner argues that his constitutional rights were violated because the aggravating circumstances upon which the State relied to seek the death penalty were not presented to the grand jury or included in the indictment. However, the aggravating circumstances need not be pled in the indictment, and the grand jury review is not constitutionally required for death notices. *David Lynn Jordan*, 2016 WL 6078573, at *85 (citations omitted).

The Petitioner maintains that the Tennessee Supreme Court's proportionality review process violates due process and that the appellate review process was not "meaningful" because (1) "the courts could not reweigh proof due to the absence of written findings concerning mitigating circumstances"; (2) "the information relied upon for comparative review was inadequate and incomplete"; and (3) "the methodology in

which only cases where a death sentence was upheld are reviewed is fundamentally flawed." This argument has been rejected. *See id.* at *86 (citing *State v. Banks*, 271 S.W.3d 90, 159 (Tenn. 2008)).

Finally, the Petitioner asserts that Tennessee's methods of execution violate due process and the prohibition against cruel and unusual punishment. He states that while courts have rejected these claims, he raises them to preserve them for further review. *See Abdur'Rahman v. Parker*, 558 S.W.3d 606, 625 (Tenn. 2018); *Lemaricus Davidson*, 2021 WL 3672797, at *50. Accordingly, he is not entitled to relief.

## X. Cumulative Error

The Petitioner maintains that he is entitled to relief due to the cumulative effect of the errors he has alleged above. We conclude that prejudice did not result from any single deficiency by trial counsel or the cumulative effect thereof. We have found no single instance where the Petitioner was otherwise denied his constitutional right to a fair and impartial trial. Therefore, there is no basis to conclude that any cumulative error resulted in an unfair trial.

## CONCLUSION

We conclude that the Petitioner is not entitled to post-conviction relief, and we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE